Richard A. Simpson (admitted *pro hac vice*)
RSimpson@wiley.law
Pamela L. Signorello (admitted *pro hac vice*)
PSignorello@wiley.law
Joseph W. Gross (admitted *pro hac vice*)
JGross@wiley.law
Ashley E. Eiler (admitted *pro hac vice*)
AEiler@wiley.law
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Facsimile: (202) 719-7049

Rebecca L. Hill, 06246
Rebecca.Hill@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111-2047
Telephone: (801) 323-5000
Facsimile: (801) 355-3472

*Attorneys for Plaintiff Continental Casualty Company*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, | |
|     Plaintiff, | Case No. 2:21-cv-00585-HCN-DBP |
| vs. | District Judge Howard C. Nielson, Jr. |
| PARAMOUNT FINANCIAL SERVICES, INC. D/B/A LIVE ABUNDANT, EMRON ANDREW, AARON ANDREW, KARL NELSON, JEREMY WATSON, SHAREE ANDREW, GREGORY DUCKWITZ, and J. SCOTT REYNOLDS, | |
|     Defendants. | |

---

## PLAINTIFF CONTINENTAL CASUALTY COMPANY'S
## MOTION FOR SUMMARY JUDGMENT
## <u>WITH INCORPORATED MEMORANDUM OF LAW</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

MOTION.......................................................................................................................1

MEMORANDUM OF LAW .........................................................................................2

STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF") .........................4

ARGUMENT ..............................................................................................................19

    I. The "Unregistered Security Exclusion" bars coverage for the Paramount Claims. ...... 21

      A.    The Woodbridge Claims "in any way involve" the investment in an unregistered security. ...................................................................................................... 21

      B.    The FIP Claims "in any way involve" the investment in an unregistered security.  24

    II. The Pension Benefits Exclusion independently bars coverage for the FIP Claims....... 26

    III.  The Bankruptcy Exclusion independently bars coverage for the Woodbridge Claims. .......................................................................................................................... 26

    IV.  At most, a single $1 million limit applies to the FIP Claims and, separately, the Woodbridge Claims, each of which involves Interrelated Wrongful Acts. .............. 28

    V.   Continental has provided the Insureds with a full defense in the Paramount Claims and is entitled to summary judgment on Defendants' Counterclaims....................... 36

CONCLUSION............................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Wal-Mart Stores, Inc.,*
144 F.3d 664 (10th Cir. 1998) ...................................................................19

*American Auto Insurance Co. v. B.D. McClure & Associates,*
No. 09-C-1589, 2010 U.S. Dist. LEXIS 140172 (N.D. Ill. Jan. 21, 2010)
(unpublished) .............................................................................................28

*American Casualty Co. of Reading, Pa. v. Belcher,*
709 F. App'x. 606 (11th Cir. 2017) ...........................................................35

*American Medical Security, Inc. v. Executive Risk Specialty Insurance Co.,*
393 F. Supp. 2d 693 (E.D. Wis. 2005)........................................................35

*America West Bank Members, L.C. v. State,*
342 P.3d 224 (Utah 2014)...........................................................................37

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.,*
855 P.2d 1263 (Cal. 1993) ..........................................................................34

*Berry & Murphy, P.C. v. Carolina Casualty Insurance Co.,*
586 F.3d 803 (10th Cir. 2009) ...............................................................33, 34

*Boelman v. Grinnell Mutual Reinsurance Co.,*
826 N.W.2d 494 (Iowa 2013) .................................................................20, 21

*Bryan Bros. Inc. v. Continental Casualty Co.,*
704 F. Supp. 2d 537 (E.D. Va. 2010) .........................................................35

*Camico Mutual Insurance Co. v. Rogozinski,*
No. 3:10-cv-762-J-32MCR, 2012 U.S. Dist. LEXIS 130648 (M.D. Fla. Sept.
13, 2012) (unpublished)..............................................................................35

*Ciber, Inc. v. ACE American Insurance Co.,*
261 F. Supp. 3d 1119 (D. Colo. 2017)........................................................34

*CNA Casualty v. E.C. Fackler, Inc.,*
836 N.E.2d 732 (Ill. App. Ct. 2005) ..........................................................27

*Continental Casualty Co. v. Orr,*
No. 8:07CV292, 2008 U.S. Dist. LEXIS 51205 (D. Neb. July 3, 2008)
(unpublished) .............................................................................................31

*Continental Casualty Co. v. Wendt*,
205 F.3d 1258 (11th Cir. 2000) ............................................................35

*Center For Excellence in Higher Education, Inc. v. RSUI Indemnity Co.*,
375 F. Supp. 3d 1217 (D. Utah 2019) ..............................................37, 38

*Derma Pen, LLC v. Sentinel Insurance Co., Ltd.*,
545 F. Supp. 3d 1177 (D. Utah 2021) ...................................................19

*Direct General Insurance Co. v. Houston Casualty Co.*,
139 F. Supp. 3d 1306 (S.D. Fla. 2015), *aff'd*, 661 F. App'x. 980 (11th Cir.
2016) ........................................................................................................36

*Dougherty v. VFG, LLC*,
118 F. Supp. 3d 699 (E.D. Pa. 2015) .....................................................24

*Employers Reinsurance Corp. v. Labow*,
No. 91-C-4004, 1992 U.S. Dist. LEXIS 9427 (N.D. Ill. June 26, 1992)
(unpublished) ..........................................................................................28

*Evans v. Huber*,
360 P.3d 862 (Utah Ct. App. 2016) ........................................................38

*Ganim v. Columbia Casualty Co.*,
No. 1:07 CV 1497, 2008 U.S. Dist. LEXIS 45251 (N.D. Ohio June 9, 2008)
(unpublished), *aff'd*, 574 F.3d 305 (6th Cir. 2009)..........................23, 24

*Global Fitness Holdings, LLC v. Federal Recovery Acceptance, Inc.*,
127 F. Supp. 3d 1228 (D. Utah 2015).....................................................39

*Great American Insurance Co. v. Woodside Homes Corp.*,
448 F. Supp. 2d 1275 (D. Utah 2006).....................................................20

*Gregory v. Home Insurance Co.*,
876 F.2d 602 (7th Cir. 1989) ..................................................................35

*Hamilton v. Standard Insurance Co.*,
516 F.3d 1069 (8th Cir. 2008) ................................................................20

*Hein v. American Family Mutual Insurance Co.*,
166 N.W.2d 363 (Iowa 1969) .................................................................21

*Highwoods Properties v. Executive Risk Indemnity, Inc.*,
407 F.3d 917 (8th Cir. 2005) ..................................................................31

*Kilcher v. Continental Casualty Co.*,
747 F.3d 983 (8th Cir. 2014) ..................................................................30

*Liberty Insurance Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*,
162 F. Supp. 3d 1068 (C.D. Cal. 2016), *aff'd*, 708 F. App'x. 374 (9th Cir. 2017) ................................................................................................35

*Monroe County v. International Insurance Co.*,
609 N.W.2d 522 (Iowa 2000) ......................................................................23

*Morden v. XL Specialty Insurance*,
903 F.3d 1145 (10th Cir. 2018) ...............................................................31, 32

*Park Cityz Realty, LLC v. Archos Capital, LLC*,
No. 2:20-CV-00522-JCB, 2021 U.S. Dist. LEXIS 208428 (D. Utah Oct. 27, 2021) (unpublished) ..............................................................................38, 39

*S.W. Energy Corp. v. Continetal Insurance Co.*,
974 P.2d 1239 (Utah 1999) ..........................................................................21

*Saleh v. Farmers Insurance Exchange*,
133 P.3d 428 (Utah 2006) ............................................................................21

*Sandoval v. State Farm Mutual Automobile Insurance Co.*,
No. 1:21-CV-171-TC, 2022 U.S. Dist. LEXIS 112390 (D. Utah June 23, 2022) ..........................................................................................................37

*Saoud v. Everest Indemnity Insurance Co.*,
564 F. Supp. 3d 597 (E.D. Mich. 2021), *aff'd*, No. 21-1621, 2022 U.S. App. LEXIS 19531 (6th Cir. July 14, 2022) (unpublished) ...............................22, 23, 24

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ...............................................................................21, 24

*Silvest v. Monumental General Insurance Co.*,
No. 92-3336, 1993 U.S. App. LEXIS 17418 (7th Cir. July 9, 1993) (unpublished) ..............................................................................................20

*Simms v. Metropolitan Life Insurance Co.*,
685 P.2d 321 (Kan. Ct. App. 1984) ..............................................................20

*In re SRC Holding Corp.*,
545 F.3d 661 (8th Cir. 2008) ........................................................................23

*Starr Indemnity & Liability Co. v. MonaVie, Inc.*,
No. 2:14-cv-00395-DN, 2019 U.S. Dist. LEXIS 43015 (D. Utah March 15, 2019) (unpublished) ..................................................................................34

*Templeton v. Catlin Specialty Insurance Co.*,
612 F. App'x. 940 (10th Cir. 2015) ...........................................................32, 33

*Templeton v. Fehn*,
   No. 12-cv-00859-RPM, 2014 U.S. Dist. LEXIS 85639 (D. Colo. June 24, 2014) (unpublished) .................................................................................................33

*Transamerica Insurance Co. v. South*,
   125 F.3d 392 (7th Cir. 1997) ...........................................................................27

*Transamerica Insurance Co. v. South*,
   975 F.2d 321 (7th Cir. 1992) ...........................................................................27

*Travelers Properties Casualty Co. of America v. Federal Recovery Services, Inc.*,
   156 F. Supp. 3d 1330 (D. Utah 2016)..............................................................36

*UBS Finanical Services, Inc. v. XL Specialty Insurance Co.*,
   929 F.3d 11 (1st Cir. 2019) ..............................................................................24

*W3i Mobile, LLC v. Westchester Fire Insurance Co.*,
   632 F.3d 432 (8th Cir. 2011) ...........................................................................24

*White v. Continental Casualty Co.*,
   No. 5:07-cv-62-Oc-10-GRJ, 2008 U.S. Dist. LEXIS 39171 (M.D. Fla. May 14, 2008) (unpublished) ................................................................................27

**Statutes**

Securities Exchange Act of 1933 .............................................................................22

Securities Exchange Act of 1934 .............................................................................23

**Other Authorities**

Fed. R. Civ. P. 37 ....................................................................................................38

Stephanie Powers, *Indexed Universal Life Insurance*, Investopedia (May 27, 2020), https://www.investopedia.com/articles/insurance/09/indexed-universal-life-insurance.asp (last visited Feb. 6, 2023) ..........................................................9

## MOTION

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1, Continental Casualty Company ("Continental") moves for summary judgment determining that (1) the "Unregistered Securities Exclusion" bars coverage for both the "FIP Claims" and the "Woodbridge Claims" (Count II); (2) the "Pension Benefits Exclusion" independently bars coverage for the "FIP Claims" (Count III); and (3) the "Bankruptcy Exclusion" independently bars coverage for the "Woodbridge Claims" (Count IV).[1]

Alternatively, Continental is entitled to partial summary judgment declaring that (1) the "FIP Claims" involve the same **Wrongful Acts** or **Interrelated Wrongful Acts,** such that a single $1 million per **Claim** limit of liability applies to the "FIP Claims" (Count V); (2) the "Woodbridge Claims" involve the same **Wrongful Acts** or **Interrelated Wrongful Acts**, such that a single $1 million per **Claim** limit of liability applies to the "Woodbridge Claims" (Count VI); (3) the single $1 million per **Claim** limit of liability applicable to the "FIP Claims" applies to the "Hybrid Lawsuit" to the extent it incorporates "FIP Claims" on the basis that the "Hybrid Lawsuit" and the "FIP Claims" involve the same **Wrongful Acts** or **Interrelated Wrongful Acts** (Count VII); and (4) the single $1 million per **Claim** limit of liability applicable to the "Woodbridge Claims" applies to the "Hybrid Lawsuit" to the extent it incorporates "Woodbridge Claims" on the basis that the "Hybrid Lawsuit" and the "Woodbridge Claims" involve the same **Wrongful Acts** or **Interrelated Wrongful Acts** (Count VIII).[2]

---

[1] Words in quotation marks are defined in the incorporated memorandum of law. Words in bold throughout this motion and incorporated memorandum of law are defined in the relevant policy.

[2] In Count I of its Complaint, Continental raised an additional bar to coverage – namely, that the "Paramount Claims" are not **Claims** for **Wrongful Acts** solely in rendering or failing to render **Professional Services**. If the Court grants this motion, Count I would become moot. Continental reserves its right to pursue Count I at trial if necessary.

Finally, Continental moves for summary judgment on Defendants' Counterclaims because Continental has provided Defendants with a full defense in all of the relevant underlying **Claims**, and no Defendant has funded any portion of its or his own defense in these matters or otherwise experienced any damage.

## MEMORANDUM OF LAW

### Introduction and Relief Requested

Paramount Financial Services, Inc. d/b/a Live Abundant ("Paramount") markets and sells indexed universal life insurance ("IUL") policies. An IUL is a type of permanent life insurance whose cash value growth by investment can be used to lower or fully pay the premium without lowering the death benefit. In conjunction with its sale of IULs, Paramount (through its affiliated Life Agents) also engages in certain financial and retirement planning activities for its clients, including for the purpose of funding the IULs. The underlying claims at issue in this insurance coverage action arise out of those activities. In two distinct sets of claims brought against Continental's **Insureds**,[3] the underlying claimants allege that the **Insureds** negligently engaged in financial and retirement planning activities by recommending (and misrepresenting) two specific investments intended to fund the IULs, both of which ultimately failed, financially damaging the **Insureds'** clients. In the first such set of claims (the "FIP Claims"), claimants challenge the **Insureds'** recommendation that they invest in pension income streams through Future Income Payments, LLC ("FIP"), a Ponzi scheme that ceased operations in April 2018, owing nearly $300 million in unpaid investor payments to over 2,600 individuals. In the second set of claims (the "Woodbridge Claims"), claimants challenge the **Insureds'** recommendation that they invest in real

---

[3] Defendants Emron Andrew, Aaron Andrew, Karl Nelson, Jeremy Watson, Sharee Andrew, Gregory Duckwitz, and J. Scott Reynolds (collectively, the "Individual Defendants" and together with Paramount, "Defendants" or the "**Insureds**") are or were Paramount-affiliated Life Agents.

estate through Woodbridge Group of Companies LLC ("Woodbridge"), a $1.2 billion Ponzi scheme that went bankrupt in 2017.

Continental provides insurance coverage to Defendants under a group life agent professional liability insurance policy for specified types of claims made against them. The relevant policy includes certain exclusions and limitations, several of which apply to bar coverage for the FIP Claims and/or the Woodbridge Claims (together, the "Paramount Claims").

As explained below, Continental is entitled to summary judgment determining that there is no coverage for the Paramount Claims under the subject policy on the following grounds: (1) the "Unregistered Security Exclusion" bars coverage for all of the Paramount Claims because all of the Paramount Claims involve investments in unregistered securities (Count II); (2) the "Pension Benefits Exclusion" bars coverage for the FIP Claims because the FIP Claims involve the assignment or purchase of pension benefits (Count III); and (3) the "Bankruptcy Exclusion" bars coverage for the Woodbridge Claims because the Woodbridge Claims involve the bankruptcy of an entity in which **Insureds** recommended placement of **Client** funds (Count IV).

Alternatively, if the Court determines that coverage is not barred in full, Continental is entitled to partial summary judgment determining that (1) a single $1 million per **Claim** limit of liability applies to the FIP Claims, which involve the same or **Interrelated Wrongful Acts** (Count V); (2) a single $1 million per **Claim** limit of liability applies to the Woodbridge Claims, which involve the same or **Interrelated Wrongful Acts** (Count VI); and (3) the limits of liability applicable to the FIP Claims and Woodbridge Claims apply to the "Hybrid Lawsuit" (defined below) to the extent that it incorporates FIP Claims and Woodbridge Claims, respectively (Counts VI and VIII).

Additionally, Continental is entitled to summary judgment on all of Defendants' Counterclaims because they are premised on the Paramount Claims being covered by the subject policy, which they are not. Moreover, Continental has provided — and continues to provide — the **Insureds** with a full defense in the Paramount Claims, having paid in excess of $1 million in **Defense Costs** to date, and no **Insured** has funded any portion of its own defense or otherwise experienced any damage.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

### *The Master Policy*

1. Continental issued Life Agent Professional Liability Policy No. 287287986 (the "Master Policy") to Mercer Financial Services Professional Risk ("Mercer") for the **Policy Period** incepting on October 1, 2008. *See* Ex. A, Declaration of Terry Curtis ("Mercer Decl."), at ¶ 3, Ex. A.1, Master Policy, Declarations.[4]

2. The Master Policy has a $1 million per **Claim** limit of liability and a $20 million **Policy Year** aggregate limit of liability, inclusive of **Defense Costs**. *See* Ex. A.1, Master Policy, Endorsement 1 (the "Life Agent Professional Liability Aggregate Endorsement").

3. Subject to its terms, the Master Policy provides coverage for **Loss** that an **Insured** becomes legally obligated to pay resulting from a **Claim** for a **Wrongful Act** solely in rendering or failing to render **Professional Services**. *See id.*, § I, Insuring Agreement.

4. The Master Policy defines **Claim** to include "a written demand for monetary damages" or "a civil adjudicatory or arbitration proceeding for monetary damages" against an

---

[4] Mercer is a risk purchasing group formed to obtain group liability insurance coverage for groups of insureds engaged in similar businesses or activities. *See* Mercer Decl. ¶ 2.

**Insured** for a **Wrongful Act** brought by or on behalf of or for the benefit of any **Client**. *Id.*, § III, Definitions, Claim.

5. The Master Policy defines **Wrongful Act** to mean a negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**. *See id.*, § III, Definitions, Wrongful Act.

6. The Master Policy defines **Professional Services** to mean:

> with respect to an **Agent** or **General Agent**, to the extent they are provided in the course and scope of such **Agent** or **General Agent's** business as an **Agent** or **General Agent** and such **Agent** or **General Agent** has the appropriate license in both the **Client's** resident state or jurisdiction and the state or jurisdiction in which the business is conducted:
>
> 1. the sale, attempted sale or servicing of life insurance, accident and health insurance or managed health care organization contracts (that does not require a securities license);
> 2. the sale, attempted sale or servicing of disability income insurance (if purchased as indicated on the **Certificate of Insurance**);
> 3. the sale, attempted sale or servicing of indexed/fixed annuities (if purchased as indicated on the **Certificate of Insurance**);
> 4. services as a Notary Public;
> 5. financial planning activities in conjunction with services described in paragraphs 1. through 4. (if purchased) of this definition, whether or not a separate fee is charged;
> 6. the supervision, management and training of an **Agent** by a **General Agent** with respect to activities otherwise covered by this Policy.

*Id.*, § III, Definitions, Professional Services.

7. The Master Policy excludes coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or in any way involving the use of or investment in any security that is not registered with the Securities and Exchange Commission." *Id.*, § XVI.W, Exclusions, Investment in Specified Securities or Funds (the "Unregistered Security Exclusion").

8. The Master Policy also excludes coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or in any way involving the actual or

alleged sale, assignment or purchase of any stream of income or benefits originally payable to another person or entity, including but not limited to retirement, pension, disability, insurance or annuity benefits." *Id.*, Endorsement No. 24 (the "Pension Benefits Exclusion").

9.    The Master Policy further excludes coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or in any way involving the insolvency, receivership, conservatorship, liquidation, bankruptcy or inability to pay of a natural person, entity, benefit plan, insurance company, managed health care organization, reinsurer, risk retention group or captive (or any self insurance plan or trust by whatsoever name), or limited partnership in which the **Insured** has placed business or obtained insurance coverage, or placed or recommended placement of the funds of a **Client**; however, notwithstanding the foregoing, the Insurer shall have the right and duty to defend the **Insured** in any suit alleging acts described above, provided the **Claim** arises from the **Insured's** placement of coverage with an admitted Insurer with an A.M. Best rating of 'A-' or better at the time of placement." *Id.*, § XVI.I, Exclusions, Insolvency (the "Bankruptcy Exclusion").

10.    The Master Policy explicitly addresses how multiple matters involving the same or related facts or circumstances will be considered for potential coverage under the Master Policy; this is relevant to, among other things, whether a single "per **Claim**" limit of liability will apply to multiple matters.  Specifically, the Master Policy provides that "[m]ore than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** *shall be considered as one **Claim***." *Id.*, § VI.E, Limit of Liability, Retention and Allocation, Interrelated Wrongful Acts (italic emphasis added).

11.    The Master Policy defines **Interrelated Wrongful Acts** to mean "any **Wrongful Acts** which are *logically or causally connected* by reason of *any* common fact, circumstance,

situation, transaction or event." *Id.*, § III, Definitions, Interrelated Wrongful Acts (italic emphasis added). **Wrongful Acts** are defined as "any negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**." *Id.*, § III, Definitions, Wrongful Acts.

12.     The Master Policy provides:

> The amount set forth as the **Policy Year** Per **Claim** Aggregate Limit of Liability in paragraph 1. of this Endorsement [$1,000,000] shall be the maximum Aggregate Limit of Liability of the Insurer for each **Claim**, *regardless of the number of* **Insureds**, **Certificates of Insurance**, **Claims** *made, or persons or entities bringing such* **Claims**.

*Id.*, § VI, Limit of Liability, Retention and Allocation, as amended by Endorsement No. 1 (italic emphasis added).

13.     The Master Policy further provides: "[T]he Insurer shall not be obligated to pay any **Loss** to defend or continue to defend any **Claim** after the applicable limit of the Insurer's liability has been exhausted by payment of **Loss**." *Id.*, § II.A.1., Defense, Defense of Claims.

14.     Subject to identified exceptions not at issue in this motion, the Master Policy defines **Loss** generally to include monetary settlements, monetary judgments, and **Defense Costs** for which the **Insured** is legally obligated to pay on account of a covered **Claim**. *Id.*, § III, Definitions, Loss.

### *Certificates of Insurance*

15.     The Individual Defendants, each of whom was a Life Agent affiliated with Paramount, participate in the Master Policy by virtue of Certificates of Insurance issued to them.

*See* Answer (Dkt. 10), ¶¶ 10-16, 23; Mercer Decl. ¶¶ 4-5, Exs. A.2 & A.3, Certificate Delivery Emails & Certificates of Insurance.

16.     The Certificates of Insurance are not, themselves, insurance.  Rather, they make clear that they are "merely evidence of insurance provided under and subject to the Master Policy" and that "[a]ll claims are subject to the terms, conditions, limitations and exclusions of the Master Policy." *See* Ex. A.3, Certificates of Insurance.  According to each Certificate of Insurance: "THIS CERTIFICATE OF INSURANCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND, OR ALTER THE COVERAGE AFFORDED BY THE INSURANCE POLICY." *See id*.

17.     Each Certificate of Insurance reiterates in bold, capitalized type that it is "SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF" the Master Policy. *See id*.

18.     According to each Certificate of Insurance: The Master Policy "is also subject to a Policy Year aggregate limit of liability of $20,000,000.  The Policy Year aggregate limit of liability will be reduced by claims paid on behalf of all Insureds under the policy, including you.  The Policy Year aggregate limit includes the total per claim/aggregate limits of the insurer regardless of the total number of Insureds under the Policy, the total number of Certificates of Insurance issued under the policy, Claims made under the policy, or persons or entities bringing such Claims." *See id*.

19.     A copy of the Master Policy Form (only not including state-specific endorsements relevant to states in which the **Insureds** do not reside) was delivered to each of the individual **Insureds**. *See* Mercer Decl. ¶¶ 6-7, Ex. A.4, Master Policy Form.

20.     As noted in the cover letter issued with each Certificate of Insurance: "Upon initial coverage issuance, a copy of the Master Policy will be attached with this email message. Alternatively, you may access the Master Policy online at www.renewmyeo.com." *See* Ex. A.3, Certificates of Insurance.

21.     Likewise, each Certificate of Insurance also specifies that "[a] copy of such [Master Policy] and any endorsements thereto is available at www.eoforless.com." *See id*.

### *Indexed Universal Life Insurance*

22.     Paramount markets and sells indexed universal life insurance ("IUL") policies. An IUL is a type of permanent life insurance whose cash value growth by investment can be used to lower or fully pay the premium without lowering the death benefit. *See generally* Stephanie Powers, *Indexed Universal Life Insurance*, Investopedia (May 27, 2020), https://www.investopedia.com/articles/insurance/09/indexed-universal-life-insurance.asp (last visited Feb. 6, 2023).

23.     In conjunction with its sale of IULs, Paramount (through its affiliated Life Agents) also engages in certain financial and retirement planning activities for its clients, including for the purpose of funding the IULs. *See* Ex. A.1, Master Policy, Definitions, Professional Services.

### *The FIP Claims*

24.     Beginning in 2018, the numerous lawsuits and non-suited demands constituting the FIP Claims were brought against the **Insureds** concerning their recommendation that their clients invest in pension income streams through FIP.[5] True and correct copies of the pertinent pleadings

---

[5] Pension income streams are a type of "structured cash flow."

filed in the FIP Claims (without exhibits) are attached as Exs. B.1-B.25 to the Declaration of Pamela L. Signorello (the "Wiley Decl.") ¶¶ 2-26.[6]

25.     Each of the FIP Claims purports to be brought on behalf of one or more clients of one or more of the **Insureds** who invested in the pension income streams, which were funded by pension benefits owed to individual pensioners who received up-front, lump-sum payments from FIP in exchange for their agreement to provide FIP with a portion of their monthly pension payments over a specific term. *See id.*

26.     In or around April 2018, FIP ceased collecting payments from pensioners and, consequently, ceased making payments to the pension income stream investors, including the **Insureds'** clients (plaintiffs in the FIP Claims). *See* Indictment, *United States v. Kohn*, Cr. No. 6:19-239 (D.S.C.) (Doc. No. 2), a true and correct copy of which is attached as Wiley Decl. ¶ 27, Ex. B.26.

27.     On March 12, 2019, FIP and its principal were indicted on federal criminal charges. According to the Indictment, beginning in or about April 2011:

> FIP actively recruited pension holders (described as "sellers" in FIP nomenclature) who found themselves in acute financial distress and were desperate for money. In exchange for the *pensioner selling, assigning, or promising to pay monthly pension payments to FIP*, the pensioner received a lump sum payment or loan.

*Id.* ¶ 3 (emphasis added).

28.     The Indictment alleges:

> Working through a network of investment advisors and insurance agents, FIP solicited investors (described as "buyers" in FIP nomenclature) to *purchase "structured cash flows" (i.e., pensioner monthly pension payments)*. FIP represented that its structured cash flows would provide higher rates of return than traditional fixed income products. FIP allowed investors to use nonqualified or

---

[6] Continental understands that the originally non-suited FIP Claims (in the form of demand letters issued to the **Insureds**) have since been incorporated into the suited FIP Claims. Accordingly, those demands are not included as exhibits hereto.

qualified (i.e., IRA/ROTH) funds and promised a rate of return of between 6.5 percent and 8 percent based on the term and source of pension funds.

*Id.* ¶ 6 (emphasis added).

29. According to the Indictment: "As state regulators began prohibiting FIP from operating in various states and pensioners struggled under a usurious payment regime imposed on them, FIP diverted new investor funds flowing into the business to fund payments to earlier investors to keep the scheme and artifice operational. In this manner, the investment program operated by FIP was a 'Ponzi scheme.'" *Id.* ¶ 9.

30. The FIP Claims challenge the **Insureds'** alleged recommendation that their clients invest in FIP as the primary funding mechanism for their purchase of IUL policies from the **Insureds**. *See, e.g.*, Ex. B.1, Anderson FAC ¶ 39; Ex. B.2, Argueta Answer, Affirmative Defense No. 4; Ex. B.3, Auduong FAC ¶ 43; Ex. B.4, Bartlett FAC ¶ 41; Ex. B.5, Belcher FAC ¶ 41; Ex. B.6, Bennett FAC ¶ 38; Ex. B.8, Braybrook FAC ¶ 35; Ex. B.9, Buman FAC ¶ 59; Ex. B.10, D'Silva FAC ¶ 46; Ex. B.11, Freck FAC ¶ 36; Ex. B.12, Galvis Complaint ¶ 36; Ex. B.13, Hansen FAC ¶ 36; Ex. B.16, Heath First Amended Answer, Intent to Apportion Fault to Non-Party; Ex. B.17, Kane FAC ¶ 34; Ex. B.18, Mendenhall FAC ¶ 36; Ex. B.19, Palmer FAC ¶ 36; Ex. B.20, Pew FAC ¶ 34; Ex. B.21, Ramirez Complaint ¶ 35; Ex. B.22, Reiman Answer to FAC, Intent to Apportion Fault to Non-Party; Ex. B.23, Roob FAC ¶ 59; Ex. B.24, Thompson FAC ¶ 55; Ex. B.25, Wilkerson FAC ¶ 41.

31. As plaintiffs in one FIP Claim alleged: "It was a scheme to sell indexed life insurance with unaffordable premiums in conjunction with a speculative, high-risk investment hoping to generate income to fund the insurance premiums." Ex. B.14, Harvey FAC ¶ 14.

32. Based on the recommendation of the **Insureds**, plaintiffs in the FIP Claims allegedly "purchased FIP structured cash flows in conjunction with the purchase of IUL policies.

Plaintiffs used the income stream from the structured cash flows to 'fully fund' their IUL policies faster and at higher levels." Ex. B.1, Anderson FAC ¶ 44.

33.     Paramount allegedly "designed the Life Insurance Retirement Strategy so that Plaintiffs would rely on and use the income stream from the FIP structured cash flow products to pay the premiums for their IUL policies, which were the tentpole of the Life Insurance Retirement strategy." *See id.* ¶ 43.

34.     According to plaintiffs in one FIP Claim: "Defendants did not inform or disclose to Plaintiffs that the FIP Structured Cash Flow product was a high-risk transaction involving an *unregistered investment that was not approved by...the SEC*." Ex. B.14, Harvey FAC ¶ 38 (italic emphasis added).

### *The Woodbridge Claims*

35.     On December 4, 2017, Woodbridge filed for bankruptcy. *See In re: Woodbridge Group of Companies, LLC*, Case No. 17-12560 (Bankr. D. Del.).

36.     In August 2019, Robert Shapiro, the former owner and CEO of Woodbridge, pled guilty to conspiracy to commit mail and wire fraud and evasion of payment of federal income taxes, in connection with which he submitted a Stipulated Factual Proffer in which he admitted that, from in or around July 2012 through in or around December 2017, he conspired "to defraud investors and obtain money and property by materially false and fraudulent pretenses, representations, and promises in connection with the sale of promissory notes and units[.]" *See* Stipulated Factual Proffer (the "Woodbridge Proffer"), *United States v. Shapiro*, Case No. 19-cr-20178-CR-CMA (S.D. Fla.) (Doc. 140), a true and correct copy of which is attached as Wiley Decl. ¶ 28, Ex. B.27.

37. According to the Woodbridge Proffer, during the conspiracy, Woodbridge "primarily sold two types of investments to investors: (a) short-term promissory notes that purportedly paid investors monthly interest that Woodbridge described as a First Position Commercial Mortgage ('FPCM'); and (b) unit offerings with five-year terms ('Fund Offerings') that were sold to investors that also falsely and fraudulently claimed to pay investors interest payments. [Mr. Shapiro] and his co-conspirators misleadingly claimed that these investments were adequately secured by real property owned by third-party borrowers, and thus safe." *Id.*, at p. 4.

38. The Woodbridge Proffer acknowledged that, from in or around August 2012 through in or around December 2017, Woodbridge raised approximately $1.29 billion from approximately 10,000 investors, which Woodbridge solicited through various means, including "a nationwide network of hundreds of external sales agents." *Id.*

39. "Contrary to representations to investors, [the] real estate portfolio failed to generate sufficient cash flow, so the…properties were unable to satisfy the loan obligations and interest payments owed to Woodbridge and its investors. To make up for the cash deficiency and without disclosing the material risks associated with that growing deficiency, [Mr. Shapiro] diverted recently collected investors' funds to pay purported profits to prior investors. As a result of this improper diversion, hundreds of millions of dollars invested by new investors were misused to pay false and misleading 'returns' to existing Woodbridge investors." *Id.* at p. 6.

40. According to the Woodbridge Proffer: "During the course of the conspiracy, at least five states, including Texas, Massachusetts, Arizona, Pennsylvania, and Michigan, issued cease and desist orders against one or more of the Woodbridge entities based on their *unregistered sale of securities*." *Id.* at p. 7 (emphasis added).

41.     The lawsuit styled *Duennebeil v. Paramount Financial Services, Inc., d/b/a Live Abundant,* Case No. 180903806 (3d Jud. Dist. Ct., Salt Lake Cnty., Utah) (the "*Duennebeil* Lawsuit"), the single standalone Woodbridge Claim, challenges the **Insureds'** recommendation and facilitation of their clients' investments in Woodbridge.   A true and correct copy of the operative Second Amended Complaint filed in the *Duennebeil* Lawsuit is attached as Wiley Decl. ¶ 29, Ex. B.28.

42.     According to plaintiffs in the *Duennebeil* Lawsuit, as part of the financial planning offered in conjunction with their sale of life insurance policies and other insurance products, the **Insureds** also allegedly "recommended" and "facilitated" investments intended to fund the insurance products.  *See id.* ¶¶ 24, 29.

43.     Specifically, according to plaintiffs in the *Duennebeil* Lawsuit, "[i]n order to fund the Insurance Products [that the **Insureds**] marketed to Plaintiffs, [the **Insureds**] would recommend real-estate investments that [they] claimed would produce income sufficient to fund the marketed Insurance Products…."  *Id.*, at p. 2.   Plaintiffs allege that the investments were "fraudulent" and that, through the exercise of reasonable care, the **Insureds** "should have known" that they were fraudulent, "inappropriate and inadvisable" for their clients.  *Id.* at p. 3.   According to the *Duennebeil* plaintiffs:

> By failing to adequately investigate and understand the risks associated with the Real-Estate Investments and failing to inform Plaintiffs of the same, Defendants violated their fiduciary duties to Plaintiffs and acted negligently.   As a result of Plaintiffs' breach of their fiduciary duties and negligent conduct, Plaintiffs suffered dramatic losses to their retirement savings.

*Id.*

44.     As evidenced by the **Insureds'** motion for directed verdict filed during the trial of the *Duennebeil* Lawsuit – which indicates that "the jury will be asked to decide whether the

Defendants should have known Woodbridge was not a suitable investment and whether Defendants conducted adequate due diligence" – the "real-estate investments" at issue in the *Duennebeil* Lawsuit were investments in Woodbridge. Plaintiffs claimed that they "lost funds due to the Woodbridge bankruptcy." *See* Defendants' Rule 50(A) Motion for Judgment, *Duennebeil* Lawsuit, a true and correct copy of which is attached as Wiley Decl. ¶ 30, Ex. B.29, at pp. 8, 11.

45.     The Jury Instructions issued to the jury following the trial of the *Duennebeil* Lawsuit identify the "background of the case" as follows:

> Each of the plaintiffs was a client of Live Abundant who *bought a Woodbridge product* and worked with either Aaron Andrew, Karl Nelson, Jeremy Watson or Marcus Maxfield in the process of purchasing the Woodbridge product.
>
> The plaintiffs claim Live Abundant and Douglas Andrew, Aaron Andrew, Karl Nelson, Jeremy Watson, and Marcus Maxfield, individually, *recommended that Plaint.ifs invest in the Woodbridge investment products*. In so doing, plaintiffs contend that each of the defendants breached a fiduciary duty they owed to the plaintiffs in connection with the Woodbridge real estate investment, by *failing to conduct due diligence into the Woodbridge products* before they were sold to the plaintiffs. They further claim that each defendant *failed to exercise reasonable care in connection with the Woodbridge real estate investment* by failing to properly understand and investigate the risks of the Woodbridge real estate investment. They also claim that each of the defendants *made misrepresentations and omissions about the Woodbridge real estate investment* that the plaintiffs each relied on when they chose to purchase the real estate investment, including that the real estate investments were safe and secure and that they were backed by an interest in real property.

Jury Instructions, *Duennebeil* Lawsuit, a true and correct copy of which is attached as Wiley Decl. ¶ 29, Ex. B.30, at pp. 5-6 (emphasis added).

46.     The parties to the *Duennebeil* Lawsuit stipulated that defendants therein "were compensated for some of Plaintiffs' investments in the Woodbridge Investments." *Id*. at p. 13.

47.     The Special Verdict Form for Apportionment completed by jurors following the trial of the *Duennebeil* Lawsuit further demonstrates that the only investments at issue in that matter were investments in Woodbridge, assigning percentages of fault to each of (1) defendants;

(2) plaintiffs; and (3) Woodbridge. *See Duennebeil* Lawsuit, Special Verdict Form, a true and correct copy of which is attached as Wiley Decl. ¶ 30, Ex. B.31, at p. 25.

48.     On January 29, 2020, in *In the Matter of Paramount Financial Services, Inc. d/b/a Live Abundant*, Administrative Proceeding File No. 3-19680, before the Securities and Exchange Commission (the "SEC"), the SEC entered an Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions (the "SEC Paramount Order"). A true and correct copy of the SEC Paramount Order is attached as Wiley Decl. ¶ 31, Ex. B.32.

49.     According to the SEC Paramount Order: "At all relevant times, Live Abundant…acted as an unregistered broker or dealer by selling securities of Woodbridge Group of Companies, Inc. ('Woodbridge') through its Supervisory Producer, Aaron A. Andrew ('Andrew')." *Id.*, p. 2.

50.     The SEC Paramount Order further states: "[B]etween from at least November 2015 and July 2017, *Live Abundant and Andrew offered and sold Woodbridge securities. None of Woodbridge's securities offerings were registered with the Commission.* Live Abundant and Andrew sold investors two primary types of securities: (1) a twelve-to-eighteen month term promissory note bearing 5%-8% interest that Woodbridge described as First Position Commercial Mortgages ('FPCM'), and (2) seven different private placement fund offerings with five-year terms ('Fund Offerings')….Andrew and Live Abundant received approximately $1.8 million in transaction based commissions from Woodbridge earned as a result of raising approximately $43 million through the sale of Woodbridge securities to investors." *Id.* (emphasis added).

*The Hybrid Lawsuit*

51.     Several additional lawsuits filed by clients of various **Insureds** were consolidated into the matter styled *Huwe v. Paramount Financial Services, Inc*, Civil No. 190906436 (3d Jud. Dist. Ct., Salt Lake Cnty., Utah) (the "Hybrid Lawsuit").  *See* Order Granting Stipulation and Joint Motion to Consolidate Cases, Hybrid Lawsuit (June 16, 2020), a true and correct copy of which is attached as Wiley Decl. ¶ 32, Ex. B.33.  A true and correct copy of the operative Second Amended Complaint filed in the Hybrid Lawsuit is attached as Wiley Decl. ¶ 33, Ex. B.34.

52.     Plaintiffs in the Hybrid Lawsuit "seek[] redress for the Plaintiffs who were harmed by retirement and financial planning activities Defendants provided to Plaintiffs."  Ex. B.34 ¶ 9.

53.     Specifically, plaintiffs in the Hybrid Lawsuit allege that defendants negligently advised clients with respect to a "Life Insurance Retirement Strategy," involving the recommendation of "alternative funding mechanisms administered by third parties" to fund IUL policies at a higher target level.  *See id*. ¶ 16.  The "Life Insurance Retirement Strategy" involves the **Insureds'** alleged advice that their clients purchase pension income streams through FIP.

54.     According to plaintiffs in the Hybrid Lawsuit, the **Insureds** "recommended these alternative funding mechanisms to Plaintiffs without adequately investigating or understanding the risks associated with those vehicles and further failed to communicate those risks to Plaintiffs."  *Id*. ¶ 21.

55.     Additionally, the Hybrid Lawsuit plaintiffs allege that defendants negligently advised clients with respect to an "Alternate Retirement Strategy," which the operative complaint describes as "an alternate retirement strategy wherein Plaintiffs would loan their money to a third party at a high interest rate, in return for monthly interest payments and a return of the principal

loan at the end of the loan term." *Id.* ¶ 23. The "Alternate Retirement Strategy" involves the **Insureds'** alleged advice that their clients purchase investments in Woodbridge.

56.     According to plaintiffs in the Hybrid Lawsuit, "[a]s a direct and proximate cause of Defendants' actions and inactions with regard to the Alternate Retirement Strategy recommendations, Plaintiffs suffered substantial losses." *Id.* ¶ 28.

57.     Based on the foregoing, plaintiffs in the Hybrid Lawsuit assert two causes of action against defendants therein: (1) negligence, and (2) breach of fiduciary duty. *See id.* ¶¶ 40-52.

### *Continental's Defense of the Insureds in the Paramount Claims*

58.     The Master Policy provides: "If a **Claim** is made against the **Insured**…, the Insurer shall have the right and duty to defend such **Claim**…. [T]he Insurer shall not be obligated to pay any **Loss** to defend or continue to defend any **Claim** after the applicable limit of the Insurer's liability has been exhausted by payment of **Loss**." *See* Ex. A.1, Master Policy, § II.A.1.

59.     Subject to a reservation of all of its rights, including with respect to the applicable limit of liability, Continental agreed to provide the **Insureds** with a defense in the Paramount Claims. *See* Ex. C, Declaration of Paula Toomey ("Continental Decl."), ¶ 2.

60.     Continental has paid and is continuing to pay the **Insureds' Defense Costs** in connection with the Paramount Claims subject to a reservation of rights pending the resolution of this insurance coverage action. See *id.* ¶ 3.

61.     Through January 23, 2023, the **Insureds'** defense counsel has submitted directly to Continental a total of 279 invoices identifying $1,229,131.68 in charges purportedly incurred in the defense of the Paramount Claims. *See id.* ¶ 4.

62.     Through February 15, 2023, Continental has issued payments directly to the **Insureds'** defense counsel for **Defense Costs** incurred in the Paramount Claims totaling

$1,065,635.00 (approximately 87% of the total charges submitted). *See id.* ¶ 5. The remainder of the outstanding charges either are under review by Continental or have been the subject of deductions taken by Continental as amounts that do not constitute **Defense Costs**, including for vendor costs for which no supporting invoice has been provided. *See id.*

63. Continental has not issued any payments, or been asked to issue any payments, directly to any **Insured** in connection with the Paramount Claims on the basis that any **Insured** has paid any **Defense Costs**, or otherwise. *See id.* ¶ 6.

64. No counsel retained to defend any **Insured** in the Paramount Claims has withdrawn its representation of an **Insured** for non-payment of invoices. *See id.* ¶ 7.

65. Defendants served Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) on February 25, 2022. A true and correct copy of the Initial Disclosures is attached as Wiley Decl. ¶ 40, Ex. B.39. For the computation of damages required by Fed. R. Civ. P. 26(a)(1)(A)(iii), Defendants stated, "N/A at this time." Ex. B.39., Section D.

66. Defendants have never supplemented these Initial Disclosures. Wiley Decl. ¶ 41.

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Derma Pen, LLC v. Sentinel Ins. Co., Ltd.*, 545 F. Supp. 3d 1177, 1189 (D. Utah 2021). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). While the Court must indulge all reasonable inferences in the non-moving party's favor, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome a

motion for summary judgment. *Great Am. Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1277 (D. Utah 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Because a master policy is the primary contract, the law applicable to the master policy controls when construing group insurance policies. *See Silvest v. Monumental Gen. Ins. Co.*, No. 92-3336, 1993 U.S. App. LEXIS 17418, at *9-10 (7th Cir. July 9, 1993) (unpublished) (holding that law applicable to group policyholder – not certificate of insurance holder – applies to coverage analysis); *Hamilton v. Standard Ins. Co.*, 516 F.3d 1069, 1073 (8th Cir. 2008) (same) (citing *Miller v. Home Ins. Co.*, 605 S.W.2d 778, 780 (Mo. 1980)) (adopting the "majority rule" that the law of the state where the master policy is delivered controls choice of law questions); *Simms v. Metro. Life Ins. Co.*, 685 P.2d 321, 325 (Kan. Ct. App. 1984) (same) (citing *Pound v. Ins. Co. of N. Am.*, 439 F.2d 1059, 1063 (10th Cir. 1971)) (observing that "the vast weight of decisions unite in holding that group insurance policies should be interpreted according to the law of the jurisdiction wherein the master policy was issued and delivered"). Here, the Master Policy was issued to Mercer in Iowa. Accordingly, Iowa law applies to its interpretation.

Under well-settled Iowa law, policy interpretation is "always a matter of law for the court," and the "plain meaning of the insurance contract generally prevails." *Boelman v. Grinnell Mut. Reinsurance Co.*, 826 N.W.2d 494, 501 (Iowa 2013). "The cardinal rule of construing insurance policies is that except in cases of ambiguity, the intent of the parties must control, and the court determines the intent of the parties by looking at what the policy itself says." *Id.* Policy language is ambiguous only if it is "susceptible to two *reasonable* interpretations." *Id.* (italics in original). A court applying Iowa law "will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase." *Id.* "An insurance policy is not ambiguous…just because the parties disagree as to the meaning of its terms." *Id.* at 502; *see*

*also id.* at 501 (stating that "[i]f the policy does not define a term, we give the word its ordinary meaning"); *Hein v. Am. Family Mut. Ins. Co.*, 166 N.W.2d 363, 366 (Iowa 1969) (stating that "clear and unambiguous language" in insurance policy "must be given its plain meaning").[7]

## I. The "Unregistered Security Exclusion" bars coverage for the Paramount Claims.

The underlying plaintiffs in *all* of the Paramount Claims base their claims on allegations that the **Insureds** recommended and/or facilitated their investments in unregistered securities in the form of (1) investments in pension income streams in the FIP Claims and (2) real estate investments in the Woodbridge Claims. *See* SUMF ¶¶ 24, 41. Under the circumstances, the Unregistered Security Exclusion – which precludes coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or *in any way involving* the use of or *investment in any security that is not registered* with the Securities and Exchange Commission" – unambiguously bars coverage for all of these matters because they "in any way involve" investments in unregistered securities. *Id.* ¶ 7.

### A. The Woodbridge Claims "in any way involve" the investment in an unregistered security.

The SEC already has concluded that the Woodbridge investments constituted securities not registered with the SEC. *See id.* ¶¶ 48-50. Specifically, in its Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions in *In the Matter of Paramount Financial Services, Inc. d/b/a Live Abundant*, Administrative Proceeding File No. 3-19680 (Jan. 29, 2020), the SEC held that "between from at least November 2015 and July 2017, Live Abundant and [Aaron] Andrew offered

---

[7] Utah law governing policy interpretation is to the same effect. *See, e.g., S.W. Energy Corp. v. Cont'l Ins. Co.*, 974 P.2d 1239, 1242 (Utah 1999); *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 433 (Utah 2006).

and sold Woodbridge securities," and "[n]one of Woodbridge's securities offerings were registered with the Commission." *Id.* ¶ 50; Ex. B.32.

The SEC's determination in this regard is entirely consistent with relevant law concerning "securities." As a fundamental matter, the Securities Act of 1933 (the "Securities Act") defines "security" to include an investment contract. *See* Section 2(a)(1) of the Securities Act; *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (holding that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party").

As recently as April 19, 2022, the SEC determined that investment contracts qualify as securities. In a Cease-and-Desist Order issued in *In the Matter of The Legal Funding Group of Georgia, LLC*, Administrative Proceeding File No. 3-20825 (April 19, 2022), the SEC found that respondents in that matter (a litigation funding company and its founder) offered and sold "investment contracts" the proceeds of which they used to fund their litigation funding business, pursuant to which investors were entitled to a percentage of profits generated in connection with the underlying litigation.[8] *See* Ex. B.35 ¶¶ 3-4. Because respondents "did not file or cause to be filed a registration statement with the Commission in connection with their offer and sale of investment contracts, and no exemption from registration was available," the SEC determined that the respondents violated Section 5(a) of the Securities Act, which prohibits the sale of unregistered securities. *See id.*, ¶¶ 9-10.

In *Saoud v. Everest Indemnity Insurance Co.*, 564 F. Supp. 3d 597 (E.D. Mich. 2021), *aff'd*, No. 21-1621, 2022 U.S. App. LEXIS 19531 (6th Cir. July 14, 2022) (unpublished), the United

---

[8] A true and correct copy of the Cease-and-Desist Order is attached as Wiley Decl., Ex. B.35.

States District Court for the Eastern District of Michigan, applying Michigan law, held that an "unregistered security" exclusion substantially similar to the one found in the Master Policy barred coverage under an investment adviser's professional liability policy because the investment product at issue in the underlying claims constituted an unregistered "security." In that case, the insured's clients loaned money to a company (1 Global) with the hope that 1 Global would repay the money with high interest. Although the professional liability policy did not define "security," the Court determined that the term should be given the same meaning as in the Securities Act and the Securities Exchange Act of 1934: namely, "any note…[or] investment contract" (the only exception being for a note on "commercial paper"[9] that has a maturity at the time of issuance of not exceeding nine months). On that basis, the court determined that the investment product at issue qualified as a security, and coverage was barred for the claims arising out of such investment because it was not registered with the SEC. *Id.*; *see also Ganim v. Columbia Cas. Co.*, No. 1:07 CV 1497, 2008 U.S. Dist. LEXIS 45251 (N.D. Ohio June 9, 2008) (unpublished) (unregistered security exclusion barred coverage for arbitration involving client's investment in adviser's financial services business), *aff'd*, 574 F.3d 305 (6th Cir. 2009).

Plainly, the Woodbridge Claims "in any way involve" the investment in a security not registered with the SEC. *See Monroe Cnty. v. Int'l Ins. Co.*, 609 N.W.2d 522, 525 (Iowa 2000) (holding prior litigation exclusion barred coverage for underlying claim because the phrase "in any way involving" "must be applied in the same comprehensive manner as [it is] written"); *In re SRC Holding Corp.*, 545 F.3d 661, 668 (8th Cir. 2008) (in context of interpreting policy exclusion with "in any way involving" language, determining that the word "any" has an "expansive meaning");

---

[9] As the court in *Saoud* explained, generally commercial paper is marketed through commercial paper dealers and other sales channels designed to reach only institutional investors and certain highly sophisticated individuals. *See id.* at 605.

*W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011) (refusing to apply products exclusion narrowly, which "would require us to ignore the exclusion's 'in any way involving' clause") (internal citation omitted); *UBS Fin. Servs., Inc. v. XL Specialty Ins. Co.*, 929 F.3d 11, 22 (1st Cir. 2019) (phrase "in any way involving" should be "expansively read" and "significantly broadens the scope" of an exclusion beyond an "arising out of" formulation). It necessarily follows that the Unregistered Security Exclusion applies to bar coverage for the Woodbridge Claims.

**B. The FIP Claims "in any way involve" the investment in an unregistered security.**

The investments at issue in the FIP Claims also were securities not registered with the SEC, such that the FIP Claims likewise "in any way involve" the investment in an unregistered security and are barred from coverage by the Unregistered Securities Exclusion.

Investors in pension income stream products (like those at issue in the FIP Claims) enter into a contract that entitles them to a fixed return during the term of the contract in exchange for an up-front investment of money. *See* SUMF ¶¶ 27-29. As explained in detail above, such investment contracts qualify as "securities." *See* Section 2(a)(1) of the Securities Act; *W.J. Howey Co.*, 328 U.S. at 301; *Saoud*, 564 F. Supp. 3d 597; *Ganim*, 2008 U.S. Dist. LEXIS 45251; *Dougherty v. VFG, LLC*, 118 F. Supp. 3d 699 (E.D. Pa. 2015) (treating pension income stream products as securities).

The SEC has held that a product similar to a pension income stream product is a security. *See* Cease-and-Desist Order, *In re Prosper Marketplace, Inc.*, Administrative Proceeding File No. 3-13296, Securities and Exchange Commission (Nov. 24, 2008).[10] In that matter, an online lending

---

[10] A true and correct copy of the Cease-and-Desist Order is attached as Wiley Decl., Ex. B.36.

platform connected individuals who wished to borrow money with individuals or institutions that wished to purchase loans extended to borrowers. A number of states have also determined that pension income stream products are securities under relevant state laws. *See, e.g.*, Emergency Cease and Desist Order, *In re Sobell Corp.*, No. ENF-16-CDO-1741, Texas State Securities Board (Feb. 1, 2016); Cease and Desist Order and Notice of Intent to Impose Sanctions, *In re VFG, LLC f/k/a Voyager Fin. Grp.*, No. 13-10-0013, State of New Mexico, Regulation and Licensing Department, Securities Division (Dec. 10, 2013); Consent Order, *In re VFG, LLC f/k/a Voyager Fin. Grp., LLC*, No. S-12-0015, Arkansas Securities Commissioner (June 23, 2014).[11]

Indeed, numerous states (including the State of Utah) expressly have determined that the very pension income stream products sold by FIP were unregistered securities. *See, e.g.*, Stipulation and Consent Order, *In re Austin Cole Raught*, No. SD-19-0013, Utah Division of Securities of the Department of Commerce (May 23, 2019); Consent Order, *In re Timothy L. McCarty*, No. 20184570, South Carolina Securities Commissioner (Jan. 27, 2022); Consent Order, *In re Daniel L. Glazier*, No. 20191504, South Carolina Securities Commissioner (Feb. 11, 2021); Consent Order, *In re Michael A. Julian*, KSC No. 2016-6368, Kansas Securities Commissioner (Sept. 29, 2020); Ex Parte Order to Cease and Desist, *In re Future Income Payments, LLC*, No. 19-012-S, Vermont Department of Financial Regulation, Securities Division (April 2, 2019); Cease and Desist Order, *In re Future Income Payments LLC*, No. CD-2018-0011, Alabama Securities Commission (May 25, 2018).[12]

---

[11] True and correct copies of the referenced Orders are attached as Wiley Decl., Ex. B.37.
[12] True and correct copies of the referenced Orders are attached as Wiley Decl., Ex. B.38.

Under the circumstances, where the FIP Claims "in any way involve" the investment in a security not registered with the SEC, the Unregistered Security Exclusion applies to bar coverage for the FIP Claims.

## II.    The Pension Benefits Exclusion independently bars coverage for the FIP Claims.

Coverage for the FIP Claims also is precluded on the separate and independent basis that the Pension Benefits Exclusion applies to bar coverage.  That Exclusion bars coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or *in any way involving* the actual or alleged sale, *assignment or purchase of any stream of income or benefits originally payable to another person* or entity, *including but not limited to…pension…benefits*." SUMF ¶ 8 (emphasis added).

The FIP Claims are brought on behalf of clients of the **Insureds** who invested in pension income streams through FIP.  *See id*. ¶¶ 30-33.  As the name clearly denotes, the pension income streams were funded by pension benefits originally payable to individual pensioners.  *Id*. ¶¶ 27-28.  As such, the FIP Claims in any way involve the assignment or purchase of pension benefits, placing them squarely within the ambit of the Pension Benefits Exclusion.

Accordingly, the Pension Benefits Exclusion independently applies to bar coverage for the FIP Claims.

## III.    The Bankruptcy Exclusion independently bars coverage for the Woodbridge Claims.

Coverage under the Master Policy for the Woodbridge Claims also is precluded on the separate and independent basis that the Bankruptcy Exclusion applies.  That Exclusion bars coverage for any **Loss** in connection with any **Claim** "based upon, directly or indirectly arising out of, or *in any way involving* the…*bankruptcy* or inability to pay of a[n]…entity…in which the

**Insured** has placed business or…placed or *recommended placement of the funds of a* **Client**….”
*Id.* ¶ 9 (italic emphasis added).

The Woodbridge Claims are brought on behalf of clients of the **Insureds** who allegedly invested in Woodbridge at the recommendation of the **Insureds**. *Id.* ¶ 41. Following Woodbridge's bankruptcy filing on December 4, 2017, the clients suffered financial losses on account of Woodbridge's inability to pay. *See id.* ¶¶ 35, 41-47. In their motion for directed verdict filed during the trial of the *Duennebeil* Lawsuit, the **Insureds** acknowledged the direct relationship between plaintiffs' alleged losses and the Woodbridge bankruptcy, referencing "Plaintiffs claimed that they lost funds due to the Woodbridge bankruptcy." *See id.* ¶ 44. The Woodbridge Claims therefore in any way involve the bankruptcy or inability to pay of an entity in which **Insureds** recommended placement of **Client** funds, and the Bankruptcy Exclusion applies to bar coverage.

Courts have applied exclusions similar to the Master Policy's Bankruptcy Exclusion to preclude coverage for comparable claims. *See, e.g.*, *Transamerica Ins. Co. v. South*, 975 F.2d 321 (7th Cir. 1992) (applying Illinois law) (applying substantially identical exclusion in a Continental policy to bar coverage for claims against investment advisors, brought by their clients, in connection with the advisors' placement of client funds in annuities sold by a company that ultimately became insolvent); *Transamerica Ins. Co. v. South*, 125 F.3d 392 (7th Cir. 1997) (applying Illinois law) (same); *CNA Cas. v. E.C. Fackler, Inc.*,836 N.E.2d 732 (Ill. App. Ct. 2005) (applying substantively similar exclusion in a Continental policy to bar coverage for claims involving insured's placement of employer contributions into insolvent self-insurance trusts); *White v. Cont'l Cas. Co.*, No. 5:07-cv-62-Oc-10-GRJ, 2008 U.S. Dist. LEXIS 39171 (M.D. Fla. May 14, 2008) (unpublished) (applying Florida law) (applying substantially identical, "plain and unambiguous" exclusion in a Continental life agents policy to bar coverage for claims arising out

of insureds' sale of health care insurance in insolvent plan); *Am. Auto Ins. Co. v. B.D. McClure & Assocs.*, No. 09-C-1589, 2010 U.S. Dist. LEXIS 140172 (N.D. Ill. Jan. 21, 2010) (unpublished) (barring coverage under similar bankruptcy exclusion for claims involving insurance broker's sale to employers of workers' compensation coverage in insolvent insurance program); *Emps. Reinsurance Corp. v. Labow*, No. 91-C-4004, 1992 U.S. Dist. LEXIS 9427 (N.D. Ill. June 26, 1992) (unpublished) (applying similar bankruptcy exclusion to preclude coverage for claim against health insurance agent involving procurement of insurance coverage with insolvent carrier).

Accordingly, the Bankruptcy Exclusion independently applies to bar coverage for the Woodbridge Claims.

## IV. At most, a single $1 million limit applies to the FIP Claims and, separately, the Woodbridge Claims, each of which involves Interrelated Wrongful Acts.

As explained above, there is no coverage at all for any of the Paramount Claims. If coverage were potentially applicable, however, it would be limited as follows: (1) a single $1 million per **Claim** limit of liability would apply to all of the FIP Claims against all of the **Insureds** because the FIP Claims involve the same or **Interrelated Wrongful Acts**; and (2) a single $1 million per **Claim** limit of liability would apply to all of the Woodbridge Claims against all of the **Insureds** because the Woodbridge Claims also involve the same or **Interrelated Wrongful Acts**. The single limit applicable to the FIP Claims also would apply to the Hybrid Lawsuit to the extent it incorporates FIP Claims, and the single limit applicable to the Woodbridge Claims also would apply to the Hybrid Lawsuit to the extent it incorporates Woodbridge Claims.

Each **Insured's** Certificate of Insurance provides that it is "subject to all the terms, exclusions and conditions of" the Master Policy. SUMF ¶ 17. The Master Policy provides that "[m]ore than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim**." *Id*. ¶ 10. The Master Policy defines **Interrelated Wrongful Acts**

as follows: "any **Wrongful Acts** which are *logically or causally connected* by reason of *any* common fact, circumstance, situation, transaction or event." *Id*. ¶ 11. **Wrongful Act** means any negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**. *Id*. Notably, the Master Policy provides:

> The amount set forth as the **Policy Year** Per **Claim** Aggregate Limit of Liability in paragraph 1. of this Endorsement [$1,000,000] shall be the maximum Aggregate Limit of Liability of the Insurer for each **Claim**, *regardless of the number of Insureds, Certificates of Insurance, Claims made, or persons or entities bringing such Claims*. [emphasis added.]

*Id*. ¶ 12. In effect, the Master Policy expressly presupposes that multiple **Insureds** to whom separate Certificates of Insurance were issued may seek coverage for "each **Claim**," in which event a single $1 million limit of liability will apply to such **Claim**.

The FIP Claims involve **Wrongful Acts** that are logically and causally connected by multiple common facts, circumstances, transactions, and events. At bottom, all of the FIP Claims – the majority of which read like "copycat" pleadings, with only the names of the plaintiffs changed, *see id.* ¶ 24 – challenge the **Insureds'** alleged recommendation that their clients invest in FIP as a means to fund their purchase of IUL policies; these alleged recommendations by the **Insureds** are **Wrongful Acts** that are both logically and causally connected by the common fact of the recommended investment, *i.e.*, by the same group of agents' recommendations that their clients fund IULs with FIP. *Id*. Similarly, each of the FIP Claims alleges that the investors suffered losses as a result of the ultimate failure of FIP – a common event that both logically and causally connects the **Wrongful Acts** alleged in the FIP Claims and requires them to be treated as a single **Claim** under the Master Policy, subject to a single $1 million per **Claim** limit of liability. *See id*. ¶¶ 10-11.

The Woodbridge Claims also involve **Wrongful Acts** that are logically and causally connected by multiple common facts, circumstances, transactions, and events. Plaintiffs in the Woodbridge Claims all challenge the **Insureds'** alleged recommendation that their clients invest in Woodbridge as a means to fund their purchase of insurance products from Paramount. *See* SUMF ¶ 41, Ex. B.29. These alleged recommendations by the **Insureds** are **Wrongful Acts** that are both logically and causally connected by the common fact of the recommended investment, *i.e.*, by Woodbridge. Similarly, each of the Woodbridge Claims alleges that the investors suffered losses as a result of the ultimate failure of Woodbridge a common event that both logically and causally connects the **Wrongful Acts** alleged in the Woodbridge Claims. *See id.* ¶¶ 37-39. The Woodbridge Claims thus involve **Interrelated Wrongful Acts** and must be treated as a single **Claim** under the Master Policy, subject to a single $1 million per **Claim** limit of liability.

Case law from within the Eighth Circuit (which includes Iowa) supports an expansive reading of the Master Policy provisions governing "interrelatedness," and emphasizes the commonalities among claims rather than the differences (including those pertaining to the number or identity of claimants, or the number of distinct injuries to those claimants).

For example, in *Kilcher v. Continental Casualty Co.*, 747 F.3d 983 (8th Cir. 2014) (applying Minnesota law), the Eighth Circuit held that multiple claims asserted by multiple different clients against an investment advisor for negligent advice concerning different investment products (whole life insurance products and fixed annuities) in varying amounts over a multi-year period constituted related claims. In reaching this conclusion, the Eighth Circuit held that there was a "logical connection" between wrongful acts alleged by each client because the advisor made repetitive mistakes in the performance of her professional services. The court in *Kilcher* concluded that, "[a]lthough [the insured] made different alleged misstatements, omissions, and promises on

different dates to each [claimant], there nonetheless exists a logical connection between her wrongful acts." *Id.* at 990.

Likewise, in *Highwoods Props. v. Exec. Risk Indem., Inc.*, 407 F.3d 917, 922 (8th Cir. 2005) (applying North Carolina law), the court held that two lawsuits were related claims, notwithstanding that they alleged "distinct wrongful acts," focused on different aspects of a merger, and sought different remedies, where related claims provision was a condition "narrowing the scope of coverage." *See also Cont'l Cas. Co. v. Orr*, No. 8:07CV292, 2008 U.S. Dist. LEXIS 51205, at *16 (D. Neb. July 3, 2008) (unpublished) (clients' claims against law firm constituted related claims, though they alleged "unique damages to different clients to whom the lawyers owed separate duties").

The case law from within the Eighth Circuit is entirely consistent with a large body of "related claims" caselaw nationwide, including the Tenth Circuit, as the courts' analysis consistently focuses on the commonalities between claims, rather than the differences. For example, in *Morden v. XL Specialty Insurance*, 903 F.3d 1145 (10th Cir. 2018) (applying Utah law), the Tenth Circuit held that a lawsuit brought by clients of an investment advisor (alleging improper investment advice involving four different ventures over a four-year period) and proceedings instituted by the SEC (alleging violation of federal securities laws in connection with the sale of stock in some, but not all, of the companies in which the clients invested) involved "Interrelated Wrongful Acts." *Id.* at 1151. Although the relevant investments and ventures were "quite varied in nature[,]" the Court determined that it sufficed that they "share[d] common threads" in order to find that they involved "Interrelated Wrongful Acts." *Id.* at 1147. According to the Court, the matters involved Interrelated Wrongful Acts because the Wrongful Acts at issue "were *committed by the same entity*…, against the same victims (the [plaintiffs] and *other clients*),

*using the same techniques* (understating risk, overstating upside potential, and concealing financial interests of the advisers), *during the same time frame* (2005-2009)." *Id.* at 1152 (emphasis added).

In *Morden*, the Tenth Circuit determined that "minor variations in the [underlying] claims were inconsequential" in assessing relatedness. 903 F.3d at 1153. The court held that three arbitration proceedings arose from "interrelated wrongful acts," notwithstanding that they were brought by different claimants and asserted different claims, because all three proceedings shared a "sufficient factual nexus." Each of the matters included some allegations of churning or flipping of investment accounts in order to enrich broker/agents at the expense of account holders. The three proceedings involved *certain* of the same respondents; all of the alleged misconduct was alleged to have taken place during "*roughly*" the same time period (from the late 1990s to the mid-2000s); each of the claims alleged *some* of the same misconduct; and all of the claims alleged that the insured was vicariously liable for failing to supervise its brokers/agents. *See id.*

Likewise, in *Templeton v. Catlin Specialty Insurance Co.*, 612 F. App'x. 940 (10th Cir. 2015) (applying New York law), the Tenth Circuit applied the "broad" definition of Interrelated Wrongful Acts – which, akin to the definition in the Master Policy, required only that wrongful acts be similar or "connected by reason of *any* common fact, circumstance, situation, transaction, casualty, event, decision or policy" – as written, to uphold a liability insurer's denial of coverage under an "interrelated wrongful acts exclusion." *Id.* at 946, 956, 957, 958. The relevant exclusion applied where a claim involved "any Wrongful Act occurring on or after the Retroactive Date which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts." *Id.* at 945-46, 956. Notably, the FINRA arbitration award for which the insured sought coverage involved *two distinct sets* of risky securities that the insured had sold to clients, first in 2004 (the MedCap II Note) – before the Retroactive Date – and

subsequently three years later in 2007 (the MedCap IV Note). The district court determined on summary judgment that the sales of the distinct sets of securities were "interrelated wrongful acts," on the basis that "[s]everal common facts connect [the insured's] wrongful acts in 2004 and 2007, as the acts involved the same clients…and investments in the same company…." *Templeton v. Fehn*, No. 12-cv-00859-RPM, 2014 U.S. Dist. LEXIS 85639, *22 (D. Colo. June 24, 2014) (unpublished). The district court reasoned: "The Policy does not require that the acts be 'identical,' only 'interrelated.'" *Id*. at *23. On appeal, the Tenth Circuit readily agreed, explicitly cautioning that, although there may be dissimilarities among wrongful acts, "dissimilarities…do not show the wrongful acts were not 'similar' or 'connected.'" *Templeton v. Catlin Specialty Ins. Co.*, 612 F. App'x 940, 959 (10th Cir. 2015). According to the Tenth Circuit, it sufficed that the claims regarding the different securities transactions at issue:

> alleged liability based on the same conduct by [the insured] – his failure to disclose the same material facts about MedCap Holdings, his failure to investigate the products he sold, and his failure to conduct a proper suitability analysis of the [clients] before selling them the MedCap II and MedCap IV notes.

612 F. App'x at 958.

In *Berry & Murphy, P.C. v. Carolina Casualty Insurance Co.*, 586 F.3d 803 (10th Cir. 2009) (applying Colorado law), the Tenth Circuit applied "related wrongful act" language substantially identical to the language in the Master Policy,[13] and concluded that an attorney demand letter (issued to one insured) and a later-filed legal malpractice lawsuit (instituted against two insureds) constituted a single claim. The Court concluded that the acts of malpractice alleged in the letter and the later-filed lawsuit were "logically or causally connected." *See id*. at 810, 812.

---

[13] The policy at issue in *Berry & Murphy* defined "Related Wrongful Acts" as acts that are "logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision." *Id*. at 809.

Specifically, the Court determined that the matters were "logically connected" because they were "connected by an inevitable or predictable interrelation or sequence of events." *Id*. at 811.

Notably, the Tenth Circuit in *Berry & Murphy* cited with approval the decision in *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.*, 855 P.2d 1263, 1266 (Cal. 1993), directly quoting from that decision as follows:

> *[I]f an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability.* It would be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors.

*Id*. at 1267 (emphasis added).

Precisely as the court contemplated in *Bay Cities Paving*, here, the **Insureds'** "single error" (one in the FIP Claims, and the other in the Woodbridge Claims) – *i.e.*, failure properly to investigate the relevant investment – harmed different clients whose claims appropriately should "be treated as a single claim under the policy's limitation of liability." *See also Ciber, Inc. v. ACE Am. Ins. Co.*, 261 F. Supp. 3d 1119, 1124, 1128 (D. Colo. 2017) (lawsuits involved "interrelated wrongful acts" notwithstanding that they were filed two years apart, by different plaintiffs, alleging different legal theories, where policy "expansively" defined "interrelated wrongful acts" as "all wrongful acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes[,]" and lawsuits involved a "single scheme"); *Starr Indem. & Liab. Co. v. MonaVie, Inc.*, No. 2:14-cv-00395-DN, 2019 U.S. Dist. LEXIS 43015, *25 (D. Utah Mar.15, 2019) (unpublished) (consumer class action lawsuits filed on behalf of different class members two years apart alleged "related Wrongful Acts" where the lawsuits "contain the common threads of a multilevel marketing scheme that involved misrepresentations about the health benefits of [the insured's] juice products").

As these cases indicate, and as the Eleventh Circuit explained, the relevant inquiry under this policy language "is not whether there are any differences between the…claims" but "whether the claims are logically or causally connected by 'any' common fact, circumstance, etc." *Am. Cas. Co. cf Reading, Pa. v. Belcher*, 709 F. App'x. 606, 609 (11th Cir. 2017). Thus, courts routinely deem claims to be related even where there are numerous claimants who are differently situated and to whom the insured owed separate duties; where the claimants suffered distinct and unique injuries; and where the claims span a long duration of time. *See, e.g., Camico Mut. Ins. Co. v. Rogozinski*, No. 3:10-cv-762-J-32MCR, 2012 U.S. Dist. LEXIS 130648 (M.D. Fla. Sept. 13, 2012) (unpublished) (holding that three claimants' separate claims against the same accountant constituted a single related claim, where they were based on the same alleged errors, even where the errors occurred over a span of multiple years); *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704 F. Supp. 2d 537, 543 (E.D. Va. 2010) ("common ties" in the insured's scheme to defraud constituted "common facts and circumstances" under policy's interrelated acts or omissions provision).[14]

---

[14] *See also, e.g., Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000) (finding it immaterial that there were discrete injuries suffered by different claimants to whom the insured owed different duties, where the injuries flowed from repetition of the same or similar wrongful acts through a consistent course of conduct or business practice); *Gregory v. Home Ins. Co.*, 876 F.2d 602 (7th Cir. 1989) (concluding that claims by an insured attorney's client and claims by third parties, which involved the insured's distinct mistaken tax and securities advice, were "related" under a policy that did not define the term; concluding that "relatedness" included both logical and causal connections); *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely L. Corp.*, 162 F. Supp. 3d 1068, 1079 (C.D. Cal. 2016), *cjf'd*, 708 F. App'x. 374 (9th Cir. 2017) (seven actions by different parties for misrepresentations regarding inflated purchase prices and inflated fees for twenty-three different real estate investments occurring over nearly six years constituted "related" claims because they involved "allegations of similar or identical acts of wrongdoing which were part of a general course of conduct"); *Direct Gen. Ins. Co. v. Hous. Cas. Co.*, 139 F. Supp. 3d 1306, 1314 (S.D. Fla. 2015), *cjf'd*, 661 F. App'x. 980 (11th Cir. 2016) (holding that *over 70,000* claims were related, even where policy did not define relatedness, because each arose out of the common practice of insured continuing to use certain payment reimbursement technology after a change in the applicable law); *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 707 (E.D. Wis. 2005) (holding that thirty-nine separate lawsuits by different plaintiffs were "Related

Because all the FIP Claims easily involve the same **Wrongful Acts** or **Interrelated Wrongful Acts**, and the Woodbridge Claims likewise involve the same **Wrongful Acts** or **Interrelated Wrongful Acts**, (1) the FIP Claims are properly deemed a single **Claim** to which (in the event of any coverage) a single $1 million per **Claim** limit of liability applies under the Master Policy, and (2) the Woodbridge Claims also properly are deemed a single **Claim** to which (in the event of any coverage) a single $1 million per **Claim** limit of liability applies under the Master Policy. And, it necessarily follows that the single limit applicable to the FIP Claims would apply to the Hybrid Lawsuit to the extent it incorporates FIP Claims, and the single limit applicable to the Woodbridge Claims would apply to the Hybrid Lawsuit to the extent it incorporates Woodbridge Claims.

## V. Continental has provided the Insureds with a full defense in the Paramount Claims and is entitled to summary judgment on Defendants' Counterclaims.

Continental is also entitled to summary judgment on Defendants' Counterclaims I and II (Doc. No. 33), which generally assert that Continental breached its duty to defend and breached the implied covenant of good faith and fair dealing by unreasonably failing to defend, or failing to "fully" defend, the **Insureds** in connection with the Paramount Claims, principally by refusing to pay and failing to reimburse Defendants for their attorneys' fees and costs. *See id.* ¶¶ 13-16. These claims fail for several reasons.

*First*, as a threshold matter, because the Master Policy does not provide coverage for the Paramount Claims in the first instance, Continental does not owe any of the **Insureds** a defense and cannot have breached the insurance contract as alleged in Counterclaim I. *See Travelers Prop. Cas. Co. of Am. v. Fed. Recovery Servs., Inc.*, 156 F. Supp. 3d 1330, 1337 (D. Utah 2016)

---

Claims" because they arose from logically and causally related wrongful acts concerning insured's common underwriting practice over a multi-year period).

("Without a duty to defend, [insureds] cannot prevail on [their] breach of contract counterclaim."). For the same reasons, Defendants' Counterclaim II (for breach of the duty of good faith and fair dealing) also fails. *See Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 231 (Utah 2014) ("Because [plaintiff] did not allege the existence of facts required to plead a breach of contract, it has also failed to plead a breach of the covenant of good faith and fair dealing."); *Sandoval v. State Farm Mut. Auto. Ins. Co.*, No. 1:21-CV-171-TC, 2022 U.S. Dist. LEXIS 112390, *14-15 (D. Utah June 23, 2022) ("A claim for breach of the covenant of good faith and fair dealing is derivative of the breach of contract claim. . . . Accordingly, when there is no breach of an express contract term, 'there can be no cause of action for breach of an implied covenant arising therefrom….'" (internal citation omitted)).

*Second*, the undisputed facts belie Defendants' assertion that Continental failed to defend or refused to fully defend the **Insureds** in the Paramount Claims. The record establishes that Continental has paid and is continuing to pay the **Insureds' Defense Costs** in connection with the Paramount Claims, subject to a reservation of rights pending the resolution of this insurance coverage action. *See* SUMF ¶ 60. Indeed, through February 15, 2023, Continental has paid more than $1 million in **Defense Costs**, representing 87% of all legal fees and costs submitted on behalf of the **Insureds** in connection with the Paramount Claims. *See* SUMF ¶¶ 61-62. Thus, Continental has defended and continues to defend the **Insureds**. *See id.* No counsel retained to defend any **Insured** in any of the Paramount Claims has withdrawn its representation of any **Insured** for non-payment of invoices. *Id.* ¶ 64. In such circumstances, there can be no breach of the duty to defend (and thus, no breach of the implied covenant of good faith and fair dealing). *See Ctr. For Excellence in Higher Educ., Inc. v. RSUI Indem. Co.*, 375 F. Supp. 3d 1217, 1229 (D. Utah 2019)

(granting summary judgment to insurer on breach of contract claim where insurer did not breach duty to defend).

*Third*, Defendants cannot in any event establish that they suffered any damages as a result of Continental's purported failure to provide a "full" defense in connection with the Paramount Claims. Damages are an essential element of a breach of contract claim. *See, e.g.*, *Evans v. Huber*, 366 P.3d 862, 866 (Utah Ct. App. 2016) (affirming grant of summary judgment for failure to prove damages on a breach of contract claim); *Stevens-Henager Coll. v. Eagle Gate Coll.*, 248 P.3d 1025, 1032 (Utah Ct. App. 2011) (similar). Defendants cannot point to any evidence in the record establishing that any of them paid, out of pocket, for any legal fees or costs incurred in connection with the defense of the Paramount Claims. Rather, the record establishes that the **Insureds'** defense counsel – not the **Insureds** themselves – demanded payment of their fees and costs from Continental. *See* SUMF ¶ 63. And, critically, Continental has, in fact, paid defense counsel for the amounts that constitute **Defense Costs** under the Master Policy. *See id.*

Moreover, Defendants have never provided a computation of each category of their claimed damages, as required by Fed. R. Civ. P. 26(a). SUMF ¶¶ 65-66. Because Defendants' non-disclosure is unjustified and prejudicial, they will be precluded from presenting any damages-related information in connection with this motion as well as at trial. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). In such circumstances, summary judgment is warranted, as Defendants will be unable to meet their burden to put forth sufficient evidence from which a reasonable fact-finder could rule in their favor on damages. *See, e.g.*, *Park Cityz Realty, LLC v. Archos Cap., LLC*, No. 2:20-CV-00522-JCB, 2021 U.S. Dist. LEXIS 208428, at

*30 (D. Utah Oct. 27, 2021) (unpublished) (granting summary judgment where Rule 37(c)(1) would preclude plaintiffs from presenting damages evidence at trial and where plaintiffs could not rebut defendants' *prima facie* demonstration of an entitlement to summary judgment based on a lack of damages evidence).

Defendants' Counterclaim III asserts a claim for "Estoppel" based on the allegations that Continental agreed to defend Defendants in connection with the Paramount Claims and that Defendants relied on this promise to their detriment, incurring "hundreds of thousands of dollars in unreimbursed legal fees and expenses." Doc No. 33, ¶¶ 30-34. Continental is entitled to summary judgment on Counterclaim III for three reasons. *First*, "[a]s a prerequisite to bringing a promissory estoppel claim, the plaintiff must establish that the parties do not have a formal contract controlling their rights and obligations." *Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1228, 1238 (D. Utah 2015) (granting summary judgment on claim for promissory estoppel where a contract governed the parties' rights and obligations). Here, the parties' rights and obligations are governed by the terms of the Master Policy. *Second*, Counterclaim III presupposes that Continental failed to provide the **Insureds** with the promised defense, which (as explained above) it did not. *Third*, where Continental has paid the vast majority of all submitted legal fees and costs, and the **Insureds** have paid none, the **Insureds** cannot establish that they have suffered any detriment as a result of Continental's alleged conduct. *See id*. (finding detriment to be a necessary element of promissory estoppel).

## CONCLUSION

The issues presented on this motion are straightforward. As a threshold matter, because all of the Paramount Claims involve investments in unregistered securities, the Unregistered Security Exclusion bars coverage. Moreover, because the FIP Claims involve the assignment or purchase

of pension benefits, and the Woodbridge Claims involve client losses on account of a bankrupt investment, the Pension Benefits Exclusion and the Bankruptcy Exclusion, respectively, apply to bar coverage. Alternatively, because each category of claims (FIP and Woodbridge) is based on acts or omissions that are "logically or causally connected by reason of any common fact, circumstance, situation, transaction or event," any coverage would be limited to $1 million per category of claim.

The issues relevant to the Counterclaims are likewise straightforward: The Counterclaims are premised on the Paramount Claims being covered, which they are not. Continental has provided the **Insureds** with a full defense in the Paramount Claims, and the **Insureds** have suffered no damage in connection with the defense provided. Accordingly, the Counterclaims fail, and Continental's motion should be granted.

Dated: February 28, 2023

Respectfully submitted,

/s/ Richard A. Simpson
Richard A. Simpson (admitted *pro hac vice*)
RSimpson@wiley.law
Pamela L. Signorello (admitted *pro hac vice*)
PSignorello@wiley.law
Joseph W. Gross (admitted *pro hac vice*)
JGross@wiley.law
Ashley E. Eiler (admitted *pro hac vice*)
AEiler@wiley.law
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 719-7000
Facsimile: (202) 719-7049

Rebecca L. Hill, 06246
Rebecca.Hill@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111-2047
Telephone: (801) 323-5000

Facsimile:  (801) 355-3472

*Attorneys for Plaintif Continental Casualty Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of February 2023, I caused a true and correct copy of

the foregoing to be served upon counsel of record by electronic filing.

/s/ Richard A. Simpson
Richard A. Simpson
