Brennan H. Moss (10267)
**ARMSTRONG TEASDALE LLP**
222 S. Main Street, Suite 1830
Salt Lake City, Utah 84101
Telephone: (801) 401-1600
Email: bmoss@atllp.com

Patrick J. Kenny (38032MO)
(*admitted pro hac vice*)
Angela B. Kennedy (69167MO)
(*admitted pro hac vice*)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile: (314) 621-5065
Email: pkenny@atllp.com
        akennedy@atllp.com

*Counsel for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **CONTINENTAL CASUALTY COMPANY,**<br><br>            **Plaintiff,**<br><br>**vs.**<br><br>**PARAMOUNT FINANCIAL SERVICES, INC. D/B/A LIVE ABUNDANT, EMRON ANDREW, AARON ANDREW, KARL NELSON, JEREMY WATSON, SHAREE ANDREW, GREGORY DUCKWITZ, AND J. SCOTT REYNOLDS,**<br><br>            Defendants. | **MOTION FOR SUMMARY JUDGMENT**<br><br>CASE NO: 2:21-cv-00585<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Dustin B. Pead |

## TABLE OF CONTENTS

I.   Table of Authorities ........................................................................................ v

II.  Table of Underlying Actions .......................................................................... ix

III. Introduction and Relief Requested.................................................................1

IV. Statement of Undisputed Material Facts .......................................................3

    A.  The Suits that CNA Describes as the "FIP Claims" ...............................3

    B.  The Suit that CNA Describes as the "Woodbridge Claims"..................7

    C.  The Suits that CNA Describes as the "Hybrid Lawsuit" .......................7

    D.  Some Suits Have Been Resolved .............................................................9

    E.  Other undisputed facts germane to Defendants' Motion ....................11

V.  Argument ......................................................................................................15

    A.  Utah Law Governs ................................................................................15

    B.  Rules Of Decision .................................................................................16

       1.  Summary Judgment Standards ......................................................16

       2.  Law Governing Insurance Disputes ..............................................17

    C.  The Underlying Lawsuits Constitute "Claims" For "Wrongful Acts" Solely In Rendering Or Failing To Render "Professional Services."...................18

       1.  The Claim Requirement ................................................................19

       2.  The Professional Services Requirement.........................................20

       3.  The Wrongful Act Requirement ....................................................21

       4.  The Use Of "Solely" Does Not Eliminate Coverage .....................22

       5.  The Same Result Obtains In Those Underlying Actions That Have Resolved ........................................................................................23

    D.  CNA's Reliance On The Unregistered Security Exclusion Is Misplaced....................24

1.  The SEC Order and the SEC v. Davis Action Have No Impact On The Analysis. ...............................................................................26

2.  The Unregistered Securities Exclusion Has No Impact On CNA's Duty To Defend. ....................................................................28

3.  The Unregistered Securities Exclusion Has No Impact On CNA's Duty To Indemnify. .................................................................28

E.  The Transfer Of Benefits Exclusion Does Not Assist CNA. ........................................29

1.  The Nature Of The So-Called "FIP Claims" ..................................30

2.  CNA's Reliance On The Transfer Of Benefits Exclusion To Deny Benefits Improperly Assumes Facts And Reads The Exclusion Broadly. ............................33

3.  CNA Also Misreads The Transfer Of Benefits Exclusion. ..............................35

4.  Even If CNA Could Establish A FIP Claim Involved A Transfer Covered By The Exclusion, That Simply Would Lead To An Allocation Between Covered And Uncovered Damages. ...............................................36

5.  Even If CNA Could Find A Construction Of The Exclusion That Supported Its Undifferentiated Denial Of Coverage, That Simply Would Give Rise To Ambiguity Which Would Require Construction In Favor Of Defendants. ..........................................37

6.  The Transfer Of Benefits Exclusion Provides No Basis For CNA To Avoid Its Duties To Defend Or Indemnify Defendants In The FIP Claims. ........38

F.  The Insolvency Exclusion Also Does Not Assist CNA. ..............................................38

1.  The Nature Of The So-Called "Woodbridge Claims" .............................39

2.  CNA Could Not Avoid Its Duty To Defend Even If The Insolvency Exclusion Applied To The So-Called Woodbridge Claims. ...................................40

3.  CNA Misreads The Insolvency Exclusion ..................................41

4.  Even If CNA Could Establish That Some Of The Damages In The Duennebeil Suit Were Caused By Insolvency Of An Entity Chargeable Against The Insureds, At Best That Would Lead To An Allocation Between Covered And Uncovered Damages. ..........................................45

5.  The Insolvency Exclusion Provides No Basis For CNA To Avoid Its Duties To Defend Or Indemnify The Woodbridge Claims. ...................................45

G.  CNA Cannot Avoid Its Responsibilities Through The Interrelated Wrongful Act Provision. ..................................................................................46

1.  The Relief Sought In Counts V-VIII Is Premature With Respect To Questions Of Indemnity Related To The Underlying Actions.............................46

2.  To The Extent Counts V-VIII Relate To A Possible Exhaustion-Based Abandonment Of The Defense In The Underlying Actions, Judgment Should Be Entered In Favor Of Defendants.............................................47

3.  Case Law Supports Entry Of Judgment for Defendants On Counts V-VIII. ..................................................................................................53

4.  Judgment Should Be Entered In Favor Of Defendants On Counts V Through VIII Of The Complaint...................................................................59

VI. Conclusion .....................................................................................................59

iv

## I.    Table of Authorities

**Cases**                                                                                                  **Page(s)**

*Aetna Cas. & Sur. Co. v. Dannenfeldt,*
    778 F. Supp. 484 (D. Ariz. 1991) ................................................................................21

*Alf v. State Farm Fire and Cas. Co.,*
    850 P.2d 1272 (Utah 1993) ......................................................................................17

*Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London,*
    449 Mass. 621, 871 N.E.2d 418 (2007) ...........................................................48, 58

*Allstate Indem. Co. v. Thatcher,*
    2007 UT App 183, 164 P.3d 445 ..............................................................................18

*Am. Nat. Prop. & Cas. Co. v. Sorensen,*
    2013 UT App 295, 362 P.3d 909 (Utah Ct. App. 2013) ....................................34, 36

*Am. States Ins. Co., W. Pac. Div. v. Walker,*
    26 Utah 2d 161, 486 P.2d 1042 (1971) ......................................................................3

*American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.,*
    927 P.2d 186 (Utah 1996) ........................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ........................................16

*Aspen Specialty Ins. Co. v. Utah Loc. Governments Tr.,*
    954 F. Supp. 2d 1311 (D. Utah 2013) ..........................................................29, 35, 47

*Bear River Mut. Ins. Co. v. Wall,*
    1999 UT 33, 978 P.2d 460 ..........................................................................................3

*Benjamin v. Amica Mut. Ins. Co.,*
    2006 UT 37, 140 P.3d 1210 ........................................................................18, 23, 28

*Boyle v. Nat'l Union Fire Ins. Co.,*
    866 P.2d 595 (Utah Ct. App. 1993) ....................................................................18, 35

*Bureau of Consumer Fin. Prot. v. Future Income Payments, LLC,*
    Case No. CV 6:19-2950-BHH [Dkt. No. 120] (D.S.C. Feb. 22, 2021) ............15, 32

*Cincinnati Specialty Underwriters Ins. v. Red Rock 4 Wheelers,*
    576 F. Supp. 3d 905 (D. Utah 2021)............................................................... *passim*

*Commc'ns Unlimited, Contracting Servs., Inc. v. Broadband Infrastructure*
    *Connection, LLC*,
    558 F. Supp. 3d 773 (E.D. Mo. 2021)......................................................24

*Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co.*,
    972 F. Supp. 1379 (D. Utah 1997)........................................................28

*David Lerner Assocs., Inc. v. Philadelphia Indem. Ins. Co.*,
    934 F. Supp. 2d 533 (E.D.N.Y.), *aff'd*, 542 F. App'x 89 (2d Cir. 2013) ...............................21

*Draughon v. CUNA Mut. Ins. Soc.*,
    771 P.2d 1105 (Utah Ct. App. 1989) ....................................................33

*Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*,
    873 F.2d 229 (9th Cir. 1989) ........................................................55, 56

*Farmers Ins. Exch. v. Versaw*,
    2004 UT 73, 99 P.3d 796 ....................................................................17

*Fire Ins. Exch. v. Oltmanns*,
    2012 UT App 230, 285 P.3d 802 ..............................................3, 34, 41

*Fragumar Corp., N.V. v. Dunlap*,
    685 F.2d 127 (5th Cir. 1982) ...............................................................27

*Friedland v. TIC-The Indus. Co.*,
    566 F.3d 1203 (10th Cir. 2009) ...........................................................24

*Great Am. Ins. Co. v. Woodside Homes Corp.*,
    448 F. Supp. 2d 1275 (D. Utah 2006)...................................................18

*Hess Oil Virgin Islands Corp. v. UOP, Inc.*,
    861 F.2d 1197 (10th Cir. 1988) ...........................................................24

*Holmes Dev., LLC, v. Cook*,
    48 P.3d 895 (Utah 2007).......................................................................17

*Langton v. Hogan*,
    71 F.3d 930 (1st Cir. 1995)...................................................................27

*LDS Hosp. v. Capitol Life Insurance Co.*,
    765 P.2d 857 (Utah 1988)......................................................28, 38, 43

*McCuen v. Am. Cas. Co. of Reading, Pennsylvania*,
    946 F.2d 1401 (8th Cir. 1991) .............................................................56

*Mirman v. Exec. Risk Indem., Inc.*,
    474 F. Supp. 3d 609 (S.D.N.Y. 2019) ................................................................20

*Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*,
    358 F.3d 736 (10th Cir. 2004) ...........................................................................16

*National Union Fire Ins. Co. v. Ambassador Group, Inc.*,
    691 F. Supp. 618 (E.D.N.Y. 1988) ...............................................................53, 54

*Okada v. MGIC Indem. Corp.*,
    608 F. Supp. 383 (D. Haw. 1985), *aff'd in part, rev'd in part on other
    grounds,* 795 F.2d 1450 (9th Cir. 1986), *superseded on other grounds,* 823
    F.2d 276 (9th Cir. 1986) ....................................................................................55

*One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*,
    2012 UT App 100, 276 P.3d 1156 ......................................................................15

*Prop. Assistance Corp. v. Roberts*,
    768 P.2d 976 (Utah Ct. App. 1989) ..............................................................38, 43

*Ramunno on Behalf of McClain v. Delaware Dep't of Health & Soc. Servs., Div.
    of Soc. Servs.*,
    No. CV 13A-06-005 FSS, 2014 WL 1312681 (Del. Super. Ct. Feb. 28, 2014) ....35

*S.W. Energy Corp. v. Cont'l Ins. Co.*,
    974 P.2d 1239 (Utah 1999) ................................................................................28

*SEC v. Davis et al.*,
    Case No. 2:18-cv-10481-FMO-JC ..................................................................26, 27

*St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*,
    870 S.W.2d 223 (Ky. 1994) ................................................................................43

*Summerhaze Co., L.C. v. Fed. Deposit Ins. Corp.*,
    2014 UT 28, 332 P.3d 908 ......................................................................... *passim*

*Teamsters Joint Council No. 83 of the Virginia Pension Fund v. Weidner Realty
    Assocs.*,
    377 F. App'x 339 (4th Cir. 2010) .......................................................................31

*U.S. Fid. & Guar. Co. v. Sandt*,
    854 P.2d 519 (Utah 1993) ..................................................................................17

*United Ins. Co. v. Heighton*,
    No. 2:14CV435DAK, 2016 WL 4916785 (D. Utah Sept. 14, 2016) .....................17

*Utah Farm Bureau Ins. Co. v. Crook*,
    980 P.2d 685 (Utah 1999) ........................................................................................17

**Statutes**

15 U.S.C. § 77c(a)(8) ...............................................................................................23

29 U.S.C. § 1392(c) ..................................................................................................31

15 U.S.C. § 78u(d)(3) ...............................................................................................25

15 U.S.C. § 77t(d)(1) ................................................................................................25

**Other Authorities**

Federal Rules of Civil Procedure Rule 56 ..................................................................2

*In the Matter of: Future Income Payments, LLC*,
    CFR-FY2016-0027, 2018 WL 4051337 (Md. Comm. Fin. Reg. Apr. 25, 2018) ........15, 31, 32

*In the Matter of Future Income Payments, LLC, Respondent*,
    2016 WL 6882803 (NY Bnk. Dept. Oct. 20, 2016) ...........................................15, 32

*Minn. Att. Gen. and Comm. of Comm. vs. Future Income Payments, LLC, f/k/a*
    *Pensions, Annuities, and Settlements, LLC and FIP LLC*,
    Case No. 27-CV-17-12579, 2018 WL 10454834 (Minn. Dept. of Commerce
    July 18, 2018) ...................................................................................................15, 32

*In the Matter of Determining Whether There Has Been A Violation of the*
    *Consumer Loan Act of Washington By: Pensions, Annuities and Settlements,*
    *LLC, a/k/a Future Income Payments, LLC, and Scott Kohn*,
    Case No. C-14-1449-15-SC02, 2015 WL 4503495 (Wash. Dept. of Fin. Inst.
    May 13, 2015) ...................................................................................................15, 32

*In the Matter of: Future Income Payments, LLC*,
    CFR-FY2016-0027, 2018 WL 4051337 (Md. Comm. Fin. Reg. Apr. 25, 2018) .............15, 32

## II. Table of Underlying Actions

<table>
<tr><th colspan="3">Underlying Actions Called "FIP CLAIMS"</th></tr>
<tr><th>Case</th><th>Complaint</th><th>Status</th></tr>
<tr><td>*Anderson, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190909161 (Salt Lake County, Utah)</td><td>Ex. C</td><td>Pending</td></tr>
<tr><td>*Argueta, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200902643 (Salt Lake County, Utah)</td><td>Ex. E</td><td>Stipulated Dismissal. *See* Ex. TT</td></tr>
<tr><td>*Auduong, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901039 (Salt Lake County, Utah)</td><td>Ex. F</td><td>Pending</td></tr>
<tr><td>*Bartlett, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901046 (Salt Lake County, Utah)</td><td>Ex. G</td><td>Pending</td></tr>
<tr><td>*Belcher, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901020 (Salt Lake County, Utah)</td><td>Ex. H</td><td>Pending</td></tr>
<tr><td>*Belcher v. Greg Duckwitz, Paramount Financial Services, Inc., et al.*, Case No. 210901806 (Salt Lake County, Utah)</td><td>Ex. I</td><td>Stipulated Dismissal. *See* Ex. UU</td></tr>
<tr><td>*Bennett, et al. v. Jeremy Watson, Paramount Financial Services, Inc., et al.*, Case No. 190907422 (Salt Lake County, Utah)</td><td>Ex. J</td><td>Pending</td></tr>
<tr><td>*Braybrook, et al. v. Minnesota Life Ins. Co., Aaron Andrew, et al.*, Case No. 2:19-cv-01137-SVW-JPR (C.D. Cal.)</td><td>Ex. K</td><td>Settled. *See* Ex. OO</td></tr>
<tr><td>*Buman, et al. v. Aaron Andrew, Paramount Financial Services, Inc., et al.*, Case No. 200903141 (Salt Lake County, Utah)</td><td>Ex. L</td><td>Pending</td></tr>
</table>

| | | |
|---|---|---|
| *D'Silva, et al. v. Karl Nelson, Paramount Financial Services, Inc., et al.*, Case No. 200901038 (Salt Lake County, Utah) | Ex. M | Pending |
| *Freck, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190907422 (Salt Lake County, Utah) | Ex. N | Pending |
| *Galvis, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190907926 (Salt Lake County, Utah) | Ex. O | Settled. *See* Ex. PP |
| *Hansen, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 200901031 (Salt Lake County, Utah) | Ex. P | Pending |
| *Harvey, et al. v. Penn Mutual Life Ins. Co., Paramount Financial Services Inc., et al.*, Case No. 20-cv-364939 (Santa Clara County, Cal.) | Ex. Q | Settled. *See* Ex. D at ¶ 43 |
| *Heater, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 200901037 (Salt Lake County, Utah) | Ex. R | Pending |
| *Heath, et al. v. Gregory Duckwitz, Paramount Financial Services, Inc., et al.*, Case No. 200902641 (Salt Lake County, Utah) | Ex. S | Stipulated Dismissal. *See* Ex. VV |
| *Kane v. Paramount Financial Services, Inc., et al.*, Case No. 200901048 (Salt Lake County, Utah) | Ex. T | Pending |
| *Mendenhall, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 200902709 (Salt Lake County, Utah) | Ex. U | Pending |
| *Palmer, et al. v. Emron Andrew, Paramount Financial Services, Inc., et al.*, Case No. 200901026 (Salt Lake County, Utah) | Ex. V | Pending |

| | | |
|---|---|---|
| *Pew v. Paramount Financial Services, Inc., et al.*, Case No. 200902644 (Salt Lake County, Utah) | Ex. W | Stipulated Dismissal. *See* Ex. WW |
| *Ramirez v. Penn Mutual Life Ins. Co., Paramount Financial Services Inc., et al.*, Case No. 2:19-cv-07426 (C.D. Cal.) | Ex. X | Settled. *See* Ex. D at ¶ 44 |
| *Reimann, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 200902707 (Salt Lake County, Utah) | Ex. Y | Stipulated Dismissal. *See* Ex. XX |
| *Roob, et al. v. Aaron Andrew, Paramount Financial Services, Inc., et al.*, Case No. 200901041 (Salt Lake County, Utah) | Ex. Z | Pending |
| *Thompson, et al. v. Scott Reynolds, Paramount Financial Services, Inc., et al.*, Case No. 200901035 (Salt Lake County, Utah) | Ex. AA | Pending |
| *Wilkerson v. Andrew, et al.*, Case No. 180904644 (Weber County, Utah) | Ex. BB | Settled. *See* Ex. SS. |
| **Underlying Actions Called "WOODBRIDGE CLAIMS"** | | |
| *Duennebeil et al. v. Paramount Financial Services, Inc., et al.*, Case No. 180903806 (Salt Lake County, Utah) | Ex. CC | Judgment Entered. *See* Ex. YY (Post-judgment Motions Pending) |
| **Underlying Actions Called "HYBRID LAWSUIT"** | | |
| *Astill et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906441 (Salt Lake County, Utah) | Ex. DD | Pending |
| *Binkerd et al. v. Paramount Financial Services, Inc. et al.*, Case No. 190906444 (Salt Lake County, Utah) | Ex. EE | Pending |
| *Chatham et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906438 (Salt Lake County, Utah) | Ex. FF | Pending |

| | | |
|---|---|---|
| *Conroy et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906439 (Salt Lake County, Utah) | Ex. GG | Pending |
| *Crockett et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906440 (Salt Lake County, Utah) | Ex. HH | Pending |
| *Dembele et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906448 (Salt Lake County, Utah) | Ex. II | Pending |
| *Hawk et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906442 (Salt Lake County, Utah) | Ex. JJ | Pending |
| *Huwe et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906436 (Salt Lake County, Utah) | Ex. KK | Pending |
| *Murray et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190909970 (Salt Lake County, Utah) | Ex. LL | Pending |
| *Roper v. Paramount Financial Services, Inc., et al.*, Case No. 190909971 (Salt Lake County, Utah) | Ex. MM | Pending |
| *Zigerelli et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906443 (Salt Lake County, Utah) | Ex. NN | Pending |

### III.     Introduction and Relief Requested

This is a declaratory action concerning insurance coverage for claims against the insureds in thirty-seven underlying lawsuits (the "Underlying Actions").[1] Plaintiff Continental Casualty Company ("CNA") issued the at-issue Life Agent Professional Liability, Policy No. 287287986 (the "Master Policy"), to Mercer Financial Services Professional Risk ("Mercer"). *See* Statement of Undisputed Material Facts ("SUMF") 1. The insureds, Defendants in this action, Paramount Financial Services, Inc. d/b/a Live Abundant, Emron Andrew, Aaron Andrew, Karl Nelson, Jeremy Watson, Sharee Andrew, Gregory Duckwitz, and J. Scott Reynolds, participate in the Master Policy through Certificates of Insurance. *See* SUMF 2.

CNA filed this lawsuit [Dkt. No. 2] asking, among other things, that the Court declare that it has no duty to defend or indemnify its insureds for the claims against them in the Underlying Actions under the Master Policy. It requested, in the alternative, that the Court enter a declaration narrowly construing how the limits of the Master Policy might apply to the thirty-seven Underlying Actions. CNA also references many claims that have yet to be filed as lawsuits, which are not ripe for declaratory relief, and so which are not included herein in the term "Underlying Actions."

One of the Underlying Actions has proceeded to judgment in the District Court of Salt Lake County, Utah. *See* SUMF 51. Ten of the Underlying Actions have been settled or otherwise

---

[1] Throughout this motion the term "Underlying Actions" refers collectively to the (a) the group of lawsuits that lawsuits that CNA has labeled the "FIP Claims," the group of lawsuits that CNA has labeled the "Woodbridge Claims," and the lawsuits CNA has labeled the "Hybrid Lawsuit." Solely in the interests of consistency, Defendants will use those monikers in this motion as well. Defendants have identified in their undisputed facts below each of the thirty-seven Underlying Actions that fall within each of the three aforesaid CNA categories. Defendants also have included *supra* at ix-xii a table of the Underlying Actions.

voluntarily dismissed with no admissions of fault or liability.  *See* SUMFs 40–50.  Twenty-six of the Underlying Actions remain pending. *See* SUMF 56.

As set forth below, CNA's attempts to evade the coverage it promised are without merit and Defendants are entitled to judgment as a matter of law. Accordingly, Defendants respectfully move this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56-1 of the District of Utah Civil Rules for the entry of summary judgment in favor of Defendants against CNA on all counts of CNA's Complaint, declaring that under the Master Policy:

(1) CNA has a duty to defend the Defendants in the Underlying Actions;

(2) CNA has a duty to indemnify the Defendants as to the amounts established by judgment or settlement in the Underlying Actions that have resolved via judgment or settlement;

(3) CNA's request for a declaration as to the duty to indemnify must be dismissed as not ripe as to the Underlying Actions that have not resolved via judgment or settlement;

(4) the so-called FIP Claims, including any such claims in the Hybrid Lawsuit, are not subject to a single $1 million limit; and

(5) the so-called Woodbridge Claims, including any such claims in the Hybrid Lawsuit, are not subject to a single $1 million limit.

Defendants also filed their own counterclaim for breach of the duty to defend. [Dkt. No. 33].  As the claims in Defendants' counterclaim require the weighing of evidence and the resolution of factual disputes, Defendants' counterclaim is not the subject of the instant summary judgment motion. Rather, Defendants ask the Court to enter judgment in Defendants' favor and

against CNA on each of CNA's claims, confirming the coverage for the Underlying Actions that CNA promised Defendants under the Policy, as set forth above.[2]

## IV.     Statement of Undisputed Material Facts

1.      A true and accurate copy of the Life Agent Professional Liability Policy, Policy No. 287287986, defined above as the "Master Policy," issued to named insured (a non-party to this lawsuit), Mercer, is attached to CNA's Complaint in this action as Exhibit 1. *See* CNA's Complaint [Dkt. No. 2] at ¶ 1; Ex. 1 to CNA's Complaint [Dkt. No. 2].[3] For the convenience of the Court, a copy of the same is attached to this motion as Exhibit A.

2.      True and accurate copies of the Certificates under the Master Policy issued to each of the Defendants herein are attached to CNA's Complaint in this action as Exhibit 2. *See* CNA's Complaint [Dkt. No. 2] at ¶ 1; Ex. 2 to CNA's Complaint [Dkt. No. 2].[4] For the convenience of the Court, copies of the same are attached to this motion as Exhibit B.

### A.     The Suits that CNA Describes as the "FIP Claims"

3.      A true and accurate copy of the complaint in *Anderson, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190909161 (Salt Lake County, Utah) (the "Anderson Suit") is attached to the Appendix as Exhibit C; *see* Decl. of B. Moss (Exhibit D) at ¶ 4.

---

[2] The Court may enter a declaratory judgment for the defendant insured in a declaratory judgment action. *See, e.g., Fire Ins. Exch. v. Oltmanns,* 2012 UT App 230, 285 P.3d 802; *Bear River Mut. Ins. Co. v. Wall,* 1999 UT 33, 978 P.2d 460; *Am. States Ins. Co., W. Pac. Div. v. Walker*, 26 Utah 2d 161, 165, 486 P.2d 1042, 1044 (1971).

[3] CNA claims that the Policy attached as Exhibit 1 to its Complaint is the Policy that governs this Action. For purposes of this motion, Defendants do not dispute this assertion.

[4] CNA claims that the Certificates attached as Exhibit 2 to its Complaint are the Certificates of Insurance issued to each of the Defendants herein.  For purposes of this motion, Defendants do not dispute this assertion.

4.      A true and accurate copy of the complaint in *Argueta, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200902643 (Salt Lake County, Utah) (the "Argueta Suit") is attached to the Appendix as Exhibit E; *see* Ex. D at ¶ 5.

5.      A true and accurate copy of the complaint in *Auduong, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901039 (Salt Lake County, Utah) (the "Auduong Suit") is attached to the Appendix as Exhibit F; *see* Ex. D at ¶ 6.

6.      A true and accurate copy of the complaint in *Bartlett, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901046 (Salt Lake County, Utah) (the "Bartlett Suit") is attached to the Appendix as Exhibit G; *see* Ex. D at ¶ 7.

7.      A true and accurate copy of the complaint in *Belcher, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901020 (Salt Lake County, Utah) (the "Belcher Suit") is attached to the Appendix as Exhibit H; *see* Ex. D at ¶ 8.

8.      A true and accurate copy of the complaint in *Belcher v. Greg Duckwitz, Paramount Financial Services, Inc., et al.*, Case No. 210901806 (Salt Lake County, Utah) (the "Belcher II Suit") is attached to the Appendix as Exhibit I; *see* Ex. D at ¶ 9.

9.      A true and accurate copy of the complaint in *Bennett, et al. v. Jeremy Watson, Paramount Financial Services, Inc.*, *et al.*, Case No. 190907422 (Salt Lake County, Utah) (the "Bennett Suit") is attached to the Appendix as Exhibit J; *see* Ex. D at ¶ 10.

10.      A true and accurate copy of the complaint in *Braybrook, et al. v. Minnesota Life Ins. Co., Aaron Andrew, et al.*, Case No. 2:19-cv-01137-SVW-JPR (C.D. Cal.) (the "Braybrook Suit") is attached to the Appendix as Exhibit K; *see* Ex. D at ¶ 11.

11. A true and accurate copy of the complaint in *Buman, et al. v. Aaron Andrew, Paramount Financial Services, Inc.*, *et al.*, Case No. 200903141 (Salt Lake County, Utah) (the "Buman Suit") is attached to the Appendix as Exhibit L; *see* Ex. D at ¶ 12.

12. A true and accurate copy of the complaint in *D'Silva, et al. v. Karl Nelson, Paramount Financial Services, Inc.*, *et al.*, Case No. 200901038 (Salt Lake County, Utah) (the "D'Silva Suit") is attached to the Appendix as Exhibit M; *see* Ex. D at ¶ 13.

13. A true and accurate copy of the complaint in *Freck, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190907422 (Salt Lake County, Utah) (the "Freck Suit") is attached to the Appendix as Exhibit N; *see* Ex. D at ¶ 14.

14. A true and accurate copy of the complaint in *Galvis, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190907926 (Salt Lake County, Utah) (the "Galvis Suit") is attached to the Appendix as Exhibit O; *see* Ex. D at ¶ 15.

15. A true and accurate copy of the complaint in *Hansen, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901031 (Salt Lake County, Utah) (the "Hansen Suit") is attached to the Appendix as Exhibit P; *see* Ex. D at ¶ 16.

16. A true and accurate copy of the complaint in *Harvey, et al. v. Penn Mutual Life Ins. Co., Paramount Financial Services Inc., et al.*, Case No. 20-cv-364939 (Santa Clara County, Cal.) (the "Harvey Suit") is attached to the Appendix as Exhibit Q; *see* Ex. D at ¶ 17.

17. A true and accurate copy of the complaint in *Heater, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200901037 (Salt Lake County, Utah) (the "Heater Suit") is attached to the Appendix as Exhibit R; *see* Ex. D at ¶ 18.

18.     A true and accurate copy of the complaint in *Heath, et al. v. Gregory Duckwitz, Paramount Financial Services, Inc.*, *et al.*, Case No. 200902641 (Salt Lake County, Utah) (the "Heath Suit") is attached to the Appendix as Exhibit S; *see* Ex. D at ¶ 19.

19.     A true and accurate copy of the complaint in *Kane v. Paramount Financial Services, Inc., et al.*, Case No. 200901048 (Salt Lake County, Utah) (the "Kane Suit") is attached to the Appendix as Exhibit T; *see* Ex. D at ¶ 20.

20.     A true and accurate copy of the complaint in *Mendenhall, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200902709 (Salt Lake County, Utah) (the "Mendenhall Suit") is attached to the Appendix as Exhibit U; *see* Ex. D at ¶ 21.

21.     A true and accurate copy of the complaint in *Palmer, et al. v. Emron Andrew, Paramount Financial Services, Inc.*, *et al.*, Case No. 200901026 (Salt Lake County, Utah) (the "Palmer Suit") is attached to the Appendix as Exhibit V; *see* Ex. D at ¶ 22.

22.     A true and accurate copy of the complaint in *Pew v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200902644 (Salt Lake County, Utah) (the "Pew Suit") is attached to the Appendix as Exhibit W; *see* Ex. D at ¶ 23.

23.     A true and accurate copy of the complaint in *Ramirez v. Penn Mutual Life Ins. Co., Paramount Financial Services Inc., et al.*, Case No. 2:19-cv-07426 (C.D. Cal.) (the "Ramirez Suit") is attached to the Appendix as Exhibit X; *see* Ex. D at ¶ 24.

24.     A true and accurate copy of the complaint in *Reimann, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 200902707 (Salt Lake County, Utah) (the "Reimann Suit") is attached to the Appendix as Exhibit Y; *see* Ex. D at ¶ 25.

25.     A true and accurate copy of the complaint in *Roob, et al. v. Aaron Andrew, Paramount Financial Services, Inc.*, *et al.*, Case No. 200901041 (Salt Lake County, Utah) (the "Roob Suit") is attached to the Appendix as Exhibit Z; *see* Ex. D at ¶ 26.

26.     A true and accurate copy of the complaint in *Thompson, et al. v. Scott Reynolds, Paramount Financial Services, Inc.*, *et al.*, Case No. 200901035 (Salt Lake County, Utah) (the "Thompson Suit") is attached to the Appendix as Exhibit AA; *see* Ex. D at ¶ 27.

27.     A true and accurate copy of the complaint in *Wilkerson v. Andrew, et al.*, Case No. 180904644 (Weber County, Utah) (the "Wilkerson Suit") is attached to the Appendix as Exhibit BB; *see* Ex. D at ¶ 28.

**B.     The Suit that CNA Describes as the "Woodbridge Claims"**

28.     A true and accurate copy of the complaint in *Duennebeil, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 180903806 (Salt Lake County, Utah) (the "Duennebeil Suit") is attached to the Appendix as Exhibit CC; *see* Ex. D at ¶ 29.

**C.     The Suits that CNA Describes as the "Hybrid Lawsuit"**

29.     A true and accurate copy of the complaint in *Astill, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190906441 (Salt Lake County, Utah) (the "Astill Suit") is attached to the Appendix as Exhibit DD; *see* Ex. D at ¶ 30.

30.     A true and accurate copy of the complaint in *Binkerd, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190906444 (Salt Lake County, Utah) (the "Binkerd Suit") is attached to the Appendix as Exhibit EE; *see* Ex. D at ¶ 31.

31.     A true and accurate copy of the complaint in *Chatham, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906438 (Salt Lake County, Utah) (the "Chatham Suit") is attached to the Appendix as Exhibit FF; *see* Ex. D at ¶ 32.

32.     A true and accurate copy of the complaint in *Conroy, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906439 (Salt Lake County, Utah) (the "Conroy Suit") is attached to the Appendix as Exhibit GG; *see* Ex. D at ¶ 33.

33.     A true and accurate copy of the complaint in *Crockett, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906440 (Salt Lake County, Utah) (the "Crockett Suit") is attached to the Appendix as Exhibit HH; *see* Ex. D at ¶ 34.

34.     A true and accurate copy of the complaint in *Dembele, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906448 (Salt Lake County, Utah) (the "Dembele Suit") is attached to the Appendix as Exhibit II; *see* Ex. D at ¶ 35.

35.     A true and accurate copy of the complaint in *Hawk, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906442 (Salt Lake County, Utah) (the "Hawk Suit") is attached to the Appendix as Exhibit JJ; *see* Ex. D at ¶ 36.

36.     A true and accurate copy of the complaint in *Huwe, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190906436 (Salt Lake County, Utah) (the "Huwe Suit") is attached to the Appendix as Exhibit KK; *see* Ex. D at ¶ 37.

37.     A true and accurate copy of the complaint in *Murray, et al. v. Paramount Financial Services, Inc., et al.*, Case No. 190909970 (Salt Lake County, Utah) (the "Murray Suit") is attached to the Appendix as Exhibit LL; *see* Ex. D at ¶ 38.

38.     A true and accurate copy of the complaint in *Roper v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190909971 (Salt Lake County, Utah) (the "Roper Suit") is attached to the Appendix as Exhibit MM; *see* Ex. D at ¶ 39.

39.     A true and accurate copy of the complaint in *Zigerelli, et al. v. Paramount Financial Services, Inc.*, *et al.*, Case No. 190906443 (Salt Lake County, Utah) (the "Zigerelli Suit") is attached to the Appendix as Exhibit NN; *see* Ex. D at ¶ 40. Each of the lawsuits set out in SUMF Nos. 3-39 are referred to as the "Underlying Actions."

**D.     Some Suits Have Been Resolved**

40.     A true and accurate copy of the settlement agreement in the Braybrook Suit, with monetary portions redacted, is attached to the Appendix as Exhibit OO; *see* Ex. D at ¶ 41.

41.     A true and accurate copy of the settlement agreement in the Galvis Suit, with monetary portions redacted, is attached to the Appendix as Exhibit PP; *see* Ex. D at ¶ 42.

42.     The settlement agreement in the Harvey Suit contains strict confidentiality provisions. Defendants are securing all underlying parties' permission to file this agreement and expect to file it as supplemental Exhibit QQ if permission is received. *See* Ex. D at ¶ 43.

43.     The settlement agreement in the Ramirez Suit contains strict confidentiality provisions. Defendants are securing all underlying parties' permission to file this agreement and expect to file it as supplemental Exhibit RR if permission is received. *See* Ex. D at ¶ 44.

44.     A true and accurate copy of the settlement agreement in the Wilkerson Suit, with monetary portions redacted, is attached to the Appendix as Exhibit SS; *see* Ex. D at ¶ 45.

45.     CNA was aware of and consented to the settlements of the Braybrook, Galvis, Harvey, Ramirez, and Wilkerson Suits. *See* Exs. OO-SS; *see* Ex. D at ¶ 46.

9

46.     The Argueta Suit was voluntarily dismissed with prejudice. A true and accurate copy of the stipulated dismissal is attached to the Appendix as Exhibit TT; *see* Ex. D at ¶ 47.

47.     The Belcher II Suit was voluntarily dismissed with prejudice. A true and accurate copy of the stipulated dismissal is attached to the Appendix as Exhibit UU; *see* Ex. D at ¶ 48.

48.     The Heath Suit was voluntarily dismissed without prejudice. A true and accurate copy of the stipulated dismissal is attached to the Appendix as Exhibit VV; *see* Ex. D at ¶ 49.

49.     The Pew Suit was voluntarily dismissed with prejudice. A true and accurate copy of the stipulated dismissal is attached to the Appendix as Exhibit WW; *see* Ex. D at ¶ 50.

50.     The Reimann Suit was voluntarily dismissed with prejudice. A true and accurate copy of the stipulated dismissal is attached to the Appendix as Exhibit XX; *see* Ex. D at ¶ 51.

51.     The Duennebeil Suit has proceeded to judgment following a jury verdict, and motions to amend the judgment are pending. A true and accurate copy of the judgment is attached to the Appendix as Exhibit YY; *see* Ex. D at ¶ 52.

52.     In the Duennebeil case, the jury did not consider nor did they decide whether the Woodbridge products were securities, nor did they decide any securities claims. A true and accurate copy of the verdict form is attached to the Appendix as Exhibit ZZ; *see* Ex. D at ¶ 53.

53.     The jury found that Live Abundant, Douglas Andrew, and Aaron Andrew negligently provided financial services to each Plaintiff. *See* Ex. YY at p. 2.

54.     The jury further found that Aaron Andrew omitted material facts or negligently misrepresented material facts to plaintiffs James Wheeler, Michael Molacek, and Dorothy Yeung; Karl Nelson omitted material facts or negligently misrepresented material facts to plaintiffs Roxanne and/or Peter Duennebeil, John Sylvester, and Ann Halliday; Jeremy Watson omitted

10

material facts or negligently misrepresented material facts to plaintiff Gary Waggoner; and Live Abundant omitted material facts or negligently misrepresented material facts to each plaintiff. *See* Ex. YY at pp. 2-3.

55.     The Duennebeil jury found only that the insured Defendants were negligent and/or unjustly enriched in their provision of financial services. *See* Exs. YY-ZZ; *see* Ex. D at ¶ 54.

56.     Except for the Braybrook, Galvis, Harvey, Ramirez, Wilkerson, Argueta, Belcher II, Pew, Reimann, Heath, and Duennebeil Suits, there has been no settlement and no determination of liability in any of the other Underlying Actions. *See* Ex. D at ¶ 55.

### E.     Other undisputed facts germane to Defendants' Motion

57.     In addition to the Underlying Actions described above, CNA's complaint refers to "164 non-suited demand letters, dated September 4, 2019, issued by Rikard & Protopapas, LLC," but CNA did not identify these letters with any additional specificity. Ex. 3 to CNA's Complaint [Dkt. No. 2-3] at p. 2.

58.     The Defendant Insureds purchased their Certificates of Insurance in Utah. *See* CNA's Complaint [Dkt. No. 2] at ¶ 1; Ex. 2 to CNA's Complaint [Dkt. No. 2] at pp. 1, 3, 7, 9, 13, 15, 19, 21, 25, 27, 31, 33, 37, 39.

59.     The Certificates of Insurance were delivered to each of the Defendant Insureds in Utah. *See* CNA's Complaint [Dkt. No. 2] at ¶ 1; Ex. 2 to CNA's Complaint [Dkt. No. 2] at pp. 1, 3, 7, 9, 13, 15, 19, 21, 25, 27, 31, 33, 37, 39.

60.     The Certificates of Insurance each include a Utah-specific endorsement. *See* CNA's Complaint [Dkt. No. 2] at ¶ 1; Ex. 2 to CNA's Complaint [Dkt. No. 2] at pp. 6, 12, 18, 24, 30, 36, 43.

61.     With the exception of the Braybrook, Harvey, and Ramirez Suits, all of the underlying actions were filed in Utah. *See* Exs. C to NN.

62.     The underlying actions relate to conduct that occurred by the Defendant Insureds in Utah. *See* Exs. C to NN.

63.     The Defendant Insureds are domiciled in the state of Utah. *See* CNA's Complaint [Dkt. No. 2] at ¶¶ 9-16; Defendants' Answer [Dkt. No. 33] at ¶¶ 9–16.

64.      The Defendant Insureds received multiple opinions from attorneys advising that the Woodbridge products were not securities. *See* Ex. AAA; Ex. D at ¶ 57.

65.     A true and accurate copy of these opinions is attached to the Appendix as Exhibit AAA. *See* Ex. D at ¶ 58.

66.     The IUL insurance products at issue in the Duennebeil Suit were underwritten by the following insurance companies: Allianz Life Insurance Company of North America, Life Insurance Company of the Southwest, and Minnesota Life Insurance Company. A true and accurate copy of the policies and applications evidencing the insurance companies at issue are attached to the Appendix as Exhibit BBB. *See* Ex. D at ¶ 59.

67.     Allianz Life Insurance Company of North America has been rated A- or better since at least 2012. *See* Exs. CCC and DDD; Ex. D at ¶¶ 60–61.

68.     Life Insurance Company of the Southwest has been rated A- or better since at least 2016. *See* Exs. CCC and DDD; Ex. D at ¶¶ 60–61.

69.     Minnesota Life Insurance Company has been rated A- or better since at least 2011. *See* Exs. CCC and DDD; Ex. D at ¶¶ 60–61.

70.     Allianz Life Insurance Company of North America has been admitted in Utah since at least 2012. *See* Ex. EEE; Ex. D at ¶ 62.

71.     Life Insurance Company of the Southwest has been admitted in Utah since at least 2016. *See* Ex. EEE; Ex. D at ¶ 62.

72.     Minnesota Life Insurance Company has been admitted in Utah since at least 2011. *See* Ex. EEE; Ex. D at ¶ 62.

73.     In the Duennebeil Suit, Plaintiff Kent Booth purchased an interest in 901 Stone Canyon Rd., Los Angeles, CA. *See* Ex. FFF at pp. 1–18 of 447; Ex. D at ¶ 63.

74.     In the Duennebeil Suit, Plaintiffs Roxanne and Peter Duennebeil purchased interests in 805 Nimes Place, Los Angeles, CA; 141 South Carolwood Dr., Holmby Hills, CA; 8570 Hillside Ave. Los Angeles, CA; and 1 Electra Court, Los Angeles, CA. *See* Ex. FFF at pp. 19–94 of 447; Ex. D at ¶ 63.

75.     In the Duennebeil Suit, Plaintiff Ann Halliday purchased an interest in 1241 Loma Vista Dr., Beverly Hills, CA. *See* Ex. FFF at pp. 95–121 of 447; Ex. D at ¶ 63.

76.     In the Duennebeil Suit, Plaintiffs Patrick and Susan Haslam purchased an interest in 2600 Hutton Dr., Beverly Hills, CA; 1 Electra Court, Los Angeles, CA. *See* Ex. FFF at pp. 122–143 of 447; Ex. D at ¶ 63.

77.     In the Duennebeil Suit, Plaintiff Michael Karpinski purchased interests in 270 Spruce Ridge Lane, Snowmass Village, CO, and Lot 41, Parcel B, TBD Two Creeks Drive, Snowmass Village, CO. *See* Ex. FFF at pp. 144–185 of 447; Ex. D at ¶ 63.

78.     In the Duennebeil Suit, Plaintiff Michael Molacek purchased an interest in 270 Spruce Ridge Lane, Snowmass Village, CO. *See* Ex. FFF at pp. 186–207 of 447; Ex. D at ¶ 63.

79.     In the Duennebeil Suit, Plaintiff John Sylvester purchased interests in 9120 Oriole Way, Los Angeles, CA, and Unit C-126 of the Triangle Park Lofts and Unit 301 at Market Street Crossing at Willits Town Center in Basalt, CO. *See* Ex. FFF at pp. 208–243 of 447; Ex. D at ¶ 63.

80.     In the Duennebeil Suit, Plaintiff Gary Waggoner purchased an interest in 141 South Carolwood Dr., Holmby Hills, CA. *See* Ex. FFF at pp. 244–261 of 447; Ex. D at ¶ 63.

81.     In the Duennebeil Suit, Plaintiff Arlene Walker purchased interests in Aspen Glen Section 29 Township 7 Range 88 Lot C-6 known as No. 59 Rivers Bend, Carbondale, CO; 41 King Street, New York, NY; 2350 N. Broad St., Philadelphia, PA; and 1520 Toledano St., New Orleans, LA. *See* Ex. FFF at pp. 262–277 of 447; Ex. D at ¶ 63.

82.     In the Duennebeil Suit, Plaintiff James Wheeler purchased interests in 642 Saint Cloud Road, Los Angeles, CA; 141 South Carolwood Dr. Holmby Hills; 47 Mustang Circle, Snowmass Village, CO; 9230 Robin Dr. Los Angeles, CA; 810 Sarbonne Rd. Los Angeles CA; 180 Seeburg Circle, Lot D-38, Carbondale, CO; and 1357 Laurel Way, Beverly Hills, CA. *See* Ex. FFF at pp. 278–417 of 447; Ex. D at ¶ 63.

83.     In the Duennebeil Suit, Plaintiff Francis Yeung purchased an interest in 375 Trousdale Place Beverly Hills, CA. *See* Ex. FFF at pp. 418–447 of 447; Ex. D at ¶ 63.

84.     Numerous state and federal regulators have determined that Future Income Payments, LLC ("FIP") was <u>not</u> purchasing pension streams of income, but was actually lending money to pensioners in exchange for an amount of money the pensioner should be able to afford based on their pension payments each month. *See, e.g., In the Matter of: Future Income Payments, LLC*, CFR-FY2016-0027, 2018 WL 4051337 (Md. Comm. Fin. Reg. Apr. 25, 2018); *In the Matter of Future Income Payments, LLC, Respondent*, 2016 WL 6882803 (NY Bnk. Dept. Oct. 20, 2016);

14

*Minn. Att. Gen. and Comm. of Comm. vs. Future Income Payments, LLC, f/k/a Pensions, Annuities, and Settlements, LLC and FIP LLC*, Case No. 27-CV-17-12579, 2018 WL 10454834 (Minn. Dept. of Commerce July 18, 2018); *In the Matter of Determining Whether There Has Been A Violation of the Consumer Loan Act of Washington By: Pensions, Annuities and Settlements, LLC, a/k/a Future Income Payments, LLC, and Scott Kohn*, Case No. C-14-1449-15-SC02, 2015 WL 4503495 (Wash. Dept. of Fin. Inst. May 13, 2015); *Bureau of Consumer Fin. Prot. v. Future Income Payments, LLC*, Case No. CV 6:19-2950-BHH [Dkt. No. 120] (D.S.C. Feb. 22, 2021).

## V.    Argument

### A.    Utah Law Governs

As an initial matter, Utah law governs this motion. *See American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188–90 (Utah 1996) (adopting the most significant relationship test to determine which law governs the interpretation of an insurance contract). The insurance contract at issue does not include a choice of law provision, and under these circumstances Utah law will apply the most significant relationship test. *See id*. at 188 (citing Restatement (Second) of Conflict of Laws § 188(2) (1971), which provides that a choice of law analysis is required "[i]n the absence of an effective choice of law by the [contracting] parties"); *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp*., 2012 UT App 100, ¶¶ 27–46, 276 P.3d 1156, 1165–72. To determine which state has the most significant relationship to the transaction and the parties in a contractual dispute, Section 188 requires consideration of several contacts to the states involved in the matter: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the . . . place of

15

incorporation and place of business of the parties. Id. § 188(2). Here, nearly all of the contacts were centered in Utah. *See, e.g.,* SUMF58 (the Defendant Insureds purchased their Certificates of Insurance in Utah); SUMF 59 (the Certificates of Insurance were delivered in Utah); SUMF 60 (the Certificates of Insurance include a Utah-specific endorsement); SUMF 61 (nearly every single underlying suit was filed in Utah); SUMF 62 (the Underlying Actions relate to conduct that allegedly occurred in Utah); SUMF 63 (the Defendant Insureds are domiciled in Utah).

## B.   Rules Of Decision

### 1.   Summary Judgment Standards

The standards applicable to summary judgment motions are well established. A "'court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Reorganized FLI, Inc. v. Williams Companies, Inc.*, 1 F.4th 1214, 1218 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). Once the movant shows the absence of a genuine material fact, the nonmovant "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [it] carries the burden of proof." *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co*., 358 F.3d 736, 739 (10th Cir. 2004) (citations omitted).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. Under these standards, Defendants respectfully submit that judgment should be entered for Defendants.

### 2.  Law Governing Insurance Disputes

Under Utah law, the terms of an insurance policy are construed according to their "plain and ordinary" or "usually accepted meanings." *Holmes Dev., LLC, v. Cook*, 48 P.3d 895, 902 (Utah 2007); *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999) (citations omitted). The individual provisions of the insurance policy are construed "in light of the policy as a whole." *Utah Farm Bureau*, 980 P.2d at 686. Insurers may only "exclude from coverage certain losses by using 'language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided.'" *Alf v. State Farm Fire and Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993) (citations omitted); *see also United Ins. Co. v. Heighton,* No. 2:14CV435DAK, 2016 WL 4916785, at *2 (D. Utah Sept. 14, 2016) (citing *Alf*, 850 P.2d at 1275).

Insurance contracts are "construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." *U.S. Fid. & Guar. Co. v. Sandt,* 854 P.2d 519, 522 (Utah 1993) ("[Utah] has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid.") (citations omitted). In Utah, as in many other jurisdictions, an insurance contract "must be interpreted and construed as an ordinary purchaser of insurance would understand it." *Farmers Ins. Exch. v. Versaw*, 2004 UT 73, ¶¶ 24-25, 99 P.3d 796, 800 (citing *Sandt*, 854 P.2d at 523).

A liability insurance policy promises a defense and indemnification for covered claims. "An insurer's duty to defend is determined by reference to the allegations in the underlying complaint. When those allegations, if proved, could result in liability under the policy, then the

insurer has a duty to defend." *Great Am. Ins. Co. v. Woodside Homes Corp*., 448 F. Supp. 2d 1275, 1278 (D. Utah 2006) (citing *Nova Casualty Co. v. Able Constr., Inc*., 1999 UT 69, ¶ 8, 983 P.2d 575. Accordingly, the allegations in the underlying actions are essential to resolving the issues presently before this Court.  For the same reason, where a claim has not been filed as a lawsuit, questions concerning the duty to defend are not yet ripe. *See, e.g., Allstate Indem. Co. v. Thatcher*, 2007 UT App 183, ¶ 5, 164 P.3d 445, 446 (dismissing action for declaratory judgment for lack of jurisdiction when there was no underlying complaint to analyze, because without a complaint, the "duty to defend is not ripe for judicial determination") (citations omitted).[5]

Similarly, the insurer's duty to **indemnify** the insured against underlying claims is determined not from the allegations in the complaint, but rather from the facts as they ultimately are determined through judgment or settlement.  *See, e.g., Benjamin v. Amica Mut. Ins. Co.,* 2006 UT 37, ¶¶ 29–30, 140 P.3d 1210. As a consequence, declaratory relief as to the duty to indemnify is not available where the underlying claims against the insured remain pending. *See, e.g.*, *Boyle v. Nat'l Union Fire Ins. Co*., 866 P.2d 595, 598 (Utah Ct. App. 1993) (holding that the question of coverage was not ripe for declaratory judgment adjudication prior to a determination of the liability of the insured).

### C.    The Underlying Lawsuits Constitute "Claims" For "Wrongful Acts" Solely In Rendering Or Failing To Render "Professional Services."

In Count I of its Complaint, CNA seeks a declaration of no coverage for any of the Underlying Actions based on its conclusion that none of them involve any "Claims for a Wrongful

---

[5] For this reason, to the extent CNA seeks relief as to the "164 non-suited demand letters, dated September 4, 2019, issued by Rikard & Protopapas, LLC," *see* SUMF 57, that claim should be dismissed.

Act solely in rendering or failing to render Professional Services." [Dkt. No. 2 at ¶ 69]. That is

incorrect. The insuring agreement to the Professional Liability coverage provides in relevant part:

> The Insurer shall pay on behalf of the **Insureds**, excess of the applicable Retention and within the Limits of Liability as stated in the applicable **Certificate of Insurance**, that **Loss** which the **Insureds** become legally obligated to pay resulting from a **Claim** for a **Wrongful Act** solely in rendering or failing to render **Professional Services** . . .

Ex. A at p. 3 of 71. CNA argues the above provision is not satisfied—by any of the claims in any

of the Underlying Actions—without articulating how any of the Underlying Actions actually fail

to satisfy the above requirement. That omission is understandable.

### 1.    The Claim Requirement

First, the Master Policy defines "Claim" to mean:

A.    a written demand for monetary damages; or

B.    a civil adjudicatory or arbitration proceeding for monetary damages,

against an Insured for a Wrongful Act . . . brought by or on behalf of or for the benefit of any Client [a natural person to whom, or entity to which, Professional Services are rendered by an Insured].

Ex. A at p. 5 of 71.

Though they are different in many ways, each of the Underlying Actions has been brought

by or on behalf of a client of the Defendants and seeks monetary damages.[6]

---

[6] Compare the Policy's definition of "Claim," Ex. A at p. 3 of 71, with SUMF 3 (Anderson) at ¶¶ 76-91, 111-119; SUMF 4 (Argueta) at ¶¶ 67-80, 99-105; SUMF 5 (Auduong) at ¶¶ 80-95, 115-123; SUMF 6 (Bartlett) at ¶¶ 78-93, 113-121; SUMF 7 (Belcher) at ¶¶ 71-86, 106-114; SUMF 8 (Belcher II) at ¶¶ 78-93, 113-121; SUMF 9 (Bennett) at ¶¶ 75-90, 110-118; SUMF 10 (Braybrook) at ¶¶ 52-60; SUMF 11 (Buman) at ¶¶ 96-111, 151-169; SUMF 12 (D'Silva) at ¶¶ 83-98, 118-126; SUMF 13 (Freck) at ¶¶ 73-88, 108-116; SUMF 14 (Galvis) at ¶¶ 72-80; SUMF 15 (Hansen) at ¶¶ 73-88, 108-116; SUMF 16 (Harvey) at ¶¶ 69-79; SUMF 17 (Heater) at ¶¶ 83-98, 118-126; SUMF 18 (Heath) at ¶¶ 44-56, 75-81; SUMF 19 (Kane) at ¶¶ 71-86, 106-114; SUMF 20 (Mendenhall) at ¶¶ 73-88, 108-116; SUMF 21 (Palmer) at ¶¶ 73-88, 108-116; SUMF 22 (Pew) at ¶¶ 71-86, 106-114; SUMF 23 (Ramirez) at ¶¶ 65-68; SUMF 24 (Reimann) at ¶¶ 57-72, 92-100; SUMF 25 (Roob) at ¶¶ 96-111, 131-139; SUMF 26 (Thompson) at ¶¶ 92-107, 127-135; SUMF 27 (Wilkerson) at ¶¶ 68-76); SUMF 28 (Duennebeil) at ¶¶ 125-140; SUMF 29 (Astill) at ¶¶ 63-68; SUMF 30 (Binkerd) at ¶¶ 128-133; SUMF 31 (Chatham) at ¶¶ 54-59; SUMF 32 (Conroy) at ¶¶ 66-71; SUMF 33

### 2.    The Professional Services Requirement

Second, the Master Policy defines "Professional Services" to include:

1. the sale, attempted sale or servicing of life insurance, accident and health insurance or managed health care organization contracts (that does not require a securities license);
2. the sale, attempted sale or servicing of disability income insurance (if purchased as indicated on the Certificate of Insurance);
3. the sale, attempted sale or servicing of indexed/fixed annuities, (if purchased as indicated on the Certificate of Insurance);
4. services as a Notary Public;
5. financial planning activities in conjunction with services described in paragraphs 1. through 4. (if purchased) of this definition, whether or not a separate fee is charged;
6. the supervision, management and training of an Agent by a General Agent with respect to activities otherwise covered by this Policy.

Ex. A at p. 7 of 71.

Each of the Underlying Actions seeks relief based on various activities involving the sale, attempted sale or servicing of life insurance products within the scope of subparagraph 1 in the above definition.[7] *See, e.g.*, *Mirman v. Exec. Risk Indem., Inc*., 474 F. Supp. 3d 609, 616 (S.D.N.Y. 2019) (holding that negotiating a loan for employer's holding company, opening an account for a stock buyer, and receiving commissions, "unmistakably constituted 'professional services'"

---

(Crockett) at ¶¶ 69-74; SUMF 34 (Dembele) at ¶¶ 131-136; SUMF 35 (Hawk) at ¶¶ 73-78; SUMF 36 (Huwe) at ¶¶ 40-45; SUMF 37 (Murray) at ¶¶ 35-40; SUMF 38 (Roper) at ¶¶ 35-40; SUMF 39 (Zigerelli) at ¶¶ 81-86.

[7] *See, e.g.,* SUMF 3 (Anderson) at ¶¶ 80, 85; SUMF 4 (Argueta) at ¶¶ 68, 71, 73; SUMF 5 (Auduong) at ¶¶ 84, 89; SUMF 6 (Bartlett) at ¶¶ 82, 87; SUMF 7 (Belcher) at ¶¶ 75, 80; SUMF 8 (Belcher II) at ¶¶ 82, 87; SUMF 9 (Bennett) at ¶¶ 79, 84; SUMF 10 (Braybrook) at ¶¶ 53; SUMF 11 (Buman) at ¶¶ 110, 115; SUMF 12 (D'Silva at ¶¶ 87, 92; SUMF 13 (Freck) at ¶¶ 77, 82; SUMF 14 (Galvis) at ¶¶ 73-74; SUMF 15 (Hansen) at ¶¶ 77, 82; SUMF 16 (Harvey) at ¶¶ 70-71; SUMF 17 (Heater) at ¶¶ 87, 92; SUMF 18 (Heath) at ¶¶ 45-49; SUMF 19 (Kane) at ¶¶ 75, 80; SUMF 20 (Mendenhall) at ¶¶ 77, 82; SUMF 21 (Palmer) at ¶¶ 77, 82; SUMF 22 (Pew) at ¶¶ 75, 80; SUMF 23 (Ramirez) at ¶¶ 66; SUMF 24 (Reimann) at ¶¶ 61, 66; SUMF 25 (Roob) at ¶¶ 100, 105; SUMF 26 (Thompson) at ¶¶ 96, 101; SUMF 27 (Wilkerson) at ¶¶ 69-70; SUMF 28 (Duennebeil) at p. 2, ¶¶ 24, 29; SUMF 29 (Astill) at ¶¶ 63-68; SUMF 30 (Binkerd) at ¶¶ 49, 129; SUMF 31 (Chatham) at ¶¶ 18, 55; SUMF 32 (Conroy) at ¶ 67; SUMF 33 (Crockett) at ¶¶ 19, 70; SUMF 34 (Dembele) at ¶¶ 35, 132; SUMF 35 (Hawk) at ¶¶ 74; SUMF 36 (Huwe) at ¶¶ 41; SUMF 37 (Murray) at ¶¶ 14, 15, 36; SUMF 38 (Roper) at ¶¶ 13, 14, 36; SUMF 39 (Zigerelli) at ¶¶ 22, 23, 82.

because the insured "used his special acumen and training as a broker"); *David Lerner Assocs., Inc. v. Philadelphia Indem. Ins. Co*., 934 F. Supp. 2d 533, 542 (E.D.N.Y.), *aff'd*, 542 F. App'x 89 (2d Cir. 2013) (holding that, for purposes of a policy's professional-services exclusion, purported failure of insured to conduct due diligence on real estate investment trusts in connection with providing investment advice to customers in sale of shares of REITs constituted "professional services"); *Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484, 495–497 (D. Ariz. 1991) (finding that bond sales representatives in savings and loan new accounts department were performing "professional service" within professional services exclusions in excess of general liability policies, even if they were ill-trained or untrained).

### 3.      The Wrongful Act Requirement

Third, the Policy defines "Wrongful Act" as "any negligent act, error or omission of, or **Personal Injury** caused by, the **Insureds** in rendering or failing to render **Professional Services**." Ex. A at p. 8 of 71. In each of the Underlying Actions the plaintiffs seek relief from the Defendants premised on a host of alleged negligent acts, errors, or omissions related to "the sale . . . or servicing of life insurance" namely, various indexed universal life ("IUL") policies from a variety of insurance companies, and "financial planning activities in conjunction with [these] services . . . whether or not a separate fee is charged." Ex. A at p. 7 of 71.[8]

---

[8] Allegations to this effect in each of the Underlying Actions can be found at: SUMF 3 (Anderson) at ¶¶ 76-91, 111-119; SUMF 4 (Argueta) at ¶¶ 67-80, 99-105; SUMF 5 (Auduong) at ¶¶ 80-95, 115-123; SUMF 6 (Bartlett) at ¶¶ 78-93, 113-121; SUMF 7 (Belcher) at ¶¶ 71-86, 106-114; SUMF 8 (Belcher II) at ¶¶ 78-93, 113-121; SUMF 9 (Bennett) at ¶¶ 75-90, 110-118; SUMF 10 (Braybrook) at ¶¶ 52-60; SUMF 11 (Buman) at ¶¶ 96-121, 151-169; SUMF 12 (D'Silva) at ¶¶ 83-98, 118-126; SUMF 13 (Freck) at ¶¶ 73-88, 108-116; SUMF 14 (Galvis) at ¶¶ 72-80; SUMF 15 (Hansen) at ¶¶ 19-21, 73-88, 108-116; SUMF 16 (Harvey) at ¶¶ 69-79; SUMF 17 (Heater) at ¶¶ 83-98, 118-126; SUMF 18 (Heath) at ¶¶ 44-56, 75-81; SUMF 19 (Kane) at ¶¶ 71-86, 106-114; SUMF 20 (Mendenhall) at ¶¶ 73-88, 108-116; SUMF 21 (Palmer) at ¶¶ 73-88, 108-116; SUMF 22 (Pew) at ¶¶ 71-86, 106-114; SUMF 23 (Ramirez) at ¶¶ 65-68; SUMF 24 (Reimann) at ¶¶ 57-72, 92-100; SUMF 25 (Roob) at ¶¶ 96-111, 131-139; SUMF 26 (Thompson) at ¶¶ 92-107, 127-135; SUMF 27 (Wilkerson) at ¶¶ 68-76); SUMF 28 (Duennebeil) at ¶¶ 125-140; SUMF 29 (Astill) at ¶¶ 63-68; SUMF 30 (Binkerd) at ¶¶ 128-133; SUMF 31 (Chatham) at ¶¶ 54-59; SUMF 32

Thus, each of the Underlying Actions seeks recovery money damages from the Defendants based on an array of purported "Wrongful Acts" in rendering or failing to render "Professional Services."

### 4. The Use Of "Solely" Does Not Eliminate Coverage

The use of the word "solely" in the Insuring Agreement (". . . Loss which the Insureds become legally obligated to pay resulting from a Claim for a Wrongful Act <u>solely</u> in rendering or failing to render Professional Services . . .") does not take the Underlying Actions outside the reach of the insuring agreement. Indeed, CNA has yet to identify which allegations in the Underlying Actions CNA contends amount to conduct by the Defendants that did not involve the rendering or failing to render "Professional Services." Moreover, even if it should be the case that an Underlying Action included claims for Loss involving both (a) a Wrongful Act in rendering or failing to render Professional Services, and (b) some other Wrongful Act not involving the provision of Professional Services, the Master Policy simply provides that coverage is to be allocated between the two causes of Loss:

> If a Claim made against the Insureds includes both covered and uncovered matters . . . the Insureds agree that there must be an allocation between insured and uninsured Loss (other than that part of Loss attributable to Defense Costs).

Ex. A at p. 10 of 71.

Thus, as a matter of law, each of the Underlying Actions involve claims against the Defendants for purported "**Loss** . . . resulting from a **Claim** for a **Wrongful Act** solely in rendering

---

(Conroy) at ¶¶ 66-71; SUMF 33 (Crockett) at ¶¶ 69-74; SUMF 34 (Dembele) at ¶¶ 131-136; SUMF 35 (Hawk) at ¶¶ 73-78; SUMF 36 (Huwe) at ¶¶ 40-45; SUMF 37 (Murray) at ¶¶ 35-40; SUMF 38 (Roper) at ¶¶ 35-40; SUMF 39 (Zigerelli) at ¶¶ 81-86.

or failing to render **Professional Services** . . . ." Defendants accordingly request that the Court enter judgment in favor of Defendants and against CNA on the first Count in CNA's Complaint.

### 5.    The Same Result Obtains In Those Underlying Actions That Have Resolved

None of the settlements or the one judgment in the Underlying Action alters the above analysis. To be sure, the question of CNA's indemnity obligation only can be determined once a judgment or settlement on a particular suit is reached. *See, e.g.*, *Benjamin,* 2006 UT 37, ¶¶ 29–30 (explaining that the duty to indemnify depends on whatever liability arises out of a judgment or settlement); *see also Summerhaze Co., L.C. v. Fed. Deposit Ins. Corp.,* 2014 UT 28, ¶ 36, 332 P.3d 908, 920.[9]

However, in the Duennebeil Suit (the one Underlying Action to be tried) the jury found that Live Abundant, Douglas Andrew, and Aaron Andrew negligently provided financial services to each Plaintiff. *See* SUMF 53. The jury further found that Aaron Andrew omitted material facts or negligently misrepresented material facts to plaintiffs James Wheeler, Michael Molacek, and Dorothy Yeung; Karl Nelson omitted material facts or negligently misrepresented material facts to plaintiffs Roxanne and/or Peter Duennebeil, John Sylvester, and Ann Halliday; Jeremy Watson omitted material facts or negligently misrepresented material facts to plaintiff Gary Waggoner; and Live Abundant omitted material facts or negligently misrepresented material facts to each plaintiff. *See* SUMF 54. These findings, which are binding on CNA, *see, e.g.*, *Summerhaze Co.,* 332 P.3d at 920–921, establish that the liability assessed against the Defendants in that action is

---

[9] For this reason, the question of CNA's obligation to indemnify is not yet ripe as to those of the Underlying Actions that remain pending, all of which are shown in the Table of Underlying Actions, *supra* at ix-xii.

indeed within the scope of the Policy's Professional Liability insuring agreement. *See id.* ("If an insurer has notice of a claim against an insured, and 'has been afforded an opportunity to appear and de-fend,' regardless of whether the insurer actually appears, any judgment against the insured will also conclusively bind the insurer.").

The same conclusion follows with respect to those five of the Underlying Actions that have settled. In that regard, Defendants note that in none of those settlements was there any allocation as to amounts paid between covered and purportedly non-covered claims. *See* SUMF 40 at pp. 3-5; SUMF 41 at pp. 2-4; SUMF 42; SUMF 43; and SUMF 44 at pp. 2-5. Yet, where the parties settled with CNA's consent and without including an allocation between covered and uncovered claims in the settlement documents, that failure to allocate is fatal to CNA's position. *See, e.g., Commc'ns Unlimited, Contracting Servs., Inc. v. Broadband Infrastructure Connection, LLC,* 558 F. Supp. 3d 773, 785–86 (E.D. Mo. 2021); *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1211 (10th Cir. 2009); *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1209 (10th Cir. 1988). CNA was aware of and consented to each of the settlements. *See* SUMF 45.

Thus, the amounts of the judgment and each of the settlements in the Underlying Actions are within the Insuring Agreement to the Professional Liability coverage in the Master Policy.

### D.      CNA's Reliance On The Unregistered Security Exclusion Is Misplaced.

In Count II of its Complaint CNA seeks to evade its obligations under the Master Policy based on the alleged application of the Unregistered Security Exclusion to the Underlying Actions. That argument, too, is without merit. The Unregistered Security Exclusion provides that CNA:

> shall not be liable to pay any **Loss** in connection with any **Claim** . . . based upon, directly or indirectly arising out of, or in any way involving the use of or investment in any security that is not registered with the Securities and Exchange Commission[.]

Ex. A at pp. 13, 18 of 71.

The Underlying Actions refer to three products to which CNA may argue this exclusion applies: (1) IUL insurance products from the Insured Defendants, (2) investment products from third party Woodbridge, and (3) investment products from third party FIP.

First, none of the plaintiffs in the Underlying Actions have alleged that Defendants sold securities that were required to be registered by the SEC.[10] Indeed, in none of the Underlying Actions do the plaintiffs assert federal claims at all.[11] To the contrary, the plaintiffs in each of the Underlying Actions seek relief from the Defendants' alleged claims arising from the sale of IUL insurance policies or the recommendation of certain lending strategies.[12] There is no dispute that

---

[10] *See generally* SUMF 3 (Anderson); SUMF 4 (Argueta); SUMF 5 (Auduong); SUMF 6 (Bartlett); SUMF 7 (Belcher); SUMF 8 (Belcher II); SUMF 9 (Bennett); SUMF 10 (Braybrook); SUMF 11 (Buman); SUMF 12 (D'Silva); SUMF 13 (Freck); SUMF 14 (Galvis); SUMF 15 (Hansen); SUMF 16 (Harvey); SUMF 17 (Heater); SUMF 18 (Heath); SUMF 19 (Kane); SUMF 20 (Mendenhall); SUMF 21 (Palmer); SUMF 22 (Pew); SUMF 23 (Ramirez); SUMF 24 (Reimann); SUMF 25 (Roob); SUMF 26 (Thompson); SUMF 27 (Wilkerson); SUMF 28 (Duennebeil); SUMF 29 (Astill); SUMF 30 (Binkerd); SUMF 31 (Chatham); SUMF 32 (Conroy); SUMF 33 (Crockett); SUMF 34 (Dembele); SUMF 35 (Hawk); SUMF 36 (Huwe); SUMF 37 (Murray); SUMF 38 (Roper; SUMF 39 (Zigerelli).

[11] *See generally* SUMF 3 (Anderson); SUMF 4 (Argueta); SUMF 5 (Auduong); SUMF 6 (Bartlett); SUMF 7 (Belcher); SUMF 8 (Belcher II); SUMF 9 (Bennett); SUMF 10 (Braybrook); SUMF 11 (Buman); SUMF 12 (D'Silva); SUMF 13 (Freck); SUMF 14 (Galvis); SUMF 15 (Hansen); SUMF 16 (Harvey); SUMF 17 (Heater); SUMF 18 (Heath); SUMF 19 (Kane); SUMF 20 (Mendenhall); SUMF 21 (Palmer); SUMF 22 (Pew); SUMF 23 (Ramirez); SUMF 24 (Reimann); SUMF 25 (Roob); SUMF 26 (Thompson); SUMF 27 (Wilkerson); SUMF 28 (Duennebeil); SUMF 29 (Astill); SUMF 30 (Binkerd); SUMF 31 (Chatham); SUMF 32 (Conroy); SUMF 33 (Crockett); SUMF 34 (Dembele); SUMF 35 (Hawk); SUMF 36 (Huwe); SUMF 37 (Murray); SUMF 38 (Roper; SUMF 39 (Zigerelli).

[12] *See, e.g.,* SUMF 3 (Anderson) at ¶¶ 80, 85; SUMF 4 (Argueta) at ¶¶ 68, 71, 73; SUMF 5 (Auduong) at ¶¶ 84, 89; SUMF 6 (Bartlett) at ¶¶ 82, 87; SUMF 7 (Belcher) at ¶¶ 75, 80; SUMF 8 (Belcher II) at ¶¶ 82, 87; SUMF 9 (Bennett) at ¶¶ 79, 84; SUMF 10 (Braybrook) at ¶ 53; SUMF 11 (Buman) at ¶¶ 110, 115; SUMF 12 (D'Silva at ¶¶ 87, 92; SUMF 13 (Freck) at ¶¶ 77, 82; SUMF 14 (Galvis) at ¶¶ 73-74; SUMF 15 (Hansen) at ¶¶ 77, 82; SUMF 16 (Harvey) at ¶¶ 70-71; SUMF 17 (Heater) at ¶¶ 87, 92; SUMF 18 (Heath) at ¶¶ 45-49; SUMF 19 (Kane) at ¶¶ 75, 80; SUMF 20 (Mendenhall) at ¶¶ 77, 82; SUMF 21 (Palmer) at ¶¶ 77, 82; SUMF 22 (Pew) at ¶¶ 75, 80; SUMF 23 (Ramirez) at ¶¶ 66; SUMF 24 (Reimann) at ¶¶ 61, 66; SUMF 25 (Roob) at ¶¶ 100, 105; SUMF 26 (Thompson) at ¶¶ 96, 101; SUMF 27 (Wilkerson) at ¶¶ 69-70; SUMF 28 (Duennebeil) at p. 2, ¶¶ 24, 29; SUMF 29 (Astill) at ¶¶ 63-68; SUMF 30 (Binkerd) at ¶¶ 49-50, 129; SUMF 31 (Chatham) at ¶¶ 18, 55; SUMF 32 (Conroy) at ¶ 67; SUMF 33

the IUL insurance products actually at issue in the Underlying Actions are not securities. *See* 15 U.S.C. § 77c(a)(8). This alone is dispositive on the question of whether the Unregistered Security Exclusion will defeat CNA's duty to defend as applied to each of the Underlying Actions. *See, e.g.*, *Cincinnati Specialty Underwriters Ins. v. Red Rock 4 Wheelers*, 576 F. Supp. 3d 905, 913 (D. Utah 2021) (explaining that under Utah law, an insurer has a duty to defend unless it can "demonstrate that none of the allegations of the underlying claim [are] potentially covered").

Second, CNA's argument with respect to Woodbridge appears to be based on (1) the SEC order attached as Exhibit 4 to its Complaint [Dkt. 2 at Ex. 4] and (2) presumably a related judgment that was entered in *SEC v. Davis et al.* in the Central District of California. That reliance is misplaced.

### 1.       The SEC Order and the SEC v. Davis Action Have No Impact On The Analysis.

The SEC order and the judgment in *SEC v. Davis* do not support the application of the Unregistered Security Exclusion to the Woodbridge Claims. First, the SEC order was a consent order entered "[s]olely for the purpose of [those] proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party . . . [.]" [Dkt. 2-4 at p. 1]. That order was limited to Live Abundant and none of the other Defendants in this lawsuit. *See id.* Live Abundant did not admit or deny any of the Commission's findings, "except as to the Commission's jurisdiction over it and the subject matter of these proceedings and the findings contained in paragraph III.2 below."[13] [Dkt. 2-4 at p. 1]. Admitting the Commission's jurisdiction

---

(Crockett) at ¶¶ 19, 70; SUMF 34 (Dembele) at ¶¶ 35, 132; SUMF 35 (Hawk) at ¶¶ 74; SUMF 36 (Huwe) at ¶¶ 41; SUMF 37 (Murray) at ¶¶ 14, 15, 36; SUMF 38 (Roper) at ¶¶ 13, 14, 36; SUMF 39 (Zigerelli) at ¶¶ 22, 23, 82.

[13] Paragraph III.2 of the Consent Order attached as Exhibit 4 to CNA's Complaint states only that: "On January 17, 2020, a judgment was entered by consent against Live Abundant permanently enjoining it from future

was not an admission that the Woodbridge product was a "security." *See, e.g.*, *Fragumar Corp., N.V. v. Dunlap,* 685 F.2d 127, 128 (5th Cir. 1982) (jurisdiction over Securities Act claims can exist even where the investment at issue is not a "security" under the Act)

CNA also gains nothing from the Consent Judgments entered against Aaron Andrews and Paramount Financial Services, Inc., d/b/a Live Abundant in the *SEC v. Davis et al.* case. Those Consent Judgments include no findings of fact and no conclusions of law, much less any finding that the Woodbridge product, in fact, was an unregistered security. *See SEC v. Davis et al.*, Case No. 2:18-cv-10481-FMO-JC, at Dkt. Nos. 191 and 192. The Judgments reflect nothing more than a compromise to end litigation through payment of stipulated amounts under Section 20(d) of the Securities Act of 1933 (the "Securities Act") and Section 21(d)(3) of the Exchange Act. *See* [Dkt. No. 2-4 at p. 2]; *SEC v. Davis et al.*, Case No. 2:18-cv-10481-FMO-JC, at Dkt. Nos. 191 and 192. *See also Langton v. Hogan,* 71 F.3d 930, 935 (1st Cir. 1995) ("The way in which a consent judgment or consent decree resolves, between the parties, a dispute over a legal issue is not a ruling *on the merits* of the legal issue that either (1) becomes precedent applicable to any other proceedings under the law of *stare decisis* or (2) applies to others under the law of claim preclusion or issue preclusion.") (emphasis in original).

Section 20(d) of the Securities Act simply empowers the SEC to seek a civil penalty in federal district court when the SEC believes that a person has violated the Securities Act. 15 U.S.C. § 77t(d)(1). Section 21(d)(3) of the Exchange Act provides essentially the same language with

---

violations of Sections 5(a) and 5(c) of the Securities Act of 1933 and Section 15(a)(1) of the Exchange Act, in the civil action entitled Securities and Exchange Commission v. Robert "Lute" Davis et al., Civil Action Number 2:18-cv-10481-FMO-JC, in the United States District Court for the Central District of California." [Dkt. No. 2-4 at p. 2].

respect to the Exchange Act. 15 U.S.C. § 78u(d)(3) (empowering the SEC to bring an action seeking civil penalties in district court "[w]henever it shall appear to the Commission that any person has violated any provision of this title, the rules or regulations thereunder, or a cease-and-desist order entered by the Commission pursuant to section 78u-3 of this title . . ."). Neither judgment amounts to a finding that the Woodbridge product, in fact, was a security within the meaning of the Act.

> **2.     The Unregistered Securities Exclusion Has No Impact On CNA's Duty To Defend.**

CNA cannot meet its burden to establish that there is no possibility of coverage through application of the Unregistered Securities Exclusion, and CNA has the duty to provide for the defense of its insureds unless there is no possibility of coverage. *See Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1216 (Utah 2006). Any uncertainty regarding whether the allegations come within the scope of the CNA Policy must be resolved in Defendants' favor. *See S.W. Energy Corp. v. Cont'l Ins. Co.*, 974 P.2d 1239, 1242 (Utah 1999); *Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co.*, 972 F. Supp. 1379, 1383 (D. Utah 1997). Any uncertainty regarding the exclusion must be construed in favor of the Defendants. *See, e.g., LDS Hosp. v. Capitol Life Insurance Co.*, 765 P.2d 857, 859 (Utah 1988) (holding that "exclusionary clauses are to be most strictly construed against the insurer . . . It must not be forgotten that the purpose of insurance is to insure[.]" (further citation omitted)). In light of the above, Defendants respectfully submit that CNA cannot use the Unregistered Securities Exclusion to avoid its duty to defend.

> **3.     The Unregistered Securities Exclusion Has No Impact On CNA's Duty To Indemnify.**

The same is true with respect to the Underlying Actions that have settled or gone to judgment.  As to the latter, only a single case has gone to judgment—the Duennebeil Suit—and nothing in the underlying judgment supports application of the Unregistered Securities Exclusion. The question of indemnity is to be decided based on what is actually found in the underlying lawsuit.  *See, e.g.*, *Aspen Specialty Ins. Co. v. Utah Loc. Governments Tr.*, 954 F. Supp. 2d 1311, 1316 (D. Utah 2013) (explaining that the duty to indemnify depends on what liability is imposed on the insured "after final adjudication of the merits of the allegedly insured claim").  In the Duennebeil Suit, the jury did not consider nor did they decide whether the Woodbridge products were securities, nor did they decide any securities claims.  SUMF 52.  They found only that certain insured Defendants were negligent, made negligent misrepresentations, and/or were unjustly enriched in their provision of financial services to the plaintiffs.  SUMFs 53–55.

In the cases that settled, there were no findings or stipulations that the products at issue were securities or, for that matter, that any of the claims being resolved were securities claims. *See generally* SUMFs 40–44.

Thus, Defendants also respectfully submit that CNA cannot use the Unregistered Securities Exclusion to avoid its duty to indemnify with respect to the Underlying Actions.

**E.     The Transfer Of Benefits Exclusion Does Not Assist CNA.**

In Count III of its Complaint CNA alleges that the Transfer of Benefits Exclusion precludes coverage for a number of claims that CNA is calling the "FIP Claims." That exclusion provides:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim:**

- based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, assignment or purchase of any stream of income or benefits originally payable to another person or entity, including but not limited to retirement, pension, disability, insurance or annuity benefits;

- based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, assignment or purchase of any product, benefit, investment or stream of income where the sale or assignment of such product, benefit, investment or stream of income is not permitted, whether by law or by the terms of the product, benefit or investment;

- based upon, directly or indirectly arising out of, or in any way involving the actual or alleged sale, assignment or purchase of any product, benefit, investment or stream of income where the sale or assignment of such product, benefit, investment or stream of income is prohibited by federal, state or local law.

All other terms and conditions of the Policy remain unchanged.

Ex. A at p. 54 of 71.

### 1.    The Nature Of The So-Called "FIP Claims"

CNA's reference to this exclusion is a red herring and overlooks the involvement of a non-party to this lawsuit, Future Income Payments, LLC ("FIP"). The only product Defendants sold the underlying plaintiffs was IULs.[14] Each of the FIP Claims is factually distinct but, in each, the plaintiffs claim that the sale of their particular IULs was in itself wrongful, in part, because the IULs were too expensive for the plaintiffs in light of their various circumstances and they then obtained third party financing to pay for their premiums.[15]  In the Underlying Actions that CNA

---

[14] *See, e.g.,* SUMF 3 (Anderson) at ¶¶ 39 (alleging the funding mechanism was sold by FIP); SUMF 5 (Auduong) at ¶ 38 (alleging plaintiffs used third-party funding mechanisms); SUMF 6 (Bartlett) at ¶ 41, 87; SUMF 7 (Belcher) at ¶ 29; SUMF 9 (Bennett) at ¶ 33; SUMF 11 (Buman) at ¶¶ 54, 59; SUMF 12 (D'Silva) at ¶ 41; SUMF 13 (Freck) at ¶ 31; SUMF 15 (Hansen) at ¶ 31; SUMF 17 (Heater) at ¶¶ 41, 46; SUMF 19 (Kane) at ¶¶ 29, 34; SUMF 20 (Mendenhall) at ¶ 31; SUMF 21 (Palmer) at ¶ 31, 36; SUMF 25 (Roob) at ¶ 54; SUMF 26 (Thompson) at ¶¶ 50, 55; SUMF 29 (Astill) at ¶ 21 (alleging defendants advised plaintiffs to fund their IULs "using alternative funding mechanisms administered by third parties"); SUMF 30 (Binkerd) at ¶ 36; SUMF 31 (Chatham) at ¶ 19; SUMF 32 (Conroy) at ¶ 22; SUMF 33 (Crockett) at ¶ 23; SUMF 34 (Dembele) at ¶ 39; SUMF 35 (Hawk) at ¶ 23; SUMF 36 (Huwe) at ¶ 16; SUMF 37 (Murray) at ¶ 16; SUMF 38 (Roper) at ¶ 15; SUMF 39 (Zigerelli) at ¶ 24.

[15] *See, e.g.,* SUMF 3 (Anderson) at ¶ 53 ("The indexed universal life insurance policies as promoted, recommended, and sold to Plaintiffs were also inappropriate and unsuitable products for Plaintiffs given their ages, needs, and risk profiles (irrespective of FIP structured cash flow products)."); SUMF 5 (Auduong) at ¶ 57, 60; SUMF 6 (Bartlett) at ¶ 55; SUMF 7 (Belcher) at ¶ 48; SUMF 9 (Bennett) at ¶ 52; SUMF 11 (Buman) at ¶ 73; SUMF 12

has denominated "FIP Claims," the underlying plaintiffs financed their respective IUL premiums by entering a separate contract, on a separate date, with FIP, independent of the purchase of the IULs.[16]   CNA has ascribed the term "FIP Claims" to those Underlying Actions in which the plaintiffs financed their premium payments with FIP.

85.   To raise the funds with which plaintiffs would finance their IUL premium payments, FIP entered into separate transactions with other parties who are not involved in this lawsuit or any of the Underlying Actions, many of whom were pensioners.[17]   Numerous state and federal regulators have determined that FIP was <u>not</u> purchasing pension streams of income, but was actually selling loans: lending money to pensioners in exchange for an amount of money the pensioner should be able to afford based on their pension payments each month.[18] *See, e.g., In the*

---

(D'Silva) at ¶ 60; SUMF 13 (Freck) at ¶ 50; SUMF 15 (Hansen) at ¶ 50; SUMF 17 (Heater) at ¶ 60; SUMF 19 (Kane) at ¶ 48; SUMF 20 (Mendenhall) at ¶ 50; SUMF 21 (Palmer) at ¶ 50; SUMF 25 (Roob) at ¶ 73; SUMF 26 (Thompson) at ¶ 69; SUMF 29 (Astill) at ¶¶ 22-26; SUMF 30 (Binkerd) at ¶¶ 37-41; SUMF 31 (Chatham) at ¶¶ 20-24; SUMF 32 (Conroy) at ¶¶ 23-27; SUMF 33 (Crockett) at ¶¶ 24-28; SUMF 34 (Dembele) at ¶¶ 40-44; SUMF 35 (Hawk) at ¶¶ 24-28; SUMF 36 (Huwe) at ¶¶ 17-21; SUMF 37 (Murray) at ¶¶ 17-21; SUMF 38 (Roper) at ¶¶ 16-20; SUMF 39 (Zigerelli) at ¶¶ 25-28, 35-36.

[16] *See, e.g.,* SUMF 3 (Anderson) at ¶¶ 39; SUMF 5 (Auduong) at ¶ ; SUMF 6 (Bartlett) at ¶¶ 41, 87; SUMF 7 (Belcher) at ¶ 29; SUMF 9 (Bennett) at ¶ 33; SUMF 11 (Buman) at ¶¶ 54, 59; SUMF 12 (D'Silva) at ¶ 41; SUMF 13 (Freck) at ¶ 31; SUMF 15 (Hansen) at ¶ 31; SUMF 17 (Heater) at ¶¶ 41, 46; SUMF 19 (Kane) at ¶¶ 29, 34; SUMF 20 (Mendenhall) at ¶ 31; SUMF 21 (Palmer) at ¶¶ 31, 36; SUMF 25 (Roob) at ¶ 54; SUMF 26 (Thompson) at ¶¶ 50, 55; SUMF 29 (Astill) at ¶ 21; SUMF 30 (Binkerd) at ¶ 36; SUMF 31 (Chatham) at ¶ 19; SUMF 32 (Conroy) at ¶ 22; SUMF 33 (Crockett) at ¶ 23; SUMF 34 (Dembele) at ¶ 39; SUMF 35 (Hawk) at ¶ 23; SUMF 36 (Huwe) at ¶ 16; SUMF 37 (Murray) at ¶ 16; SUMF 38 (Roper) at ¶ 15; SUMF 39 (Zigerelli) at ¶ 24.

[17] *See, e.g.,* SUMF 3 (Anderson) at ¶ 40; SUMF 5 (Auduong) at ¶ 44; SUMF 6 (Bartlett) at ¶ 42; SUMF 7 (Belcher) at ¶ 35; SUMF 9 (Bennett) at ¶ 39; SUMF 11 (Buman) at ¶ 60; SUMF 12 (D'Silva) at ¶ 47; SUMF 13 (Freck) at ¶ 37; SUMF 15 (Hansen) at ¶ 37; SUMF 17 (Heater) at ¶ 47; SUMF 19 (Kane) at ¶ 35; SUMF 20 (Mendenhall) at ¶ 37; SUMF 21 (Palmer) at ¶ 37; SUMF 25 (Roob) at ¶ 60; SUMF 26 (Thompson) at ¶ 56.

[18] *See, e.g.,* SUMF 3 (Anderson) at ¶ 41; SUMF 5 (Auduong) at ¶ 45; SUMF 6 (Bartlett) at ¶ 43; SUMF 7 (Belcher) at ¶ 36; SUMF 9 (Bennett) at ¶ 40; SUMF 11 (Buman) at ¶ 61; SUMF 12 (D'Silva) at ¶ 48; SUMF 13 (Freck) at ¶ 38; SUMF 15 (Hansen) at ¶ 38; SUMF 17 (Heater) at ¶ 48; SUMF 19 (Kane) at ¶ 36; SUMF 20 (Mendenhall) at ¶ 38; SUMF 21 (Palmer) at ¶ 38; SUMF 25 (Roob) at ¶ 61; SUMF 26 (Thompson) at ¶ 57.

*Matter of: Future Income Payments, LLC*, CFR-FY2016-0027, 2018 WL 4051337 (Md. Comm. Fin. Reg. Apr. 25, 2018); *In the Matter of Future Income Payments, LLC, Respondent*, 2016 WL 6882803 (NY Bnk. Dept. Oct. 20, 2016); *Minn. Att. Gen. and Comm. of Comm. vs. Future Income Payments, LLC, f/k/a Pensions, Annuities, and Settlements, LLC and FIP LLC*, Case No. 27-CV-17-12579, 2018 WL 10454834 (Minn. Dept. of Commerce July 18, 2018); *In the Matter of Determining Whether There Has Been A Violation of the Consumer Loan Act of Washington By: Pensions, Annuities and Settlements, LLC, a/k/a Future Income Payments, LLC, and Scott Kohn*, Case No. C-14-1449-15-SC02, 2015 WL 4503495 (Wash. Dept. of Fin. Inst. May 13, 2015); *Bureau of Consumer Fin. Prot. v. Future Income Payments, LLC*, Case No. CV 6:19-2950-BHH [Dkt. No. 120] (D.S.C. Feb. 22, 2021).

Unfortunately, the various financing arrangements with FIP ultimately failed.[19] As a result, according to the various claims of the underlying plaintiffs in the FIP Claims, they no longer could finance the premium payments on their IULs leading to loss of their IUL investments due to policy lapse prior to fully funding the IUL, surrender charges, and/or unexpected premium payments.[20]

---

[19] *See, e.g.,* SUMF 3 (Anderson) at ¶ 46; SUMF 5 (Auduong) at ¶ 50; SUMF 6 (Bartlett) at ¶ 48; SUMF 7 (Belcher) at ¶ 41; SUMF 9 (Bennett) at ¶ 45; SUMF 11 (Buman) at ¶ 66; SUMF 12 (D'Silva) at ¶ 53; SUMF 13 (Freck) at ¶ 43; SUMF 15 (Hansen) at ¶ 43; SUMF 17 (Heater) at ¶ 53; SUMF 19 (Kane) at ¶ 41; SUMF 20 (Mendenhall) at ¶ 43; SUMF 21 (Palmer) at ¶ 43; SUMF 25 (Roob) at ¶ 66; SUMF 26 (Thompson) at ¶ 62; SUMF 29 (Astill) at ¶ 28; SUMF 30 (Binkerd) at ¶ 43; SUMF 31 (Chatham) at ¶ 26; SUMF 32 (Conroy) at ¶ 29; SUMF 33 (Crockett) at ¶ 30; SUMF 34 (Dembele) at ¶ 46; SUMF 35 (Hawk) at ¶ 30; SUMF 39 (Zigerelli) at ¶ 31.

[20] *See, e.g.,* SUMF 3 (Anderson) at ¶ 49; SUMF 5 (Auduong) at ¶ 53; SUMF 6 (Bartlett) at ¶ 51; SUMF 7 (Belcher) at ¶ 44; SUMF 9 (Bennett) at ¶ 48; SUMF 11 (Buman) at ¶ 69; SUMF 12 (D'Silva) at ¶¶ 55, 56; SUMF 13 (Freck) at ¶¶ 45, 46; SUMF 15 (Hansen) at ¶¶ 45, 46; SUMF 17 (Heater) at ¶¶ 55, 56; SUMF 19 (Kane) at ¶¶ 43, 44; SUMF 20 (Mendenhall) at ¶¶ 45, 46; SUMF 21 (Palmer) at ¶¶ 45, 46; SUMF 25 (Roob) at ¶¶ 68, 69; SUMF 26 (Thompson) at ¶¶ 64, 65; SUMF 29 (Astill) at ¶¶ 29, 32; SUMF 30 (Binkerd) at ¶¶ 44, 47; SUMF 31 (Chatham) at ¶¶ 27, 30; SUMF 32 (Conroy) at ¶¶ 30, 33; SUMF 33 (Crockett) at ¶¶ 31, 34; SUMF 34 (Dembele) at ¶¶ 47, 50; SUMF 35 (Hawk) at ¶¶ 31, 34; SUMF 39 (Zigerelli) at ¶¶ 32, 35.

### 2. CNA's Reliance On The Transfer Of Benefits Exclusion To Deny Benefits Improperly Assumes Facts And Reads The Exclusion Broadly.

In light of the above, the Transfer of Benefits Exclusion has no application to the FIP Claims against Defendants. First, as can be seen from the text of the exclusion itself, it applies only to the "actual or alleged *sale, assignment or purchase* of any stream of income or benefits originally payable to another person[.]" Ex. A at p. 54 of 71 (emphasis added). Yet, state and federal regulators already have concluded that FIP was not purchasing pension streams of income, but was actually selling loans,[21] and loans are not within the proscription of the Transfer of Benefits Exclusion.

Under settled law, "[e]ven if the policy employs technical terms, we do not construe it 'through the magnifying eye of the technical lawyer,' but rather as it would be understood by 'one not trained in law or in the insurance business.'" *Draughon v. CUNA Mut. Ins. Soc.*, 771 P.2d 1105, 1108 (Utah Ct. App. 1989) (internal citation omitted). Courts "will not insert words into a policy under the guise of interpretation where the insurer could have easily avoided the problem by drafting its policy more carefully and precisely." *Id.* at 1109. Such an application of the exclusion would run afoul of fundamental rules governing the construction of exclusions in insurance policies.

CNA's reliance on the Transfer of Benefits Exclusion is misplaced because it would require the Court to construe the exclusion broadly so as to encompass—not just transactions between the

---

[21] *See, e.g.,* SUMF 3 (Anderson) at ¶ 41; SUMF 5 (Auduong) at ¶ 45; SUMF 6 (Bartlett) at ¶ 43; SUMF 7 (Belcher) at ¶ 36; SUMF 9 (Bennett) at ¶ 40; SUMF 11 (Buman) at ¶ 61; SUMF 12 (D'Silva) at ¶ 48; SUMF 13 (Freck) at ¶ 38; SUMF 15 (Hansen) at ¶ 38; SUMF 17 (Heater) at ¶ 48; SUMF 19 (Kane) at ¶ 36; SUMF 20 (Mendenhall) at ¶ 38; SUMF 21 (Palmer) at ¶ 38; SUMF 25 (Roob) at ¶ 61; SUMF 26 (Thompson) at ¶ 57. *See also* SUMF 84.

non-party, FIP, and other non-parties—but also loan arrangements when the exclusion includes no such reference.

Worse, CNA's attempt to apply the Transfer of Benefits Exclusion to the so-called FIP Claims assumes, without basis, that the separate claims by each of the individual plaintiffs in the underlying FIP Claims involve funds that FIP acquired from third parties' pensions. Yet FIP did not acquire any third parties' pensions; it simply agreed with third parties that it would make a loan in exchange for monthly payments from the third parties' bank accounts.[22] Exclusions are strictly construed and only may be applied "when they use 'language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided.'" *Fire Ins. Exch. v. Oltmanns*, 2012 UT App 230, ¶ 6, 285 P.3d 802, 805 (Utah Ct. App. 2012) (further citation omitted). Under such construction, CNA cannot assume as a factual matter that the funding received by any particular plaintiff in an underlying FIP Claim indeed involved the sale, assignment, or purchase of a third party's pension.

Quite the contrary, CNA bears the "burden to demonstrate that exclusions exist under which it can deny coverage." *Am. Nat. Prop. & Cas. Co. v. Sorensen*, 2013 UT App 295, ¶ 13, 362 P.3d 909, 913 (Utah Ct. App. 2013). Moreover, CNA could not rely on the exclusion to deny its insureds a defense to the claims unless there is no possibility but that the exclusion applies to the claim. *See, e.g., Cincinnati Specialty Underwriters Ins. v. Red Rock 4 Wheelers*, 576 F. Supp. 3d

---

[22] *See, e.g.,* SUMF 3 (Anderson) at ¶ 41; SUMF 5 (Auduong) at ¶ 45; SUMF 6 (Bartlett) at ¶ 43; SUMF 7 (Belcher) at ¶ 36; SUMF 9 (Bennett) at ¶ 40; SUMF 11 (Buman) at ¶ 61; SUMF 12 (D'Silva) at ¶ 48; SUMF 13 (Freck) at ¶ 38; SUMF 15 (Hansen) at ¶ 38; SUMF 17 (Heater) at ¶ 48; SUMF 19 (Kane) at ¶ 36; SUMF 20 (Mendenhall) at ¶ 38; SUMF 21 (Palmer) at ¶ 38; SUMF 25 (Roob) at ¶ 61; SUMF 26 (Thompson) at ¶ 57. *See also* SUMF 84.

905, 915 (D. Utah 2021) (the mere possibility of coverage triggers a duty to defend).  As reflected

above, that is not the case with the so-called FIP Claims.

With respect to the duty to indemnify as to the so-called FIP claims, as noted earlier in this

motion, that question is to be decided on the basis of the facts as established through resolution of

the underlying claims, *see, e.g.*, *Aspen Specialty Ins. Co. v. Utah Loc. Governments Tr.*, 954 F.

Supp. 2d 1311, 1316 (D. Utah 2013), and thus is not properly before this Court. *See, e.g.*, *Boyle v.

Nat'l Union Fire Ins. Co*., 866 P.2d 595, 598 (Utah Ct. App. 1993) (question of coverage was not

ripe for declaratory judgment adjudication prior to a determination of the liability of the insured).

### 3.      CNA Also Misreads The Transfer Of Benefits Exclusion.

CNA's attempt to use the Transfer of Benefits Exclusion to deny benefits in the FIP Claims

also is based on misreading of the exclusion.

Though the exclusion uses seemingly broad language—"based upon, directly or indirectly

arising out of, or in any way involving"—it still limits its application rationally to "Loss" involving

the "sale, assignment or purchase of any stream of income or benefits," such as retirement, pension,

disability, insurance or annuities. In truth, this exclusion pertains to the harm which can arise out

of or involve improper transfers of the income streams associated with those products. *See, e.g.,*

*Teamsters Joint Council No. 83 of the Virginia Pension Fund v. Weidner Realty Assocs.,* 377 F.

App'x 339, 344 (4th Cir. 2010) (applying 29 U.S.C. § 1392(c) of the Multiemployer Pension Plan

Amendments Act to authorize the recovery of improperly transferred benefit assets); *Ramunno on*

*Behalf of McClain v. Delaware Dep't of Health & Soc. Servs., Div. of Soc. Servs*., No. CV 13A-

06-005 FSS, 2014 WL 1312681, at *1 (Del. Super. Ct. Feb. 28, 2014) (discussing penalty imposed

on long-term care benefits when 401k funds were transferred to the beneficiary's daughter).

35

It is the "Loss" that arises from the "sale, assignment or purchase of any stream of income or benefits" from the aforesaid retirement products itself that this exclusion removes from potential coverage under the Master Policy. Here, only a few of the plaintiffs in the Underlying Actions make any reference to their retirement or pensions at all.[23] However, those only refer to the withdrawal of funds from retirement accounts, not to a "sale, assignment or purchase of any stream of income or benefits" from those plans.[24] Thus, the "Loss" at issue in the claims by the plaintiffs in the Underlying Actions does not include Claims by those plaintiffs for damages within the scope of the Transfer of Benefit Exclusion.

Worse, CNA attempts to apply the exclusion to each of the so-called FIP Claims as an undifferentiated group, and regardless of the actual source of each plaintiff's funding. Yet, an insurer may not refuse coverage to an array of lawsuits based on its own, inaccurate, generalizations as to the nature of those suits. *See, e.g.*, *Am. Nat. Prop. & Cas. Co. v. Sorensen*, 2013 UT App 295, ¶ 13, 362 P.3d 909, 913 (Utah Ct. App. 2013) (explaining that the insurer bears the burden to establish that an exclusion applies, and that absent this proof, Utah courts construe the policy liberally in favor of coverage so as not to defeat the purpose of the insurance policy).

4.   **Even If CNA Could Establish A FIP Claim Involved A Transfer Covered By The Exclusion, That Simply Would Lead To An Allocation Between Covered And Uncovered Damages.**

As noted above, CNA cannot establish that any particular FIP Claim would differ in any manner had that the funding for that plaintiff's IUL premiums come from some other source, such

---

[23] *See, e.g.,* SUMF 34 at ¶¶ 67-72, 75-76, 81-82, 87-88; SUMF 39 at ¶¶ 67-68, 73-74.
[24] *See, e.g.,* SUMF 34 at ¶¶ 67-72, 75-76, 81-82, 87-88; SUMF 39 at ¶¶ 67-68, 73-74.

as a spend down of that plaintiff's savings, unsecured loans, or other non-pension-related source.

Thus, the exclusion is inapplicable to each of the so-called FIP Claims in any case.

Moreover, even if CNA could establish that the Transfer of Benefits Exclusion might be linked in some manner to damages being alleged by a particular FIP Claim plaintiff, that at most would implicate the allocation provision in the Master Policy which provides:

> If a Claim made against the Insureds includes both covered and uncovered matters . . . the Insureds agree that there must be an allocation between insured and uninsured Loss (other than that part of Loss attributable to Defense Costs).

Ex. A at p. 10 of 71.

Thus, even if CNA could establish that the funding for a particular FIP Claim plaintiff came from a source within the scope of the exclusion, and also establish the damages at issue in that plaintiff's FIP Claim would have differed had that plaintiff funded their IUL premiums from another source (just by way of example, a spend down of that plaintiff's savings, unsecured loans, or other non-pension-related source), the result would not be a denial of coverage. Rather, the Master Policy simply would require an allocation of damages between those due to the sale of the IUL and those purportedly due to that plaintiff's funding of their IUL premium with FIP.

> ### 5.   Even If CNA Could Find A Construction Of The Exclusion That Supported Its Undifferentiated Denial Of Coverage, That Simply Would Give Rise To Ambiguity Which Would Require Construction In Favor Of Defendants.

As noted above, the Transfer of Benefits Exclusion has a reasonable construction under which it either does not apply to any of the particular FIP Claims or, at most, it would lead to an allocation between covered and uncovered damages in some of the FIP Claims. Thus, it would be of no consequence if CNA was able to concoct a construction of the Transfer of Benefits Exclusion that purported to justify CNA's attempt to apply the exclusion in an undifferentiated manner to

entirety of the damages at issue in each of the so-called FIP Claims.  It is settled law that, where a provision in an insurance policy can be read reasonably in more than one way, the provision is ambiguous and will be construed in favor of coverage.  *See, e.g.*, *LDS Hosp.*, 765 P.2d at 860–61. Here, CNA's attempt to deny benefits as to all of the FIP Claims based on an expansive and undifferentiated reading of the exclusion is not reasonable in the first place and, even if it was reasonable, simply would establish that the exclusion is ambiguous, *Prop. Assistance Corp. v. Roberts*, 768 P.2d 976, 977 (Utah Ct. App. 1989) ("Language may be ambiguous if 'the words used to express the meaning and intention of the parties are insufficient in a sense that the contract may be understood to reach two or more plausible meanings.'") (further citation omitted), such that the Court still should construe the exclusion in favor of the insureds, Defendants in this action.

> **6.    The Transfer Of Benefits Exclusion Provides No Basis For CNA To Avoid Its Duties To Defend Or Indemnify Defendants In The FIP Claims.**

For the reasons set forth above, the Transfer of Benefits Exclusion has no impact on CNA's duty to defend, *see, e.g.*, *Red Rock 4 Wheelers*, 576 F. Supp. at 915, could not be applied to the indemnity obligations for those FIP Claims that are still pending, *see, e.g.*, *Summerhaze Co.,* 332 P.3d at 920, and would provide CNA no defense with respect to those FIP Claims that have been resolved.[25]

> **F.    The Insolvency Exclusion Also Does Not Assist CNA.**

---

[25] *See generally* SUMF 4 (Argueta); SUMF 8 (Belcher II); SUMF 10 (Braybrook); SUMF 14 (Galvis); SUMF 16 (Harvey); SUMF 18 (Heath); SUMF 22 (Pew); SUMF 23 (Ramirez); SUMF 24 (Reimann); SUMF 27 (Wilkerson).

In Count IV of its Complaint CNA alleges that it is "entitled to a declaration that the Insolvency Exclusion precludes coverage for the Woodbridge Claims." [Dkt. No. 2 at ¶ 86]. That exclusion provides:

The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**

* * *

based upon, directly or indirectly arising out of, or in any way involving the insolvency, receivership, conservatorship, liquidation, bankruptcy or inability to pay of a natural person, entity, benefit plan, insurance company, managed health care organization, reinsurer, risk retention group or captive (or any self insurance plan or trust by whatsoever name), or limited partnership in which the Insured has placed business or obtained insurance coverage, or placed or recommended placement of the funds of a Client; however, notwithstanding the foregoing, the Insurer shall have the right and duty to defend the Insured in any suit alleging acts described above, provided the Claim arises from the Insured's placement of coverage with an admitted Insurer with an A.M. Best rating of "A-"or better at the time of placement;

Ex. A at pp. 13, 15 of 71.

As set forth below, CNA's argument is without merit.

### 1.    The Nature Of The So-Called "Woodbridge Claims"

CNA's use of the moniker "Woodbridge Claims" is somewhat confusing. The underlying lawsuits against Defendants which comprise the group CNA has labeled the "Woodbridge Claims" consist of either (1) a single lawsuit that has gone to judgment, the Duennebeil Suit,[26] or (2) certain actions brought by different individual plaintiffs and consolidated into what CNA has termed the "Hybrid Lawsuit."[27] Thus, the plural term "Woodbridge Claims" refers to the singular "Duennebeil Suit" and various claims in the so-called "Hybrid Lawsuit."

---

[26] *See* SUMFs 51-55.

[27] *See* SUMFs 29-39.

The only product Defendants sold the plaintiffs who asserted claims in the Duennebeil Suit or in any of the complaints consolidated into the Hybrid Lawsuit was IULs.[28] Each of those plaintiffs alleged that the sale of their particular IULs was in itself wrongful, in part, because the IULs were too expensive for the plaintiffs and they could not ultimately afford their premiums.[29] In the Underlying Actions that CNA has denominated the "Woodbridge Claims" the underlying plaintiffs ultimately invested in various real estate projects to finance their respective IUL premiums.[30]

### 2. CNA Could Not Avoid Its Duty To Defend Even If The Insolvency Exclusion Applied To The So-Called Woodbridge Claims.

As a preliminary matter, CNA could not avoid its duty to defend the so-called Woodbridge Claims even if the Insolvency Exclusion did apply.[31] Here, the exclusion explicitly provides that CNA continues to have the duty to defend where:

> the Claim arises from the Insured's placement of coverage with an admitted Insurer with an A.M. Best rating of "A-" or better at the time of placement[.]

Ex. A at p. 15 of 71.

---

[28] SUMF 28 (Duennebeil) at ¶¶ 24, 29; SUMF 29 (Astill) at ¶¶ 20, 64; SUMF 30 (Binkerd) at ¶¶ 35, 129; SUMF 31 (Chatham) at ¶¶ 18, 55; SUMF 32 (Conroy) at ¶¶ 21, 67; SUMF 33 (Crockett) at ¶¶ 19, 22, 70; SUMF 34 (Dembele) at ¶¶ 35, 38, 132; SUMF 35 (Hawk) at ¶¶ 22, 74; SUMF 36 (Huwe) at ¶¶ 15, 41; SUMF 37 (Murray) at ¶¶ 14, 15, 36; SUMF 38 (Roper) at ¶¶ 13, 14, 36; SUMF 39 (Zigerelli) at ¶¶ 22, 23, 82.

[29] SUMF 28 (Duennebeil) at p. 2, ¶¶ 24, 121-128; SUMF 29 (Astill) at ¶ 32; SUMF 30 (Binkerd) at ¶ 47; SUMF 31 (Chatham) at ¶ 30; SUMF 32 (Conroy) at ¶ 33; SUMF 33 (Crockett) at ¶ 34, 70; SUMF 34 (Dembele) at ¶ 50; SUMF 35 (Hawk) at ¶ 34; SUMF 36 (Huwe) at ¶¶ 17-21; SUMF 37 (Murray) at ¶¶ 17-21; SUMF 38 (Roper) at ¶¶ 16-20; SUMF 39 (Zigerelli) at ¶ 32.

[30] *See* SUMFs 73-83 for a list of the individual properties in which each plaintiff invested.

[31] Though the Woodbridge Claims have gone to verdict, post-trial motions remain pending at this time, *see* SUMF 51, so the duty to defend question is not yet moot.

In the so-called Woodbridge Claims, the Defendants sold their clients insurance products (IULs) that were placed with Allianz Life Insurance Company of North American ("Allianz"), Life Insurance Company of the Southwest ("Southwest"), and Minnesota Life Insurance Company ("Minnesota Life"). SUMF 66. At all times relevant to this matter Allianz, Southwest, and Minnesota Life have been admitted in Utah, *see* SUMFs 70–72, and have been rated A- or better. SUMFs 67–69. Thus, regardless of whether the exclusion applied, CNA's duty to defend the so-called Woodbridge Claims would be unaffected. *See, e.g., Fire Ins. Exch.*, 285 P.3d at 805 (exclusions are construed narrowly in favor of coverage).

### 3. CNA Misreads The Insolvency Exclusion.

CNA's attempt to use the Insolvency Exclusion to avoid its obligations with respect to the so-called Woodbridge Claims also is based on an unreasonable and impermissibly expansive reading of the exclusion. *See id.* (exclusions in insurance policies are to be read narrowly).

Focusing only on the first part of the exclusion, CNA would have the Court read the exclusion exceptionally broadly, to bar coverage for any claim against an insured in which there was any downstream insolvency, with no causation requirement whatsoever. For instance, CNA's reading of the exclusion would lead to no coverage for an insured who sold a client an IUL in an insurer that remains solvent, but where the insured also "recommended placement of the funds of a Client" in an entity that later became insolvent—even if the client did not follow that recommendation but later sued the insured in connection with the sale of the IUL. This "dissociated" wrongful act construction is patently unreasonable.

Read as a whole, however, the exclusion avoids the absurd results that follow from CNA's construction by requiring a causal link between the wrongful conduct for which the damages are

41

to be excluded and the insolvency. This can be seen by first noting the exclusion opens by stating that it applies only to "Loss" in connection with a "Claim," in any way involving the insolvency of an entity in which the insured recommended the client place funds. Ex. A at pp. 13, 15 of 71. Recall that the Master Policy defines "Claim" to be demands for money damages "against an Insured for a Wrongful Act[.]"  Ex. A at p. 5 of 71. Thus, the exclusion only applies to demands for money from an insured for a Wrongful Act that in any way involves the insolvency of an entity in which the insured recommended the client place funds.

Consider again the above hypothetical, but reading the exclusion as a whole with its rational causation requirement: the insured sells a client an IUL, recommends placement of client funds in an entity that later becomes insolvent but in which the client did not invest their funds. Even assuming the insured's sale of the IUL was wrongful, the exclusion would not apply to that scenario because there would be no causal link between the wrongful conduct for which the damages are to be excluded (those flowing from the wrongful sale of the IUL) and the insolvency.

The same is the case with the so-called Woodbridge Claims. CNA would deny coverage categorically, in all of the so-called Woodbridge Claims, regardless of whether the damages to be excluded were causally linked to the wrongful conduct of the insured. That is an untenable reading.

In fact, the underlying plaintiffs in the so-called Woodbridge Claims asserted that they suffered damage as a result of being sold their various IULs in the first place.[32] Even if they suffered additional damages related to the insolvency of one or more of the funding sources they

---

[32] SUMF 28 (Duennebeil) at p. 2, ¶¶ 24, 121-128; SUMF 29 (Astill) at ¶ 32; SUMF 30 (Binkerd) at ¶ 47; SUMF 31 (Chatham) at ¶ 30; SUMF 32 (Conroy) at ¶ 33; SUMF 33 (Crockett) at ¶ 34, 70; SUMF 34 (Dembele) at ¶ 50; SUMF 35 (Hawk) at ¶ 34; SUMF 36 (Huwe) at ¶¶ 17-21; SUMF 37 (Murray) at ¶¶ 17-21; SUMF 38 (Roper) at ¶¶ 16-20; SUMF 39 (Zigerelli) at ¶ 32.

arranged, they would have sought damages for being sold IULs that they could not afford regardless of the source of funding they ultimately employed to attempt to pay the premiums.[33]

Other courts have adopted similar rational readings of the insolvency exclusions. For example, in *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223 (Ky. 1994), the Kentucky Supreme Court considered the meaning of a similar insolvency exclusion in an insurance policy. There the exclusion at issue provided:

> We won't cover claims that result from the inability of an insurance company, joint under-writing association, or any similar entity to pay all or part of insured claims.

*Id.* at 225.

The insured in that case had been sued for negligently recommending an insurance company that subsequently became insolvent. *Id.* at 226. The insurer argued that the insolvency exclusion precluded coverage. The Kentucky Supreme Court found the exclusion ambiguous in that it was not clear whether it was meant to apply to a claim against the insured based on the inability of the insurer to pay regardless of whether the insured had contributed to that inability to pay. *See id.* at 227.

Here, if CNA's reading of the exclusion could be considered rational, then the same plainly is the case. *See, e.g*, *LDS Hosp.*, 765 P.2d at 860 (where there are multiple reasonable readings, the provision is ambiguous and will be construed in favor of coverage); *Prop. Assistance Corp. v. Roberts*, 768 P.2d 976, 977 (Utah Ct. App. 1989) ("Language may be ambiguous if 'the words

---

[33] SUMF 28 (Duennebeil) at p. 2, ¶¶ 24, 121-128; SUMF 29 (Astill) at ¶ 32; SUMF 30 (Binkerd) at ¶ 47; SUMF 31 (Chatham) at ¶ 30; SUMF 32 (Conroy) at ¶ 33; SUMF 33 (Crockett) at ¶ 34, 70; SUMF 34 (Dembele) at ¶ 50; SUMF 35 (Hawk) at ¶ 34; SUMF 36 (Huwe) at ¶¶ 17-21; SUMF 37 (Murray) at ¶¶ 17-21; SUMF 38 (Roper) at ¶¶ 16-20; SUMF 39 (Zigerelli) at ¶ 32.

used to express the meaning and intention of the parties are insufficient in a sense that the contract may be understood to reach two or more plausible meanings.'" (further citation omitted)).

From the point of view of a reasonable insured, the Insolvency Exclusion is not some sort of a negative lottery, voiding coverage when an insolvency somehow touches the insured's client. Rather, the exclusion only pertains to those damages causally linked to the wrongful conduct of the insured. Thus, for instance, had the entities in which the insureds sold policies in the so-called Woodbridge Claims (Allianz, Southwest, and Minnesota Life) become insolvent, the Insolvency Exclusion likely would apply to the claims against the Defendants based on the sales of the IULs.

Of course, that did not happen here. In this case, the so-called Woodbridge Claims did not involve any allegations of insolvency of any entity,[34] much less of Allianz, Southwest, or Minnesota Life, which certainly have not been insolvent in recent history, if at all.[35] Instead, the plaintiffs in the Duennebeil Suit purchased an array of different real estate investments in order to fund their purchases of IUL policies from Defendants, but the real estate investments "were not backed by a secured interest in real property." SUMF 28 (Duennebeil) at ¶ 41. In some instances, the properties "had been sold," but the underlying plaintiffs did not receive the payment from those sales they had been promised. SUMF 28 (Duennebeil) at ¶ 75. There are no allegations the funds from the sale of the real property were insufficient to cover the underlying plaintiffs' investments. Rather, the complaint is that the investments were not actually tied to the real property in the way

---

[34] *See generally* SUMF 28 (Duennebeil); SUMF 29 (Astill); SUMF 30 (Binkerd); SUMF 31 (Chatham); SUMF 32 (Conroy); SUMF 33 (Crockett); SUMF 34 (Dembele); SUMF 35 (Hawk); SUMF 36 (Huwe); SUMF 37 (Murray); SUMF 38 (Roper); SUMF 39 (Zigerelli).

[35] *See* SUMFs 67-72.

plaintiffs expected—or at all.  SUMF 28 (Duennebeil) at ¶ 75. Thus, the Insolvency Exclusion simply does not apply to damages at issue in the so-called Woodbridge Claims because CNA cannot establish that any of those damages are causally linked to the wrongful conduct of the Defendants.

4.     **Even If CNA Could Establish That Some Of The Damages In The Duennebeil Suit Were Caused By Insolvency Of An Entity Chargeable Against The Insureds, At Best That Would Lead To An Allocation Between Covered And Uncovered Damages.**

As noted above, CNA cannot establish that any of the damages at issue in the so-called Woodbridge Claims are causally linked to the wrongful conduct of the Defendants.  Thus, the exclusion is inapplicable to each of the particular Woodbridge Claims for that reason.

Moreover, even if CNA could establish that some of the damages at issue in the so-called Woodbridge Claims were causally linked to the wrongful conduct of the Defendants, that at most would implicate the allocation provision in the Master Policy which as noted above provides:

> If a Claim made against the Insureds includes both covered and uncovered matters . . . the Insureds agree that there must be an allocation between insured and uninsured Loss (other than that part of Loss attributable to Defense Costs).

Ex. A at p. 10 of 71.

Thus, even if CNA could establish that some of the damages at issue in the so-called Woodbridge Claims were causally linked to the wrongful conduct of the Defendant, that would not justify the wholesale denial of the claims as CNA requires, but rather simply would require an allocation of damages in accordance with the terms of the Master Policy.

5.     **The Insolvency Exclusion Provides No Basis For CNA To Avoid Its Duties To Defend Or Indemnify The Woodbridge Claims.**

For the reasons set forth above, the Insolvency Exclusion has no impact on CNA's duty to defend, *see, e.g.*, *Red Rock 4 Wheelers*, 576 F. Supp. at 915, could not be applied to the indemnity obligations for those so-called Woodbridge Claims that are still pending in the Hybrid Lawsuit, *see, e.g.*, *Summerhaze Co.*, 332 P.3d at 920, and provides CNA no defense with respect to the damages awarded in the judgment in the Duennebeil Suit.[36]

### G.   CNA Cannot Avoid Its Responsibilities Through The Interrelated Wrongful Act Provision.

CNA seeks in Counts V-VIII of its Complaint premature, advisory opinions as to the future application of the Master Policy's "Interrelated Wrongful Acts"[37] (shortened below to "IWA") provision—and its provisions bearing on the $1 million limit—to two collections of the Underlying Actions.  *See* [Dkt. No. 2 at ¶ 92 (FIP) and ¶ 104 (Hybrid re FIP), on the one hand, and ¶ 98 (Woodbridge) and ¶ 110 (Hybrid re Woodbridge) on the other].  As noted below, to the extent those Counts relate to potential future indemnity under the Master Policy, they should be dismissed as premature.  To the extent they relate to CNA's possible abandonment of its insureds' defense in any of the Underlying Actions, judgment should be entered in favor of Defendants.

### 1.   The Relief Sought In Counts V-VIII Is Premature With Respect To Questions Of Indemnity Related To The Underlying Actions.

As a preliminary matter, the context in which the Court evaluates those claims impacts the standard of review.  If CNA seeks advisory rulings on the IWA with regard to some future refusal

---

[36] *See* SUMFs 51-55.

[37] The Policy defines "Interrelated Wrongful Acts" as "any **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." Ex. A at p. 6 of 71. The Interrelated Wrongful Act Provision states that "More than one **Claim** involving the same **Wrongful Act**  or **Interrelated Wrongful Acts** shall be considered as one **Claim** . . ." Ex. A at p. 10 of 71.

to indemnify, the issue is premature. *See, e.g., Aspen Specialty Ins. Co. v. Utah Loc. Governments Tr.*, 954 F. Supp. 2d 1311, 1316 (D. Utah 2013) ("The duty to indemnify can only be determined after final adjudication of the merits of the allegedly insured claim. 'The duty to indemnify relates to liability actually imposed on the insured for claims falling within the scope of coverage.'") (further citation omitted).

Here, only a handful of the Underlying Actions have been resolved.[38] As to those, CNA has not alleged the "liability actually imposed on the insured" creates any ripe question with respect to limits. Whether such questions ever will arise is yet to be determined and, should any of the Underlying Actions be resolved against a Defendant in the future, the basis for that future, hypothetical liability is not yet known. Thus, with respect to CNA's duty to indemnify, the relief sought in Counts V-VIII is premature and should be dismissed or stayed pending resolution of the Underlying Actions to which each of those Counts pertain.

> **2.      To The Extent Counts V-VIII Relate To A Possible Exhaustion-Based Abandonment Of The Defense In The Underlying Actions, Judgment Should Be Entered In Favor Of Defendants.**

Alternatively, if CNA seeks advisory rulings in its Counts V through VIII in the context of a possible exhaustion-based abandonment of its defense in the many still-pending Underlying Actions,[39] the Court must rule in favor of Defendants if there is even a mere possibility that the

---

[38] *See* SUMF 56.

[39] See Ex. A at pp. 1, 3 of 71 ("DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTION"); and Ex. A at p. 5 of 71 ("but the Insurer shall not be obligated to pay any Loss to defend or continue to defend any Claim after the applicable limit of the Insurer's liability has been exhausted by payment of Loss").

Underlying Actions could be resolved within coverage without implicating the IWA provision. That plainly is the case here.

Recall that the duty to defend is triggered where an underlying complaint alleges "any facts" that might fall within coverage. *See, e.g.*, *Summerhaze Co., L.C. v. Fed. Deposit Ins. Corp.*, 2014 UT 28, ¶ 36, 332 P.3d 908, 920 (Utah 2014) ("If the 'underlying complaint alleges any facts or claims that might fall within the ambit of the policy,' the insurer must offer a defense." (further citation omitted). The duty continues until "the claims in the underlying lawsuit are judicially resolved." *Cincinnati Specialty Underwriters Ins. v. Red Rock 4 Wheelers*, 576 F. Supp. 3d 905, 916 (D. Utah 2021). Moreover, mere similarity between Wrongful Acts is not enough to bring different claims within the scope of the IWA provision. *See, e.g., Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 635-36, 871 N.E.2d 418, 430 (2007) (in analyzing the same IWA definition used by the Master Policy, holding that "Commonality is a more demanding requirement than similarity").

Here, there is at least a possibility that the Underlying Actions could be resolved within coverage without implicating the IWA provision. Indeed, should any Defendants ultimately be found liable in one or more of the Underlying Actions, that liability could be based on one of any number of grounds completely unrelated to the form of investment they ultimately employed to fund their IULs.[40] Moreover, the same is the case with respect to the various discrete allegations

---

[40] *See generally* SUMF 3 (Anderson) at ¶ 22 (alleging that Anthony Andelin and Live Abundant recommended that plaintiffs liquidate their more traditional savings, annuities and other securities, or convert home equity to cash in order to purchase "expensive, complex" IULs); SUMF 4 (Argueta) at ¶ 9 (alleging that the IUL policy sold to plaintiff was inappropriate because of his age and because plaintiff "did not have an insurable need"); SUMF 5 (Auduong) at ¶ 27 (alleging that Blair Whiting and Live Abundant represented the IUL policies would accumulate cash value, and that the plaintiffs could "borrow against the accumulated cash value to supplement their retirement income in a manner that would create tax-free retirement income."); SUMF 6 (Bartlett) at ¶ 26 (alleging the IULS would be "fully funded" after only a set number of premium payments); SUMF 7 (Belcher) at ¶¶ 30-31 (alleging that

plaintiff relied on Gregory Duckwitz and Live Abundant to conduct adequate due diligence but that they failed); SUMF 8 (Belcher II) at ¶ 29 (alleging that plaintiffs were told they would not have repay IULs during their lifetime); SUMF 9 (Bennett) at ¶¶ 25, 28 (alleging that the IULs that Jeremy Watson and Live Abundant illustrated and represented to plaintiffs were not suitable based on plaintiffs' available assets and retirement income needs); SUMF 10 (Braybrook) at ¶¶ 15, 21 (alleging that plaintiff's retirement income was already in tax-deferred vehicles and he had no spouse or heir for to receive a death benefit, such that he "had no need for a life insurance policy"); SUMF 11 (Buman) at ¶ 73 (alleging the IULs promoted, recommended, and sold to plaintiffs were "inappropriate and unsuitable products for Plaintiffs given their ages, needs, and risk profiles"); SUMF 12 (D'Silva) at ¶ 61 (alleging that Karl Nelson and Live Abundant recommended that funding IUL premium payments "only for a set amount of time, usually 3-5 years, would result in tax-free income for life"); SUMF 13 (Freck) at ¶ 23 (alleging that Terry Seeley and Live Abundant recommended purchasing IULs at a specified target level based on plaintiffs' available assets and retirement income needs); SUMF 14 (Galvis) at ¶ 35 (Raymond and Linda Smith alleged that Doug Andrew and Live Abundant were "adamant" that IULs were "the best way to structure their retirement."); SUMF 15 (Hansen) at ¶ 55 (alleging that Marcus Maxfield and Live Abundant recommended that plaintiffs use "retirement accounts, retirement savings, equity in their homes, reverse mortgages, and/or any other savings or debt they could access to fund the IUL products"); SUMF 16 (Harvey) at ¶ 48 (alleging that plaintiffs were advised Mr. Harvey's medical history would make it difficult to obtain an IUL as the sole insured so they purchased an IUL jointly); SUMF 17 (Heater) ¶¶ 62-64 (alleging that the promotion, recommendation, and sale of IUL policies subjected plaintiffs to unnecessary and inappropriate levels of risk and were not a sound and safe retirement and financial planning strategy); SUMF 18 (Heath) at ¶ 2 (alleging that the IUL was inappropriate for plaintiffs because of its "substantial, expensive continuing annual premium, including costs and fees"); SUMF 19 (Kane) at ¶ 75 (alleging that Devin Larkins and Live Abundant recommended an IUL to plaintiff Brian Kane "when they knew or should have known that the policy was risky, reckless and not reasonable or prudent for Plaintiff"); SUMF 20 (Mendenhall) at ¶ 77 (alleging that defendants failed to advise plaintiffs of their conflicts of interest in plaintiffs' purchase of IULs); SUMF 21 (Palmer) at ¶ 77 (alleging that Aaron Andrew and Live Abundant failed to advise plaintiffs of the risks associated with IUL policies); SUMF 22 (Pew) at ¶ 75 (alleging that Blair Whiting and Live Abundant failed to disclose their own financial interests in the sale of the IUL, including a complete disclosure of all fees, costs, commission, and overrides they would receive); SUMF 23 (Ramirez) at ¶ 48 (alleging that Blair Whiting and Live Abundant never informed plaintiff that his IUL company, Penn Mutual, "had a history of preying on senior citizens"); SUMF 24 (Reimann) at ¶ 12 (alleging defendants stayed silent regarding IUL risks when they had a duty to act); SUMF 25 (Roob) at ¶ 100 (alleging Aaron Andrew and Live Abundant placed their own interests ahead of plaintiffs); SUMF 26 (Thompson) at ¶ 96 (alleging that defendants knew or should have known that the IUL would eventually exhaust plaintiffs' savings and leave them with nothing); SUMF 27 (Wilkerson) at ¶¶ 43 and 44 (alleging Emron Andrew misrepresented the tax implications of the IUL and failed to inform the plaintiffs that he and Live Abundant would receive commissions from the IUL); SUMF 28 (Duennebeil) at pp. 2-3 (alleging defendants recommended IULs "at some specified amount" that was difficult to fund without additional investments); SUMF 29 (Astill) at ¶ 32; SUMF 30 (Binkerd) at ¶ 33 (alleging that Defendants "aggressively marketed" their services and plaintiffs "were led to believe that Defendants were skilled in financial strategies and had Plaintiffs' best interests in mind"); SUMF 31 (Chatham) at ¶ 21 (alleging that plaintiffs were told the IULs would act as a supplement to plaintiffs' retirement income); SUMF 32 (Conroy) at ¶ 62 (alleging that after expressing they "preferred low risk and tax-free strategies," Marcus Maxfield and Live Abundant recommended Barry and Susan Smith withdraw funds from their family trust to purchase an IUL); SUMF 33 (Crockett) at ¶ 63 (alleging Cheryl and Kenneth Harper spoke with Scott Reynolds and he and Live Abundant recommended using their savings in the amount of $284,000 to purchase an IUL); SUMF 34 (Dembele) (alleging Audra and Mamadou Dembele gathered $117,023.39 from their savings and retirement accounts to purchase an IUL); SUMF 35 (Hawk) at ¶ 71 (alleging plaintiff Efrem Gross used personal funds in the amount of $607,254.35 to purchase an IUL); SUMF 36 (Huwe) (alleging plaintiff Vincent Sghiatti relied on Clarence McBride and Live Abundant's representations to invest $423,603.38 in an IUL); SUMF 37 (Murray) at ¶ 33 (alleging plaintiffs Jack and Lynette Murray relied on Terry Seeley and Live Abundant's representations to invest $384,724 in an IUL); SUMF 38 (Roper) at ¶ 14 (alleging that defendants' retirement planning advice always involved the recommendation of insurance products); SUMF 39 (Zigerelli) at ¶¶ 46-49 (alleging

as to the FIP allegations referenced in the so-called FIP Claims and Hybrid Lawsuit (addressed in

Counts V and VII of the Complaint):

- Steven Belcher alleges that Gregory Duckwitz and Live Abundant represented that FIP was a sound and appropriate tool to use in conjunction with an IUL and that FIP was a reputable and legitimate operation, so that he took out a mortgage on his home to purchase a FIP product. SUMF 7 (Belcher) at ¶¶ 27, 29, 39.

- James Paul Braybrook alleges that Defendants never informed or warned him "that FIP had a history of preying on senior citizens, disabled veterans and retirees living on fixed pension or income streams." SUMF 10 (Braybrook) at ¶ 37.

- Ana Marcela Galvis alleged that Jeremy Watson and Live Abundant recommended but she declined to purchase an IUL, but she proceeded to invest in FIP when Mr. Watson informed her that FIP had "never missed a payment . . . in fifteen years." SUMF 14 (Galvis) at ¶¶ 22-27.

- Raymond and Linda Smith alleged that Karl Nelson and Live Abundant promoted FIP as "the best way to fund a universal life insurance policy," represented that FIP "kept a reserve of funds to cover any issues," and presented several projections but not any financial statements or disclosures. SUMF 14 (Galvis) at ¶¶ 48-53.

- Darren and Emily Johnson alleged that Tracy Belliston and Live Abundant were used by "a lot of the wealthy people" to protect their money, and that the FIP investment "had not been generally available to the public." SUMF 14 (Galvis) at ¶ 63.

- George and Linda Harvey alleged that they had a comfortable lifestyle but wanted to "protect and grow their hard-earned savings to ultimately have assets to pass onto their heirs," and that Karl Nelson and Live Abundant described FIP as a "predictable" source of income for a specific rate of return, and that if he invested $387,500, he would receive a return of $455,447 back. SUMF 16 (Harvey) at ¶¶ 20, 29, 43.

- Gary and Mary Jo Heath alleged that they paid $208,550 for FIP and $103,590 in IUL premiums, and their investment "caused significant stress and mental anguish on Plaintiffs, who have had to confront the reality that they may have lost significant savings." SUMF 18 (Heath) at ¶¶ 19, 41.

---

plaintiffs Mark and Sylvia Zigerelli invested $185,000 to purchase an IUL after speaking with Tracy Belliston and Live Abundant and discussing their retirement needs).

- Timothy Pew alleged that Blair Whiting and Live Abundant represented that the money he invested with FIP would allow him to increase his IUL premium payments and maximize his retirement planning. SUMF 22 (Pew) at ¶ 28.

- Raul Ramirez alleged that defendants exploited the vulnerabilities of his age and medical condition in advising him to purchase FIP products. SUMF 23 (Ramirez) at ¶¶ 20, 39.

- Daniel Roper alleges that he was looking to effectively plan for his retirement, and based on the advice of Gregory Duckwitz and Live Abundant, invested $230,000 of his personal funds on IUL and FIP products. SUMF 38 (Roper) at ¶¶ 31-34.

- Chris and Maureen Brinkerhoff allege that Jeremy Watson and Live Abundant recommended the Brinkerhoffs take out a loan on their home to obtain funds to purchase an IUL and FIP product, and even recommended a loan officer, Kelley Clark, who had an office in the same building. SUMF 29 (Astill) at ¶ 51.

- Nannette Tibbetts alleges that "[f]ollowing discussions of her financial and retirement plan desires," Aaron Andrew and Live Abundant recommended that she use $912,000 of the proceeds from her deceased husband's life insurance policies to purchase IUL and FIP products. SUMF 30 (Binkerd) at ¶¶ 1191-121.

- LeighAnna and Quintin Kimber allege that based on the advice of Live Abundant and Karl Nelson, they "gathered $100,000 from their IRAs and 401ks" to purchase an IUL and FIP product. They are not yet retirement age but are actively planning for retirement. SUMF 34 (Dembele) at ¶¶ 67-72.

- Chilton and Robin Hawk allege that they advised Blair Whiting and Live Abundant of their desire to supplement their current income, and based on Mr. Whiting and Live Abundant's advice, they gathered $485,000 from Chilton's inheritance in order to purchase an IUL and FIP product for retirement and to supplement their current income. SUMF 35 (Hawk) at ¶¶ 47-48.

- Robert and Diedra Murdock allege that Blair Whiting and Live Abundant described the IUL investment strategy as "having been established for 35 years," prompting the Murdocks to invest $230,000 in an IUL and FIP product. SUMF 35 (Hawk) at ¶¶ 53-54.

- Raymond and Mary Farnes allege that Live Abundant and Tracy Blaine Belliston described the IUL strategy as "very safe" and recommended that the Farnes withdraw funds from personal retirement savings and an IRA account to make a $250,325 investment in an IUL and FIP product. SUMF 39 at ¶ 67.

The same also is true with respect to the Woodbridge Claims:

- James Wheeler alleged that he was "rushed" by Aaron Andrew to purchase an investment in Woodbridge before an investment property closed and a promotional interest rate expired, and that there was a waiting list of people who wanted to invest, so that Wheeler had no time to research the investment. SUMF 28 (Duennebeil) at ¶¶ 46-53.

- Patrick and Susan Haslam alleged that they learned about Live Abundant through a radio broadcast and was later assured by Marcus Maxfield and Live Abundant that the Woodbridge investment was backed by an interest in real property. They made one investment for $25,000 and received the promised return of principle and interest from Woodbridge. They then made a second investment of $100,000. SUMF 28 (Duennebeil) at ¶¶ 63-67.

- John Sylvester alleged that Karl Nelson offered to forego a part of his commission in order to allow Mr. Sylvester to realize a higher return of 7 percent on his investment. Mr. Sylvester further alleged that Karl Nelson and Live Abundant "were emphatic" about cashing out home equity in order to invest in Woodbridge, but that he never received promised paperwork after his purchase. SUMF 28 (Duennebeil) at ¶¶ 71-74.

- Michal Karpinski alleged that he informed Marcus Maxfield and Live Abundant he was looking for a replacement for his money market investment as interest rates had declined, and he was advised that the risk of investing in Woodbridge was minimal. SUMF 28 (Duennebeil) at ¶¶ 77-78.

- Kent Booth alleged that Gregory Duckwitz informed him that numerous clients had invested in Woodbridge, as well as some of Mr. Duckwitz's own family members. SUMF 28 (Duennebeil) at ¶¶ 82-84.

- Ann Halliday alleged that Karl Nelson and Live Abundant represented that Woodbridge was very safe in order to induce her to make a $60,000 investment. SUMF 28 (Duennebeil) at ¶¶ 87-90.

- Gary Waggoner alleged that Jeremy Watson informed him that Mr. Watson and Live Abundant had "vetted" Woodbridge and assured Mr. Waggoner that he "would have a 'first position' status on the real property that he was assigned to so if something went wrong with the loan, he would be first position and then could sell the property at a profit," in order to induce Mr. Waggoner to make a $211,000 investment. SUMF 28 (Duennebeil) at ¶ 95.

- Jeff Sherwood alleged that Gregory Duckwitz told him "he could opt out" of the Woodbridge investment "on a yearly basis." SUMF 28 (Duennebeil) at ¶ 101.

- Michael Molacek alleged that he was informed the Woodbridge investment "was low risk" and so he made a $526,900 investment. SUMF 28 (Duennebeil) at ¶¶ 106-107.

52

- Francis Yeung alleged that Aaron Andrew "spoke very positively about the security of the investment" and that Live Abundant "had done extensive research and due diligence" on the Woodbridge investment. He further alleged that Mr. Andrew informed him "the properties were in prime areas," and that Mr. Andrew had invested his own money in Woodbridge as well. SUMF 28 (Duennebeil) at ¶ 111.

- Arlene Walker alleged that Live Abundant and Marcus Maxfield represented that Woodbridge "only loaned to a certain percentage of the loan to value." She further alleged Mr. Maxfield offered to increase the return on the investment from 5 to 6 percent, and since that time Woodbridge had paid 20 percent of her investment. SUMF 28 at ¶¶ (Duennebeil) 116-118.

- Bruce and Sandi Pregler allege that Live Abundant and Tracy Blaine Belliston recommended that the Preglers "withdraw funds from their Pregler Family Trust" in order to make a $125,000 investment. SUMF 39 (Zigerelli) at ¶¶ 54-55.

- Kevin Fisher alleges that Live Abundant and Tracy Blaine Belliston described the investment "as very low risk," that it "focused on military and corporate retirements as opposed to private plans," and that Mr. Fisher should "take out a second mortgage on his home" in order to make a $50,000 investment. SUMF 39 (Zigerelli) at ¶¶ 60-62.

Indeed, even when evaluated under standards less favorable to the insureds than a duty to defend analysis, numerous cases have found, "legally distinct claims that allege different wrongs to different people" are not "interrelated" claims.

### 3.    Case Law Supports Entry Of Judgment for Defendants On Counts V-VIII.

For instance, in *National Union Fire Ins. Co. v. Ambassador Group, Inc*., 691 F. Supp. 618, 622 (E.D.N.Y. 1988), the district court found that four actions were not interrelated even though they all involved allegations of wrongdoing related to the demise of Ambassador Group and its subsidiaries. The first action alleged that the directors and officers of Ambassador Group violated the federal securities laws and state common law by failing to disclose certain information. *Id.* at 623. The second action alleged that the directors and officers of a related subsidiary negligently mismanaged the company, breached fiduciary duties, and misrepresented the

subsidiary's condition in statements filed with the Vermont Department of Banking and Insurance. *Id.* The third action alleged that the directors and officers of the same subsidiary induced insurance agents to sell policies in reliance on false financial statements. *Id.* at 623–24. The fourth action alleged that a related subsidiary negligently mismanaged the company, breached fiduciary duties, and misrepresented the subsidiary's condition in statements filed with the New York Department of Insurance. *Id.* at 624. While the interrelated acts provision of that policy was interpreted narrowly to apply only to retention amounts, the insurer in the case asked the court to interpret that provision as broadly as CNA seeks to interpret the IWA here. *Id.* at 622–623. While the court ultimately rejected this interpretation, it nevertheless applied it *arguendo*, concluding that even applying the provision broadly, the underlying claims were not interrelated because they were "legally distinct claims that allege different wrongs to different people." *Id.* at 623.

The same reasoning applies here. The claims against the insureds in the Underlying Actions implicate a multiplicity of acts on the parts of each of the Defendants, involve distinct plaintiffs with individual retirement resources and goals, and allege unique misrepresentations and wrongs.[41]

Similarly, in *North River Ins. Co. v. Huff*, the District of Kansas held that a series of "loan swaps" made by a company's officers and directors were not interrelated, despite allegations that these loans were part of the same lending scheme. 628 F. Supp. 1129, 1132–34 (D. Kan. 1985). The court rejected the argument that the loan swaps were all part of one loan swap program and therefore constituted only one interrelated occurrence:[42]

---

[41] *See supra* at pp. 48-53.

[42] The policy in *North River Ins.* defined "occurrence" as "any claim or claims made involving one or more insured arising out of the same act, interrelated acts, errors, omissions or scheme." 628 F. Supp. at 1132.

> Although these transactions involve the same method of financing the loans, that being through a loan swap, each was a separate loan transaction. These transactions occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral. The loans funded by the loan swaps cannot be found to be interrelated.

*Id.* at 1133.

Again, similar reasoning applies here. Even though the plaintiffs in CNA's proposed groupings employed similar methods of financing, each was a separate transaction, occurred at separate times, involved different borrowers, were for different purposes, and involved different representations. *See also Okada v. MGIC Indem. Corp.,* 608 F. Supp. 383, 388 (D. Haw. 1985), *aff'd in part, rev'd in part on other grounds,* 795 F.2d 1450 (9th Cir. 1986), *superseded on other grounds,* 823 F.2d 276 (9th Cir. 1986) (applying a similar IWA[43] to find that claims related to the insolvency of a savings and loan company did not involve interrelated acts because the underlying claims alleged "distinct and dissimilar business decisions," meaning they involved multiple losses and not only one loss caused by many negligent acts).

The Ninth Circuit reached a similar result in *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.,* 873 F.2d 229, 234–35 (9th Cir. 1989). There, the insurer had argued that the alleged losses were all related to "an aggressive lending strategy" the insured had adopted and should therefore constitute a single loss.[44] *Id.* at 234. This included funding loans without approval, failing to complete proper loan documents, failing to perfect security interests or obtain adequate

---

[43] The policy in *Okada* provided that "[c]laims based on or arising out of the same act, Interrelated acts, or one or more series of similar acts, of one or more of the Directors or Officers shall be considered a single Loss . . ." 608 F. Supp.at 388.

[44] The policy in *Eureka Fed. Sav.* provided that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss . . ." 873 F.2d at 234.

collateral, funding loans in excess of approval limits to one borrower, and funding speculative loans without adequate sources of repayment or adequate risk analysis. The court held that "the fact that all loan losses arguably originated from one loan policy" did not mean they were interrelated, because "there were numerous intervening business decisions that took place after the loan policy was initiated that required the exercise of independent business judgment." *Id.* at 234–35. The court held that the "disparate acts and omissions made by five directors in connection with issuance of loans to over 200 unrelated borrowers" would be treated as separate, not single losses. *Id.* at 235; *see also McCuen v. Am. Cas. Co. of Reading, Pennsylvania*, 946 F.2d 1401, 1407–08 (8th Cir. 1991) (finding that claims related to seventeen loans issued to three borrowers constituted seventeen separate, not interrelated, losses).

Nor is it of any consequence that some of the cases against the Insureds have been consolidated. For instance, in *Home Ins. Co. of Illinois (New Hampshire) v. Spectrum Info. Techs., Inc.*, several shareholders had brought class action lawsuits against Spectrum in 1993. 930 F. Supp. 825, 830 (E.D.N.Y. 1996). Later, in early 1994, additional lawsuits were brought against Spectrum containing the same factual allegations as the 1993 lawsuits, as well as additional facts alleged to constitute other securities law violations. Even though these later lawsuits were consolidated with the 1993 lawsuits, the district court held that the subsequently alleged wrongful acts were "not the same as, interrelated to, a continuation of, or repetitious of" those contained in the 1993 lawsuits. *Id.* at 848.[45]

---

[45] The policy in the *Spectrum Info.* case provided that "All claims arising from the *same wrongful act or interrelated, repeated or continuous wrongful acts* of one or more assureds shall constitute a *single claim . . .*" 930 F. Supp. at 834.

Similarly, even though some of the lawsuits set out above have been consolidated for discovery purposes, each claim involves separate and distinct wrongs and separate and distinct investments based on each Insured's alleged communications and each plaintiff's individual circumstances and decisions. The various consolidations are not a reflection that these claims are interrelated, but rather a procedural tool for the convenience of the courts and the parties.

Moreover, courts applying similar policy language have repeatedly held that multiple claims by different parties claiming distinct injuries—even when related to the same underlying investment product—are not interrelated. The courts have recognized that in the context of lending and other investments, claims related to different transactions are not interrelated.

In *Southridge Capital Management, LLC v. Twin City Fire Ins. Co*., the policy provided that:

> The term interrelated and/or related WRONGFUL ACTS and/or the rendering of or failure to render PROFESSIONAL SERVICES, shall mean those WRONGFUL ACTS and/or the rendering of or failure to render PROFESSIONAL SERVICES which have as a common nexus any fact, circumstance, situation, event, transaction, or series of facts, circumstances, situations, events and/or transactions. Such interrelated and/or related WRONGFUL ACTS and/or the rendering of or failure to render PROFESSIONAL SERVICES whenever occurring shall be considered as one (1) WRONGFUL ACT and/or the rendering of or failure to render PROFESSIONAL SERVICES.

42 Conn. L. Rptr. 193, 2006 WL 2730312, *6 (Conn. Super. Ct. 2006), *decision clarified on other grounds*, 2006 WL 3491382 (Conn. Super. Ct. 2006) (unpublished). In that case, separate underlying suits alleged that an advisor firm had manipulated the price of a company downward, so that lenders it advised who had invested in the company would be entitled to a greater number of shares in the company. *See id.* The court applied Delaware law to find that these underlying suits did not involve interrelated claims, considering (1) whether the parties involved in the claims

57

were the same, (2) whether the claims all arose from the same transaction, (3) whether the wrongful acts were contemporaneous, and (4) whether there was a common scheme or plan, when the plaintiffs were all different, the defendants were different, and the acts allegedly occurred at different times. *Id.* at *9. The court further noted that even though the general natures of the claimed acts alleged in the lawsuits were similar, the financing and other features varied from capitalization to capitalization, and the suits did not involve a single specific plan implemented in different places, but rather a series of separate capitalization plans. *Id.* This is precisely the situation here. The Underlying Actions involve different parties, different transactions that occurred at different times, and customized recommendations based on each of the underlying plaintiffs' resources, goals, and other individual circumstances.[46]

Similarly, in *Allmerica Financial Corp. v. Certain Underwriters at Lloyd's, London*, the policy defined "Interrelated Wrongful Acts" identically to the Master Policy as "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." 871 N.E.2d 418 n.22 (2007). The *Allmerica* Court found that that two underlying lawsuits did not involve "Interrelated Wrongful Acts" where the first alleged that one agent of the Insured had made misrepresentations regarding a life insurance policy's "vanishing premium" feature, and the second alleged the Insured, directly and through its agents, made misleading sales presentations touting the "vanishing premium" feature of its life insurance policies. *Id.* at 430. The court reasoned that "[c]ommonality is a more demanding requirement than similarity," and the lawsuits at issue involved different policyholders, different sales agents, and

---

[46] *See supra* at pp. 48-53.

separate transactions that occurred at different times and locations. *Id.*  Similarly, the Underlying

Actions involve different policyholders, different insurance agents, and separate transactions that

occurred at different times and locations.[47]

> **4.      Judgment Should Be Entered In Favor Of Defendants On Counts V
> Through VIII Of The Complaint.**

As set forth above, to the extent Counts V through VIII of CNA's Complaint relate to the

duty to indemnify under the Master Policy, Defendants respectfully submit those Counts should

be dismissed as premature.  To the extent those Counts relate to CNA's possible abandonment of

the defense of any of the Underlying Actions, Defendants are entitled to judgment as a matter of

law if there is even a mere possibility the Underlying Actions should be resolved without

implicating the IWA provision. Defendants respectfully submit that is the case here, and judgment

therefore should be entered in favor of Defendants.

## VI.     Conclusion

For the foregoing reasons, Defendants respectfully submit that the Court should:

(a) grant their Motion for Summary Judgment;

(b) declare that under the Master Policy:

> (1)      CNA has a duty to defend the Defendants in the Underlying Actions;
>
> (2)      CNA has a duty to indemnify the Defendants as to the amounts established by
> judgment or settlement in the Underlying Actions that have resolved via judgment
> or settlement;

---

[47] *See supra* at pp. 48-53.

      (3)      CNA's request for a declaration as to the duty to indemnify must be dismissed as not ripe as to Underlying Actions that have not resolved;

      (4)      the so-called FIP Claims, including any such claims in the Hybrid Lawsuit, are not subject to a single $1 million limit; and

      (5)      the so-called Woodbridge Claims, including any such claims in the Hybrid Lawsuit, are not subject to a single $1 million limit;

(c)      enter judgment in favor of Defendants on every Count in the Complaint; and

(d)      provide Defendants with such other and further relief as the Court deems just and proper.

*/s/ Brennan H. Moss*_____
Brennan H. Moss

60

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2023, I caused a true and correct copy

of the foregoing Motion to Extend Deadline to be filed using the Court's electronic filing system,

to be sent electronically to the following:

Pamela L. Signorello
Richard A. Simpson
Joseph W. Gross
WILEY REIN LLP
2050 M ST NW
Washington, DC 20036
psignorello@wiley.law
rsimpson@wiley.law
jgross@wiley.law

Rebecca L. Hill
CHRISTENSEN & JENSEN PC
257 East 200 South, Ste. 1100
Salt Lake City, Utah 84111
rebecca.hill@chrisjen.com

*/s/ Shelby Irvin*
Shelby Irvin